UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AILEEN CULPEPPER, individually and on behalf of all other similarly situated individuals | : | |
| | : | |
| | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| v. | : | Civil Action No.: |
| | : | 3:17-cv-00264-VAB |
| | : | |
| BANK OF AMERICA, NATIONAL ASSOCIATION | : | Complaint Filed: February 16, 2017 |
| | : | |
| | : | |
| DEFENDANT. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION**

**TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. PRELIMINARY STATEMENT ......................................................................... 1

III. PROCEDURAL OVERVIEW ............................................................................ 2

IV. STATEMENT OF FACTS .................................................................................. 5

    1. The Bank's Timekeeping Policies .......................................................... 5

    2. Inbound Specialist Positions At The Call Center ................................... 6

    3. Organizational and Reporting Structure At The Call Center.................. 8

    4. Phone and Computer Log-In Procedures For Inbound Specialists........ 9

    5. Schedule Adherence And Productivity Requirements For Inbound
       Specialists .............................................................................................. 12

    6. Plaintiffs' Employment And Their Very Different Contentions About
       Working Off The Clock ......................................................................... 13

V. ARGUMENT .................................................................................................... 16

    A. Applicable Legal Standard For Collective Action Certification........... 16

    B. The Court Should Apply The Heightened Scrutiny  Standard Because
       Discovery Has Closed And Plaintiffs Issued Notice Months Ago ...... 18

    C. Conditional Certification Is Unnecessary And Potentially Misleading
       Because Plaintiffs Already Have Provided Written Notice Of This Lawsuit
       To Potential Plaintiffs But Only One Individual Has Filed A Valid
       Consent To Join ..................................................................................... 20

    D. The Court Should Deny Plaintiffs' Motion Because All The Evidence
       Confirms There Was No Common Policy Or Practice To Require Inbound
       Specialists To Open Computer Programs Off The Clock Before Their
       Shifts Started ......................................................................................... 22

    E. The Court Should Deny Plaintiffs' Motion Because There Are Significant
       Variations Between The Named And The Sole Valid Opt-In Plaintiff .............. 32

    F. The Court Should Deny Plaintiffs' Motion Because Individual Issues
       Preclude Resolution On the Merits As To The Collective ................... 34

VI. CONCLUSION ................................................................................................. 37

CERTIFICATION ........................................................................................................ 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) ................................................................................................35

*Anderson v. Pilgrim's Pride Corp.*,
  147 F.Supp.2d 556 (E.D.Tex.2001) ........................................................................36

*Brown v. Barnes & Noble, Inc.*,
  2018 U.S. Dist. LEXIS 106098 (S.D.N.Y. June 25, 2018) ............................... *passim*

*Carter v. Panama Canal Co.*,
  314 F.Supp. 386 (D.D.C.1970) ................................................................................36

*Cunningham v. Elec. Data Systems Corp*,
  754 F. Supp. 2d 638 (S.D.N.Y. 2010) ......................................................................19

*Dybach v. State of Fla. Dept. of Corrections*,
  942 F.2d 1562 (11th Cir. 1991) ...............................................................................22

*Glatt v. Fox Searchlight Pictures, Inc.*,
  293 F.R.D. 516 (S.D.N.Y. 2013) .............................................................................19

*Hinojos v. Home Depot, Inc.*,
  2006 U.S. Dist. LEXIS 95434 (D. Nev. Dec. 1, 2006) ............................................18

*Hoffman-LaRoche, Inc. v. Sperling*,
  493 U.S. 165 (1989) .....................................................................................16, 20, 21

*Holzapfel v. Town of Newburgh*,
  145 F.3d 516 (2d Cir. 1998), *cert. denied*, 525 U.S. 1055 (1998) ..........................34

*Korenblum v. Citigroup, Inc.*,
  195 F.Supp.3d 475 (S.D.N.Y. 2016) ...................................................................18, 19

*Kuebel v. Black & Decker, Inc.*,
  361 F.3d 352 (2d Cir. 2011) .....................................................................................34

*Lindow v. United States*,
  738 F.2d 1057 (9th Cir.1984) ...................................................................................36

*McDermott v. Fed. Savings Bank*,
  2018 U.S. Dist. LEXIS 65448 (E.D.N.Y. Apr. 18, 2018) ........................................19

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)..................................................................................17, 18, 32

*Parker v. Rowland Express, Inc.*,
    492 F. Supp. 2d 1159 (D. Minn. 2007)..................................................................................21

*Reich v. New York City Transit Auth.*,
    45 F.3d 646 (2d Cir. 1995)..................................................................................35, 36

*Ruiz v. Citibank, N.A.*,
    93 F. Supp. 3d 279 (S.D.N.Y. 2015)..................................................................................23

*Seward v. IBM*,
    2012 U.S. Dist. LEXIS 49688 (S.D.N.Y. Jan. 20, 2012) ......................................23, 29, 30, 31

*Singh v. City of New York*,
    418 F.Supp.2d 390 (S.D.N.Y. 2005)..................................................................................34

*Steger v. Life Time Fitness, Inc.*,
    2016 U.S. Dist. LEXIS 7267 (N.D. Ill. Jan. 21, 2016) ......................................................23, 24

*Torres v. Gristede's Operating Corp.*,
    2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 29, 2006)......................................................18

*Tracy v. NVR, Inc.*,
    293 F.R.D. 395 (W.D.N.Y. 2013)..................................................................................34

*Warman v. Am. Nat'l Standards Inst.*,
    193 F.Supp.3d 318 (S.D.N.Y. 2016)..................................................................................17

*Zivali v. AT&T Mobility*,
    LLC, 784 F.Supp.2d 456 (S.D.N.Y. 2011) ..........................................................22, 32, 34, 36

**Statutes**

29 U.S.C. § 216(b)..................................................................................16

29 U.S.C. § 256(b)..................................................................................22

Conn. Gen. Stat. § 31-58..................................................................................2

Fair Labor Standards Act, 29 U.S.C. § 201...................................................................2

**Other Authorities**

Federal Rules of Civil Procedure Rule 23 ...................................................................2

## I.    INTRODUCTION

Defendant Bank of America, N.A. ("Bank of America" or "the Bank") hereby submits the following Memorandum of Law In Opposition to Plaintiff's Motion for Conditional Certification.

## II.    PRELIMINARY STATEMENT

Plaintiff Aileen Culpepper and Opt-In Plaintiff Sarena Salmeri ("Plaintiffs") formerly worked for Bank of America as Inbound Specialist Is at the Bank's Farmington, Connecticut Call Center ("the Call Center").[1]   Their primary job duty involved handling incoming calls from the Bank's customers.   They now allege that Bank of America violated the Fair Labor Standards Act ("FLSA") by requiring them to start their shifts early to open computer programs, resulting in them working "an extra 20 to 30 minutes per day" for which they were not paid, because they did not record the time in their timekeeping system.

Plaintiffs are seeking to conditionally certify a class of, and issue court-authorized notice to all Inbound Specialists who were employed by the Bank at the Call Center since July 3, 2014, regardless of whether those individuals actually performed any work off the clock.   But, Plaintiffs have failed to present evidence that even suggests that the Bank had a common policy, practice, or scheme to require or permit them to perform work off the clock.   At best, they have presented anecdotal evidence that a few individuals started opening computer programs before they started their shifts and did not record the time – thereby *violating* the Bank's express policies and procedures, which have at all times required Plaintiffs to record to the minute their time worked, including time spent opening computer programs, so that it would be paid.

Plaintiffs bring this motion after the expiration of the discovery deadline and after they have already disseminated notice of this action to the putative collective.   Notwithstanding, there

---

[1] Bank of America refers to these centers as "contact centers."

is only *one* Opt-In Plaintiff who worked for the Bank within the three-year period preceding the filing of a Notice of Consent to Join.  Moreover, while Plaintiffs have submitted declarations from four other individuals in support of their Motion, none of them have opted into this action, and none of them claim they were subjected to a common policy or practice that required them to open computer programs off the clock.

Because Plaintiffs completed discovery and sent out notice to the putative collective prior to filing this Motion, a heightened scrutiny standard applies, which requires that the Court evaluate the actual evidence submitted by both sides.  That evidence shows unequivocally that Plaintiffs are not similarly situated to each other, are not similarly situated to the putative collective they seek to represent, and were not subjected to any common policy or practice or scheme to require or permit them to perform work off the clock.  Accordingly, as discussed in detail below, Plaintiffs' Motion should be denied in its entirety.

## III.   PROCEDURAL OVERVIEW

Plaintiff Culpepper commenced this action on February 16, 2017, asserting a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. and a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for violations of the Connecticut Minimum Wage Act, Conn. Gen. Stat. Section 31-58 *et seq*., on behalf of all Connecticut Inbound Specialists.  ECF No. 1.  Shortly after commencing this action, Culpepper's attorneys posted notice of the lawsuit on their firm website, with information on many issues such as how to join, how to obtain answers to questions, how much money they could expect to obtain, and the status of the case.  Declaration of Bethany Pelliconi ("Pelliconi Decl."), ¶ 12, Exh. I.  The Court's initial Scheduling Order, dated April 28, 2018, provided for an October 6, 2017 discovery cut-off.  ECF No. 30.  On May 3, 2017, Culpepper served her initial set of written discovery.  On June 27, 2017, Plaintiff filed a Notice of Consent to Join by Sarena Salmeri.  ECF No. 35.

On July 6, 2017, Plaintiffs took the depositions of former Home Equity Division Fulfillment Leader, Donna Gladney and former Team Leader Garfield Brown, who was Plaintiff Culpepper's supervisor. Pelliconi Decl., ¶¶ 2-3. On July 7, 2017, the Bank took the deposition of Plaintiff Aileen Culpepper. *Id.*, ¶ 4.

On October 2, 2017, the Court granted a Joint Motion for Modification of the Scheduling Order and set a discovery cut-off of December 7, 2017. ECF No. 37. On October 27, 2017, the Bank took the deposition of Sarena Salmeri. Pelliconi Decl., ¶ 5.

On October 31, 2017, Plaintiffs moved to modify the Scheduling Order, on grounds that one of their attorneys (who has been on the case since its inception) was taking over as lead counsel on the case and would need time to come up to speed and complete discovery. ECF No. 43. Plaintiffs also argued in their motion that they needed additional time to negotiate with the Bank over production of class log in records and to file a motion to compel same if necessary. *Id.* at 2.

On November 1, 2017, the Court issued another Amended Scheduling Order, setting a March 9, 2018, discovery cut-off. ECF No. 45.

On January 18, 2018, Plaintiffs filed a request for a discovery conference to address the Bank's refusal to produce class computer login data they had requested approximately one year earlier. ECF No. 48. The Court held the discovery conference on February 27, 2018. ECF No. 56.

On February 27, 2018, Plaintiffs took the depositions of Inbound Specialists Sarena Greene and Jason Krukas. Pelliconi Decl., ¶¶ 6-7. On February 28, 2018, Plaintiffs took the depositions of Inbound Specialist Team Leaders Eyrella Campos (who was one of Culpepper's supervisors) and Jaime Mosier (who supervised Salmeri). *Id.*, ¶¶ 8-9.

On March 23, 2018, Plaintiffs filed a Motion to Modify the Scheduling Order, and proposed that the discovery cut-off be extended to May 15, 2018.  ECF No. 60.  On March 25, 2018, the Court again issued an Amended Scheduling Order, setting the discovery cut-off for May 15, 2018.  ECF No. 62.

On March 31, 2018, the Bank produced to Plaintiffs a class list containing each Inbound Specialist's name, address, phone number and email address.  Pelliconi Decl., ¶ 10.  Plaintiffs' counsel sent out letters to the putative class on April 18, 2018, wherein they notified them of the lawsuit, provided a copy of the lawsuit, explained the factual and legal basis of the lawsuit, and invited the putative class members to contact them about participating in the lawsuit.   Gladney Decl., Exh. B; ECF No. 67 at p. 2.

On May 31, 2018, the Court held another discovery teleconference at Plaintiffs' request to discuss Plaintiffs' anticipated motion to compel the Bank to produce class computer login data.  ECF Nos. 67-69.

On June 1, 2018, the Court issued an Order stating that if Plaintiffs wished to pursue a motion to compel the class computer login data, they had to file it by June 15, 2018 along with a motion to amend the scheduling order.  ECF No. 73.  The Court's June 1, 2018 Order also states that the Court would address the motion to amend the scheduling order before the motion to compel, and may deny the motion to compel as "moot" if the Plaintiffs did not establish good cause to amend the scheduling order.  *Id.*

On June 1, 2018 – several weeks after the discovery cut-off – Plaintiffs filed a Consent to Join Action on behalf of Michael Weed, which Weed had signed more than a month earlier on April 28, 2018 (and before the May 15, 2018 discovery cut-off).  ECF No. 72.

On June 15, 2018, Plaintiffs filed a motion to compel the class login data, without filing any accompanying motion to amend the scheduling order as required by the Court's June 1, 2018 Order.  ECF No. 76.  On July 6, 2018, the Bank filed its opposition to, and a motion to strike Plaintiff's motion to compel because Plaintiffs filing violated the Court's Order.  ECF Nos.  77-78.

## IV.   STATEMENT OF FACTS

Bank of America is a national banking association headquartered in Charlotte, North Carolina.  It is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses, and large corporations with a full range of banking, investment, asset management and other financial products and services.

### 1.   **The Bank's Timekeeping Policies**

The Bank's hourly employees, including those working in call/contact centers, are responsible for recording their own work time in the Bank's electronic timekeeping system. Declaration of Donna Gladney ("Gladney Decl."), ¶ 3.  For each workday, employees are expected to record their own starting time, ending time, and the start and end time of unpaid meal breaks. *Id.*  Bank of America's policies require employees to record each of these times accurately, to-the-minute. *Id.* The Bank then relies upon this information to pay employees for all of their time worked.  *Id.* The Bank requires its hourly employees and managers to undertake timekeeping compliance training on an annual basis.  *Id.* The training materials specify, *inter alia*, that time spent preparing for work, including time booting up computers and opening computer programs, is compensable time worked which must be recorded in the timekeeping system:

"Employees should **enter all time to the minute** including **start** and **end**

times, meal periods, and any time off.

**Start Time**:  When an overtime-eligible employee is at his or her desk or work station and ready to begin work, including preparatory tasks (initial log-in procedures, team meetings, required reading materials, follow-up calls and equipment preparation." (emphasis in original).  *Id.*, Exh. A, at 17.

### 2.     Inbound Specialist Positions At The Call Center

The Bank employs three different levels of Inbound Specialists at the Call Center, namely Inbound Specialist I, Inbound Specialist II, and Inbound Specialist III.  *Id.*, ¶ 4. Each of these positions has different functions, priorities, skill levels, and responsibilities.  *Id.*

### A.     Inbound Specialist I

Inbound Specialist I is an entry-level position that exists primarily to handle incoming calls from Bank customers pertaining to home equity loans.  *Id.*, ¶ 5. Once hired, an Inbound Specialist I undergoes a classroom training period that lasts approximately six weeks.  *Id.* This classroom training covers the Bank's home equity loan products, credit, collateral, debt to income ratio, lien and non-lien payoffs, closing procedures, phone etiquette, and online and business partner resources available to Inbound Specialists for assisting customers with their home equity loans. *Id.* Deposition of Sarena Greene ("Greene Depo.") [Pelliconi Decl., Exh. E], 29:4-32:11; 38:8-39:8.   This training does not cover the Bank's timekeeping policies or practices.   Gladney Decl., ¶ 5; Greene Depo. [Pelliconi Decl., Exh. E], 5:14-8:8 (trainer explaining that, in training the Inbound Specialists, she does not use the timekeeping training materials).  Rather, the Inbound Specialist Is learn and certify their understanding of the Bank's timekeeping policies and practices through a web-based program at the time of hire and each year thereafter.  Gladney Decl., ¶ 5.  After the classroom training, the Inbound Specialist Is complete a "nesting" period for approximately two weeks which pairs them in the same cubicle

with a senior team member so the new Inbound Specialist Is can observe, listen to and ask questions of the senior team member while the senior team member handles customer calls. Gladney Decl., ¶ 6; Greene Depo. [Pelliconi Decl., Exh. E], 47:13-49:3. After the nesting period, the Inbound Specialist Is are expected to begin handling incoming calls from customers on their own, but the Bank expects them to continue to seek guidance from more senior Inbound Specialists on a "pod line" when they are unsure how to respond to customers' inquiries. Gladney Decl., ¶ 6.

### B.   Inbound Specialist II

The primary function of the Inbound Specialist II is to handle questions from those holding the Inbound Specialist I position. *Id.* ¶ 7. This typically occurs when an Inbound Specialist I is on a call with a customer and is not sure how to answer a question or how to direct the customer for assistance. *Id.* In that event, the Inbound Specialist I places the customer on hold and contacts an Inbound Specialist II on a separate "pod line" for guidance. *Id.* The Inbound Specialist I may then return to the customer call on hold to convey information learned from the Inbound Specialist II, or may transfer the customer call to the Inbound Specialist II. *Id.*

The Inbound Specialist II does not receive inbound calls directly from customers except on occasions when call volume is extremely high. *Id.* During those times, a Team Leader must "skill" or program the Inbound Specialist II's phone to allow for incoming customer calls for a period of time on an as-needed basis, so long as a sufficient number of Inbound Specialist IIs are still available for pod line calls. *Id.* Because of the nature of their job duties and the Bank's call routing system, Inbound Specialist IIs rarely receive direct inbound customer calls at the beginning of their shifts. *Id.*

### C.      Inbound Specialist III

The Inbound Specialist III handles "escalation" calls that are transferred to them from Inbound Specialist Is and Inbound Specialist IIs.  *Id.*, ¶ 8.  By way of example, if an Inbound Specialist I or II is speaking with a customer who requests to speak with a supervisor or who complains about the manner in which the Inbound Specialist I or II is handling an issue, the Inbound Specialist I or II is required to ask the customer to hold while they transfer the call to a line dedicated to the Inbound Specialist IIIs for handling.  *Id.* When this occurs, the Bank's automated system directs the call to the Inbound Specialist III who has been available (*i.e.*, not on the phone) for the longest period of time. *Id.*

The Inbound Specialist III does not handle incoming calls from customers directly, except during times when call volume is extremely high.  *Id.* During those times, a Team Leader must "skill" or program the phone of an Inbound Specialist III to allow for incoming customer calls for a period of time on an as-needed basis, so long as a sufficient number of Inbound Specialist IIIs are still available for escalation calls.  *Id.*

Because of the nature of their job duties and the Bank's call routing system, those holding the position of Inbound Specialist III rarely receive direct inbound customer calls, and do not typically receive escalated calls at the beginning of their shifts.  *Id.*; Greene Depo. [Pelliconi Decl., Exh. E], 129:5-24 (confirming that, as an Inbound Specialist III, she has never received a customer call within the first 30 minutes of her shift).

### 3.      Organizational and Reporting Structure At The Call Center

Inbound Specialists are grouped into teams which are typically comprise approximately 9-13 individuals who are supervised by a Team Leader.  Gladney Decl., ¶ 9. Each team has at least one Inbound Specialist II and one Inbound Specialist III, and approximately 5-8 Inbound

Specialist Is.  *Id*. The Team Leaders of each team report to the Home Equity Division Fulfilment Leader.  *Id.*

During the relevant time period, there have been 10-16 different teams and Team Leaders at the Call Center.  *Id.* The Team Leaders supervise and manage the day-to-day functions of the Inbound Specialists on their teams, including enforcing the Bank's policies and procedures, reviewing and approving time cards, and managing the performance and scheduling needs of the team members.  *Id.* The Inbound Specialists work in cubicles, and their teams are typically seated in clusters with the Team Leaders in the same row or section, but certain team members may be assigned to desks that are not adjacent to the rest of the team.  *Id.*, ¶ 10.

The Team Leaders are able to determine from their desktop computers whether the members of their teams are logged into their phones, but they do not have access to any program that indicates whether the team members have logged into their computers or whether they have any particular programs open.  *Id.*

### 4.   Phone and Computer Log-In Procedures For Inbound Specialists

Inbound Specialists work 8-hour shifts, which are staggered to begin every 30 minutes between 8:00 a.m. and 11:30 a.m.  *Id.*, ¶ 11.  Inbound Specialists who work the first two morning shifts, starting at 8:00 a.m. and 8:30 a.m., are more likely to receive customer calls at the beginning of their shifts as compared to those who start later when the Call Center is more fully staffed. *Id.*

Inbound Specialists are permitted to sit at their desks prior to their scheduled start times, but they are not permitted to begin working until their scheduled start times unless approved in advance by their Team Leader.  *Id.*, ¶ 12.  The Inbound Specialists are required to log into their phones at the scheduled start time of their shifts by pushing a button and entering an ID number – a process which takes only a few seconds. *Id.*  Upon logging into their phones, the phones are

in "aux" mode, meaning that incoming calls are blocked. *Id.* When the Inbound Specialists are ready to start receiving calls, they must push the "auto in" button so the system will start to route incoming calls to them. *Id.* The Inbound Specialists are permitted to leave their phones in "aux" mode to block incoming customer calls for up to 5 minutes after logging into their phones while they open computer programs or engage in other preparatory tasks, but those who have the first two shifts (starting at 8:00 a.m. and 8:30 a.m.) may be required to "auto" in and take calls during that initial 5 minute period of time if call volume is high. *Id.* For that reason, the Bank staffs the 8:00 a.m. and the 8:30 a.m. shifts with experienced Inbound Specialists. *Id.*

After Inbound Specialists log into their phones, they then may open, but are not required to open, the computer programs that they may need in order to respond to customer inquiries, or for other purposes such as to review their schedules or their emails.[2] *Id.*, ¶¶ 12-13. The Inbound Specialists may open as many or as few computer programs as they wish after their shifts begin, and may do so in any order they wish. *Id.*, ¶ 13. If Inbound Specialists receive a customer call before they have opened any particular computer program that they need in order to assist the customer, they are permitted to ask the customer to hold while they open the program or, at their option, may engage in small talk with the customer while they open the program. *Id.* There is one computer program, called "ACAPS" that Inbound Specialists use for every customer call and for that reason they typically open ACAPS right after logging into their phones. *Id.*, ¶ 14. The ACAPS system, which houses the customer home equity application data, takes less than two minutes to open. *Id.*

There are several other computer programs that Inbound Specialists use less frequently than ACAPS in responding to certain types of customer calls, depending on the nature of the call.

---

[2] As noted below, Inbound Specialists may open some computer programs as they need them during their shifts.

*Id.*, ¶ 15.  Inbound Specialists are not required to open any particular program until and unless they need it.  *Id.*  Because the programs "time out" after 30 minutes of non-use, opening them at the beginning of the shift would not obviate the need to open them again when and if they are needed.  *Id.* One such program is the "Interact" program, which enables the processing of a customer request to have payments deducted automatically from their checking account.  It takes approximately 30 seconds to one minute to open the Interact program.  *Id.*

Another program that Inbound Specialists may use in responding to customer calls is "Control Center," which is used only for closings (accounting for about 10% of the Inbound Specialists' incoming calls).  *Id.*, ¶ 16. It takes approximately one minute to open the Control Center program.  *Id.* Once that program opens, it displays links for tools Inbound Specialists may use for particular customer inquiries, such as the "Setting Expectations" tool, which allows Inbound Specialists to predict how much longer the loan process will take, the "Notary List" tool, which allows them to assist customers who ask for a notary, and the Policy and Procedure Guide which they can review to find protocols for home equity loan processes. *Id.*  It takes a few seconds for these tool programs to open from the links provided in Control System. *Id.*

The Online Status Tool Host program is another system that Inbound Specialists may use, on occasions when customers are having problems with their online account data.  *Id*., ¶ 17.  The Online Status Tool Host program allows Inbound Specialists to view customers' online account screens in the same format as the customer sees. *Id*. This program opens in approximately one minute.  *Id.*

Inbound Specialists may also use the "XT" system in order to view documents that the customers have provided to the Bank, in case the customers ask about the contents of the

documents or the dates on which the Bank received them.  *Id.*, ¶ 18. The XT System loads in 30 seconds to one minute.  *Id.*

Inbound Specialists use a program called "Commit" to input notes about customer complaints should that occur.  *Id.* This program loads in approximately 30 seconds.  *Id.*

In addition to the foregoing, Inbound Specialists use other computer programs but not for customer calls.  *Id.*  For example, the IEX system tells them when their breaks are scheduled, and the Outlook system allows them to access their emails. *Id.*

### 5. Schedule Adherence And Productivity Requirements For Inbound Specialists

The Bank uses Inbound Specialists' phone login data for purposes of determining their schedule adherence, productivity and performance metrics, but does not use or consider their *computer* login data for those purposes.  *Id.*, ¶ 19.  Inbound Specialists are considered to be on time for schedule adherence purposes if they are logged into their phones when their shifts begin. *Id.*  Inbound Specialists are permitted to block incoming calls by placing their phones in "aux" mode five minutes before the end of their shifts, if they are not on a call at that time, and doing so does not count against them for schedule adherence purposes.  *Id.*

Inbound Specialists have scheduled meal periods of 30 minutes, and two paid rest periods of 15 minutes during their 8-hour shifts.  *Id.*, ¶ 20.  Other than when they are on meal and rest breaks, or scheduled meeting or training time, the Bank expects Inbound Specialists to be on calls or available to receive calls (*i.e.*, logged into their phones and not in a call blocking mode) for 70% of their time. *Id.*  Put another way, the Bank permits Inbound Specialists to block their incoming calls for up to 30% of their working time per month, which equates to approximately 2.4 hours per day.  *Id.* The Bank refers to this time as "wrap and idle" time because Inbound Specialists may block incoming calls when they are inputting call "wrap" notes into the

computer and when they are "idle" and simply want to block incoming calls for any other reason, including personal reasons.   *Id.*

### 6. Plaintiffs' Employment And Their Very Different Contentions About Working Off The Clock

#### A. Plaintiff Aileen Culpepper

Plaintiff Culpepper worked for the Bank as an Inbound Specialist I from March 23, 2015 to May 28, 2016, when the Bank terminated her employment for "call avoidance."   *Id.*, ¶21. Culpepper's conduct in avoiding calls included transferring customer calls out to other Bank representatives or to automated systems without disconnecting on her end, which prevented additional incoming calls from being routed to her line.   *Id.* As Culpepper admits, after transferring these calls, she remained connected to the calls while she shopped or looked at products on the internet using the Bank's computer.   *Id*; Deposition of Aileen Culpepper ("Culpepper Depo.") [Pelliconi Decl., Exh. C], 84:2-13; 183:13-24.   Culpepper decided to commence this action against the Bank right after her claim for unemployment was denied, because that made her "upset."   *Id.*, 258:17-22.

Culpepper admits that she knew at all times during her employment that the Bank's policies required her to record all of her time worked so she would receive pay for it, including time spent logging onto computer programs; she concedes that working off the clock violated the Bank's policies.   *Id.*, 77:13-16; 124:21-125:7.   Notwithstanding, Culpepper contends that she worked off the clock for 20-30 minutes per day before her shift started by opening all of her available computer programs.   She does not contend that she did this because of a uniform policy or procedure at the Bank or that she was ever specifically told to do this.   Instead, Culpepper asserts that one of her supervisors, Garfield Brown, *implied* that it was necessary when he told

her to have unidentified "systems" "at the ready to be able to field the first call when you sign into your phone." *Id.*, 26:6-27:18; 53:11-24.

But, Culpepper admits that no one at the Bank ever told her not to record the time she spent doing this pre-shift work:

> "***Nobody ever said don't – nobody ever said do not record the time you're using to open those systems. Don't record it. Nobody ever said that***. They said, be here early and have everything up and ready to go by your start time. So, it was implied you needed to be there early, because if you weren't early, you were late.

*Id.*, 146:7-12 (emphasis added). *See also id.* at 143:10-144:4.

Culpepper also acknowledges that another supervisor, Eyrella Campos never said anything to give her that impression. *Id.*, 151:14-152:7. Further, Culpepper testified that she does not recall ever working off the clock when she had an 8:30 a.m. start time. *Id.*, 165:11-14. When Culpepper was late for work she always logged into her phone at the start of her shift, and then used the "aux" function to block incoming calls while she opened her computer programs. *Id.*, 169:16-170:8.

Culpepper testified that there was "no rule" at the Call Center when she worked there regarding how early Inbound Specialists could sit at their desks prior to their shifts and that people ate breakfast at their desks prior to their shifts. *Id.*, 48:11-18. She also testified that she was permitted to place customers on hold "as often as necessary" as long as she returned to the line every two to three minutes to check in with the customer. *Id.*, 44:8-47:3. Culpepper does not recall anyone at the Bank telling her that she should not place customers on hold while she opened her computer programs during her shift. *Id.*, 172:3-6.

### B.    Opt-In Plaintiff Sarena Salmeri

The Bank hired Plaintiff Salmeri on May 23, 2016 as an Inbound Specialist I.  Gladney Decl., ¶ 22.  Salmeri had difficulty performing her basic job functions because she has a "central auditory processing disorder" which makes it difficult for her to process information that is conveyed to her verbally.  Deposition of Sarena Salmeri ("Salmeri Depo.") [Pelliconi Decl., Exh. D], 46:12-50:17.  As a result of her impairment, and after repeated attempts by the Bank to provide extra training, support and other accommodations to enable Salmeri to perform her basic job functions, on June 12, 2017, Salmeri commenced a leave of absence from which she never returned.  *Id;* Gladney Decl., ¶22.

In contrast to Culpepper's testimony, Salmeri testified that her supervisors told her she was not allowed to block incoming calls while logging into her computer systems, Salmeri Depo. [Pelliconi Decl., Exh. D], 85:5-21, and that she could not place customer calls on hold.  *Id.*, 123:22-124:5.  In contrast to Culpepper's testimony, Salmeri also testified that she was told not to record the time it took her to log in – but, not by any of her trainers or supervisors, but, rather by "various associates that [she] was sitting with" during the "nesting" phase of her employment. *Id.*, 140:10-141:13.

Salmeri also testified that she received different instructions from different Bank representatives about whether she was allowed to sit down at her desk prior to her scheduled start time:

> "I'm not sure how to answer this because there was some people saying yes to sit down at your desk before your scheduled start time and then others were saying no; so, it was a mix of, yes, sit down and, no, don't."  *Id.*, 158:20-159:5.

While Salmeri claims in her declaration that she usually sat down at her desk at least 10 to 15 minutes before the 9:30 start of her shift in order to boot up her systems, ECF No. 75-10 at

¶¶ 7, 12, her computer login records show that she typically logged into her computer only a few minutes prior to her 9:30 a.m. start time.  Gladney Decl., Exhs. C, D.

## C.    Opt-In Plaintiff Michael Weed

The Bank hired Michael Weed in December, 2012 as an Inbound Specialist I.  Gladney Decl., ¶ 23.  On March 8, 2014, the Bank promoted Weed to the position of Inbound Specialist II.  *Id.* On December 6, 2014, the Bank promoted Weed to the position of Home Services Specialist.  *Id.* On May 16, 2017, the Bank terminated Weed's employment based on his violations of Bank policy.  *Id.* Weed filed a Consent to Join this Action on June 1, 2018.[3]  ECF No. 72.  Because the Bank did not employ Weed as an Inbound Specialist during the three year period preceding the filing of his Consent to Join, Weed is not a member of the collective in this matter.

## V.    ARGUMENT

### A.    APPLICABLE LEGAL STANDARD FOR COLLECTIVE ACTION CERTIFICATION

The FLSA permits an individual to bring a collective action, under certain circumstances, for unpaid overtime on behalf of himself or herself "and other employees similarly situated."  29 U.S.C. § 216(b).   Collective actions are based on a theory of judicial economy, on the presumption that they "benefit the judicial system by enabling the efficient resolution in one proceeding of ***common issues of law and fact.***" *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (emph. added). Although the FLSA does not prescribe the process for collective action approval, "district courts have discretion, in appropriate cases, to implement 29 U.S. C. § 216(b) . . . by facilitating notice to potential plaintiffs."

---

[3] Although Weed signed the Notice of Consent to Join on April 26, 2018, almost 3 weeks prior to the discovery cut-off, Plaintiffs did not file the Notice of Consent until after the discovery cut-off.  ECF No. 72.  This tactic prevented the Bank from taking Weed's deposition.

The dissemination of notice in an FLSA collective action is a "case management tool" that courts employ in order to facilitate swift and economic justice in "appropriate cases." *Id; Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010).   The requirement that employees file written consents to join a lawsuit was intended to combat "excessive litigation spawned by plaintiffs lacking a personal interest in the outcome." *Brown v. Barnes & Noble, Inc.*, 2018 U.S. Dist. LEXIS 106098, * 14 (S.D.N.Y. June 25, 2018) (quoting *Hoffman, supra*, at 173).

Courts in the Second Circuit apply a two-step process in determining whether to certify a collective action. *Brown,* at * 14; *Myers,* at 554-55.   Prior to discovery, the Court evaluates whether there are other potential plaintiffs "similarly situated" to the named plaintiff(s) with respect to the alleged FLSA violation such that court-authorized notice is appropriate to alert others so they may opt-in, and so the court can efficiently manage discovery in one proceeding. *Myers,* at 554-55; *Brown, supra*, at * 15.

Under the first step of this approach, also known as the "notice stage," the court determines whether to grant "conditional certification" of a collective action and authorize court-approved notice to potential collective members. *Myers*, at 555.   If the action is conditionally certified, the second step of the process typically involves a motion for decertification filed by the defendant after discovery is largely complete. *Id.*   While the burden during the notice stage is described as "lenient," it requires, at a minimum, that plaintiffs make a factual showing that they and the other putative collective action members were victims of a common policy or plan that violated the law. *See Warman v. Am. Nat'l Standards Inst.,* 193 F.Supp.3d 318, 323 (S.D.N.Y. 2016).

After discovery, the Court reviews evidence and reconsiders its preliminary conditional certification determination, and may de-certify the collective if there are significant variations

among the experiences of the named and opt-in plaintiffs, or if individual issues otherwise preclude resolution on the merits as to all members of the collective as a whole. *Myers*, at 555; *Brown* at * 15. A case that would require "separate mini-trials to resolve each individual's claim . . . is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Hinojos v. Home Depot, Inc.,* 2006 U.S. Dist. LEXIS 95434, at *7-8 (D. Nev. Dec. 1, 2006).

In contrast to the standard applied prior to or early in the discovery period, when plaintiffs seek conditional certification after discovery is complete or substantially complete, courts in the Second Circuit employ a heightened standard of scrutiny that evaluates the evidence to determine whether, in fact, the named and opt-in plaintiffs are similarly situated. *See, e.g., Torres v. Gristede's Operating Corp*., 2006 U.S. Dist. LEXIS 74039, *9-10 (S.D.N.Y. Sept. 29, 2006) (applying heightened scrutiny when conditional certification was sought following discovery).

## B.   THE COURT SHOULD APPLY THE HEIGHTENED SCRUTINY STANDARD BECAUSE DISCOVERY HAS CLOSED AND PLAINTIFFS ISSUED NOTICE MONTHS AGO

Once discovery has been conducted the majority of courts in the Second Circuit have applied a heightened scrutiny standard which evaluates the evidence submitted by both parties in determining motions for conditional certification. *See Brown, supra*, 2018 U.S. Dist. LEXIS 106098, *19 (applying "modest-plus" standard to motion for conditional certification because some discovery was completed); *Korenblum v. Citigroup, Inc.*, 195 F.Supp.3d 475, 482 (S.D.N.Y. 2016) (rejecting the "modest" pre-discovery standard in favor of a "modest plus" standard after discovery); *Torres v. Gristede's Operating Corp.*, *supra*, 2006 U.S. Dist. LEXIS 74039, *9 (concluding that "[p]ost-discovery, as is the case with the instant motion, the Court

applies heightened scrutiny to this inquiry as compared to pre-discovery"); *McDermott v. Fed. Savings Bank*, 2018 U.S. Dist. LEXIS 65448, at *5 (E.D.N.Y. Apr. 18, 2018) (finding that "where discovery has been conducted on the issue of conditional certification, the Court should consider all evidence relevant to that determination"); *Glatt v. Fox Searchlight Pictures, Inc*., 293 F.R.D. 516, 538 (S.D.N.Y. 2013) (explaining that "[c]ourts apply 'heightened scrutiny' to motions for court-authorized notice made after discovery"); *Cunningham v. Elec. Data Systems Corp*, 754 F. Supp. 2d 638, 647 (S.D.N.Y. 2010) (noting that it is appropriate for the court to consider the evidence submitted by both sides in determining a motion for conditional certification after some discovery has been conducted).  In applying this heightened scrutiny standard, the court looks "beyond the pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties."  *Korenblum*, 195 F.Supp.3d at 482.

In most of the foregoing cases, courts noted that the heightened scrutiny standard was appropriate for conditional certification motions because *some* discovery had occurred.  But here, discovery is *complete* – Plaintiffs filed their Motion after the discovery deadline passed (and after having extended it numerous times so that they could obtain additional discovery).  There is no reason to apply the lenient phase one standard for conditional certification as Plaintiffs urge the Court to do, particularly since they provided notice to the putative collective months ago and those who wished to respond have already done so.  *See* ECF No. 67 at p. 2 (Plaintiffs reporting that "[a]round April 18, 2018, Plaintiffs' counsel started mailing letters to the entire class (two-hundred and eighty (280) individuals) asking for an opportunity to ask them questions pertaining to the case. Plaintiffs received responses from five (5) former and one (1) current Inbound Specialist who confirmed the allegations in the complaint"); Gladney Decl., Ex. B; Pelliconi Decl., Ex. I.

Plaintiffs seem to recognize that a heightened scrutiny standard should apply to their Motion since they have submitted excerpts from virtually every deposition that has been taken in this matter, Bank of America's policies, and all of the declarations they have been able to obtain – far beyond what would be required for a phase one conditional certification analysis.   It follows that the Court should review that evidence, in addition to the evidence being submitted by the Bank, and conduct a heightened scrutiny review to determine whether conditional certification is appropriate.

**C.   CONDITIONAL CERTIFICATION IS UNNECESSARY AND POTENTIALLY MISLEADING BECAUSE PLAINTIFFS ALREADY HAVE PROVIDED WRITTEN NOTICE OF THIS LAWSUIT TO POTENTIAL PLAINTIFFS BUT ONLY ONE INDIVIDUAL HAS FILED A VALID CONSENT TO JOIN.**

Issuance of Court-facilitated notice, which is the objective of conditional certification, is unnecessary and unwarranted in this action because Plaintiffs' counsel already have widely distributed notice of this lawsuit through letters to potential plaintiffs, as well as advertising it on their website.  *See* ECF No. 67 at p. 2 (Plaintiffs reporting that "[a]round April 18, 2018, Plaintiffs' counsel started mailing letters to the entire class (two-hundred and eighty (280) individuals) asking for an opportunity to ask them questions pertaining to the case. Plaintiffs received responses from five (5) former and one (1) current Inbound Specialist who confirmed the allegations in the complaint"); Gladney Decl., Exh. B; Pelliconi Decl., Exh. I.

The Supreme Court has explained that court supervision of notice issued to members of a putative collective often is necessary because "the potential for misuse of the class devise, as by misleading communications, may be countered by court-authorized notice." *Hoffman-LaRoche, Inc. v. Sperling*, *supra*, 493 U.S. at 171.  "By monitoring preparation and distribution of the

notice, a court can ensure that the notice is timely, accurate, and informative.  Both the parties and the court benefit from settling disputes about the notice before it is distributed." *Id.* at 172. In this case, none of the reasons for court-supervised notice exist.

For at least the past three months, Plaintiffs' counsel have been contacting current and former Inbound Specialists by letter (and likely by telephone and email as well), urging them to join this lawsuit, as well as advertising this lawsuit on their website. *See* ECF No. 67 at p. 2; Gladney Decl., Exh. B; Pelliconi Decl., Exh. I.  With their mass communications for the past several months, Plaintiffs have demonstrated that there is no need for court involvement or court-facilitated notice.  The potential plaintiffs who are interested in joining this lawsuit already have received notice and already have had the opportunity to join this lawsuit.  The Court need not (and should not) assist Plaintiffs in continuing to barrage putative collective members with repetitive information regarding this lawsuit by allowing Plaintiffs to issue yet another round of notices in the hopes of drumming up additional opt-ins.  *See, e.g., Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1166 (D. Minn. 2007) (recognizing that "FLSA plaintiff is not entitled to conditional certification simply to seek out others who might wish to join the action").

Further, sending additional, court-facilitated notice on the heels of Plaintiffs' letter could result in potential confusion or conflict between Plaintiffs' prior communications and any subsequent notice.  In particular, the recipients of additional notice will likely now be misled into believing that the court has somehow approved or endorsed this action.  *See Hoffman-La Roche,* 493 U.S. at 174 (directing that "[i]n exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality. To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action"). As Plaintiffs already have widely disseminated notice of this lawsuit to potential plaintiffs and

there is no dispute regarding such notice, there is simply no need for the Court to approve and facilitate further notice to the potential plaintiffs.

Moreover, notwithstanding that Plaintiffs sent notice of the putative collective action months ago, there is only one valid opt-in Plaintiff in this action, namely, Plaintiff Salmeri.[4] Even the individuals who provided Plaintiffs with declarations submitted with Plaintiffs' Motion did not opt into this action. Thus, there is no reason to certify a collective because there are no similarly situated individuals who desire to join this action. *See e.g., Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991) (stating that the court "should satisfy itself that there are similarly situated employees who desire to opt-in before certifying a collective action").

Accordingly, the Court should deny Plaintiffs' Motion.

**D.    THE COURT SHOULD DENY PLAINTIFFS' MOTION BECAUSE ALL THE EVIDENCE CONFIRMS THERE WAS NO COMMON POLICY OR PRACTICE TO REQUIRE INBOUND SPECIALISTS TO OPEN COMPUTER PROGRAMS OFF THE CLOCK BEFORE THEIR SHIFTS STARTED**

In collective actions based on alleged FLSA off-the-clock violations, courts in the Second Circuit and elsewhere have uniformly held that certification is improper where there is no evidence of a uniform unlawful policy or practice that resulted in class-wide violations. *See, e.g., Zivali v. AT&T Mobility*, LLC, 784 F.Supp.2d 456, 469 (S.D.N.Y. 2011) (granting motion to decertify plaintiffs' off the clock claims because employer's policies were lawful and there

---

[4] The FLSA has a three-year statute of limitations, which is not tolled until the date an opt-in files a consent. 29 U.S.C. § 256(b). Although a second purported Opt-in Plaintiff, Michael Weed filed a Consent to Join this action on June 1, 2018, his Consent is invalid and the Court should strike it because Weed did not work for the Bank as an Inbound Specialist in the three-year period preceding the filing of his Consent.

was no evidence they were consistently violated in practices that could be generalized across the class of opt-in plaintiffs); *Seward v. IBM*, 2012 U.S. Dist. LEXIS 49688, *70-95 (S.D.N.Y. Jan. 20, 2012) (in a call center case, granting motion to decertify plaintiffs' claims that they were denied pay for pre-shift work in booting up their computers because they failed to establish a uniform policy resulting in FLSA violations); *Steger v. Life Time Fitness, Inc.*, 2016 U.S. Dist. LEXIS 7267, at *3 (N.D. Ill. Jan. 21, 2016) (denying conditional certification because "the evidence shows that the proposed class was impacted, not by a uniform if unwritten corporate policy, but rather by the individual actions of specific department heads acting contrary to corporate policy, as moderated by each employee's individual decisions"); *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 295 (S.D.N.Y. 2015) (decertifying collective action, notwithstanding "the evidence amassed by Plaintiffs of individual violations, of systematic violations at the branch level, and even of violations induced by certain area directors across multiple branches," because the "record in its totality show[ed] that [the employer's] formal, companywide policies are entirely legal and appropriate, and that there [was] no evidence of a common plan or scheme to subvert these policies").

Here, all of the evidence before the Court, including the testimony of Plaintiffs Culpepper and Salmeri and the conclusory statements from their four declarants, show very clearly that the Bank's policies were lawful, and there was no common plan or scheme to subvert those policies. As Culpepper admits, the Bank's policy required her to record all of her time worked, including time spent opening computer programs, and no one ever told her not to record that time. Culpepper Depo. [Pelliconi Decl., Exh. C], 77:13-16; 124:4-125:7. She alleges that she started opening computer programs before her shift because *one* of her supervisors, Garfield Brown "implied" that she should have unspecified "systems" "at the ready" when she started to take

calls, but she acknowledges that Brown never specified which "systems" she needed to open or how early she needed to start working.  *Id.*, 26:6-27:18; 53:11-24.  In addition, Culpepper blocked her incoming calls and opened her computer programs after her shift started at times when she was late for work.  *Id.*, 169:16-170:8.  Thus, Culpepper made the decision as to how early to start work, which "systems" to open before her shift, and to violate the Bank's policy by failing to record her time – it was not the result of any common plan or scheme that affected all Inbound Specialists at the Call Center.  Accordingly, even Culpepper - the named Plaintiff in this matter - cannot establish that she was subjected to a common policy or plan that required her to perform pre-shift work off the clock.

Salmeri also confirms in her testimony that there was no common policy or practice requiring Inbound Specialists to open computer programs before their shifts.  Salmeri purportedly received contradictory instructions from different people as to whether she was even permitted to sit at her desk prior to her shift.  In Salmeri's words: "there was some people saying yes to sit down at your desk before your scheduled start time and then others were saying no; so, it was a mix of, yes, sit down and, no, don't."  Salmeri Depo. [Pelliconi Decl., Exh. D], 158:20-159:5.  Further, Salmeri states in her declaration that Inbound Specialists do not get paid for the time spent booting up their computer systems because they "cannot" log into the telephone system before the start of their shift.  ECF No. 75-10, ¶¶ 16-17.  This conclusion does not make sense, but it does reflect Salmeri's misunderstanding rather than a common policy requiring that Inbound Specialists open computer programs off the clock before their scheduled start time.  Finally, Salmeri's computer login records show that she was not, in fact, logging into her computer "10 to 15 minutes before the start of [her] shift" as she claims in her declaration.  Gladney Decl., Exhs, C, D.  She regularly logged in less than 5 minutes prior to the start of her

shift – and frequently logged into her computer only a minute or two prior to the start of her shift. *Id.* Thus, even assuming there was some policy or practice at the Call Center requiring the Inbound Specialists to log into their computers 10 to 15 minutes before the start of their shifts, it was not one that Salmeri followed.

Likewise, Michelle Bertolino (who has not and cannot opt in to this lawsuit because she did not work as an Inbound Specialist in the past three years)[5] does not state in her declaration any facts showing there was a common policy or practice to require Inbound Specialists to open computer programs off the clock prior to their shifts. *See* ECF No. 75-9. In fact, Bertolino does not contend that anyone at the Bank ever told her to open any computer programs prior to her shift or to do any work off the clock. Instead, Bertolino merely contends that trainers advised her to be "ready to take calls" and "logged into the phone system" at the start of her scheduled shift. ECF No. 75-9, at ¶¶ 8-9.

Matthew Ericksen states in his declaration that unidentified "trainers" told him and other Inbound Specialists to arrive for work "at least thirty minutes before our shifts started to load our computer systems." ECF No. 75-5, ¶ 11. Erickson then indicates that he *disregarded* this advice, in that he only arrived "15-20 minutes before the start of his shift" on the majority of days [he] was supposed to work. *Id.*, ¶ 14. Thus, by his own admissions, Ericksen was the one who made the decision as to how early he would report for work. But, Ericksen's computer login records show that he regularly began logging into his computer only 1-3 minutes before his recorded start time. Gladney Decl., Exhs. E, F. Further, Ericksen does not contend that anyone at the Bank told him not to record this time; he merely states that his supervisors told him to

---

[5] As stated in her declaration, Bertolino worked as an Inbound Specialist from November 2013 until January 2015. ECF No. 75-9, ¶ 4. Bertolino never opted into this matter and her time to do so expired in January 2018 – three years after her employment ended.

enter his scheduled shift start time as his starting time in the timekeeping system.  ECF No. 75-5, ¶ 29.   Ericksen also acknowledges that he attended a meeting wherein Donna Gladney "reminded" Inbound Specialists that they were supposed to log into their phones *before* booting up their computers, after which time he stopped working off the clock.  *Id.*, ¶ 36.   Thus, as Ericksen's declaration shows, his conduct in allegedly working off the clock was in *derogation* of the common policy and practice at the Call Center, which was to begin work at his scheduled start time and open his computer programs while he was on the clock after he logged into his phone.

Jeff Dunphy states in his declaration that "training instructors" told him and others to come to work "before our start times" so that we could "boot-up our computer systems."  ECF No. 75-8, ¶ 8-9.   Dunphy does not state that the trainers gave him a specific instruction of how early to arrive, but he elected to come into work "15-25 minutes before [his] scheduled start time."  *Id.*, ¶ 11.   Further, Dunphy does not state that anyone told him not to record the pre-shift time he spent logging into his computer programs.  Rather, he merely concludes that unidentified supervisors "knew" that Inbound Specialists were performing work before their shifts but never told them to include the time in their time sheets.  *Id.*, ¶ 16.   Dunphy's time records contradict the statements in his declaration because those records show many instances when he did, in fact, record his start time as 15 minutes prior to his scheduled shift start time.  Gladney Decl., Exhs. G, H.  Thus, it appears that Dunphy did record his pre-shift work in logging onto his computer on certain occasions.

Andrea Morgan states in her declaration that unidentified "training instructors" told her to come into work before her start time so she could boot up computer systems.  ECF No. 75-4, ¶ 9-11.  Morgan further states that she arrived for work 10-15 minutes before her scheduled start

time because it took that long to boot up all of her computer applications.  *Id.*, ¶ 13.  Morgan does not allege that anyone at the Bank told her to work off the clock.  Instead, she claims that an unidentified team leader once asked her to change a time card that reflected the pre-shift time she spent logging into her computer, and that she never again entered that time in the timekeeping system.  *Id.*, ¶ 32-33.  This simply is a suggestion that a single manager gave Morgan instructions that did not comport with the Bank's policy, or that Morgan and the manager had a miscommunication regarding what she should enter as her start time.  It is not evidence of a common policy or plan that required all Inbound Specialists to open computer programs off the clock prior to their shifts.

The testimony of Sarena Greene and Jason Krukas, (who were Inbound Specialists and also conducted training for new Inbound Specialists) also shows that there was no common policy or practice at the Bank to require Inbound Specialists to open computer programs before their shifts started or to do so off the clock.  Greene testified that she has *never* worked off the clock, *never* started work before the scheduled start of her shift by opening computer programs and *always* logged into her phone at the start of her shift *before* opening her computer programs. Greene Depo. [Pelliconi Decl., Exh. E], 146:10-147:22.  Greene also testified that she is not aware of any Inbound Specialist who logged into their computers before they started taking calls and is not aware of anyone being told to do that. *Id.*, 134:20-135:8.   Further, Greene testified that she has never received a customer call in the first 30 minutes of her shift, *id.* at 129:5-24, so there would not have been any reason for her to log into her computer before her shift.

Krukas testified that he worked as an Inbound Specialist *on the same team with Plaintiff Culpepper*, reporting to the same supervisor, Garfield Brown, and that he also conducted training for new Inbound Specialists.  Deposition of Jason Krukas ("Krukas Depo.") [Pelliconi Decl.,

Exh. F], 8:4-9; 10:11-5.  In fact, Krukas (and Greene) trained Plaintiff Salmeri, according to her

declaration.  ECF No. 75-10, at ¶ 15. Yet, Krukas testified that he was not aware of any Inbound

Specialists opening computer programs prior to their shifts.  Krukas Depo. [Pelliconi Decl., Exh.

F], 18:8-11.  Although Krukas testified that he had opened computer programs prior to his shift

as an Inbound Specialist, he did not do so because of any common policy, practice or directive

from a supervisor.  Instead, Krukas testified that he opened the programs before his shift because

he "just took it as getting ready for the day" and did not understand from the Bank's timekeeping

training materials that he was required to record that time in the timekeeping system.  *Id.*, 14:5-

15:3; 18:8-19:10.  In fact, Krukas testified that he *thought he was the only Inbound Specialist*

*who was opening computer programs prior to their shift. Id.,* 27:2-28:20.  He also testified that a

supervisor reminded Inbound Specialists in a meeting that they were not to start opening

computer programs before their shifts started.  *Id*.

Declarations submitted by the Bank also confirm that there was no such policy or practice

at the Call Center, and show that the Inbound Specialist declarants: (1) have not performed any

work off the clock; (2) log into their phones at the start of their shifts, and then open computer

programs while they are on the clock; (3) have widely different practices with respect to which

computer programs they open after their shifts start, and the order in which they do so; (4) are

permitted to sit at their desks prior to their shift start time, but are not permitted to begin working

prior to that time; (5) place the customer on hold when they receive a customer call before they

have opened any computer program they need to assist the customer, or make small talk with the

customer until the program is open; (6) are permitted to block incoming calls while they open

computer programs (or for other reasons) (and thus there is no need for them to have all their

computer programs open before they start taking customer calls); (7) log into their computer by

pressing "Control-Alt-Delete" and entering a username and password, which takes less than 30 seconds; (8) are able to open the ACAPS program within 1 to 3 minutes; (9) are able to open each of the other computer programs that they use within a few seconds to two minutes; and (10) have never been asked to log into their computers or do any other work prior to their shift start time. *See* Declaration of Davon Allen; Declaration of Natalie Carbajal; Declaration of Mariora Cruz; Declaration of Debra Csida; Declaration of Matthew Greco; Declaration of Lisa Jankowski; Declaration of Twila McKinney; Declaration of Adam Miller; Declaration of Candace Pepin; Declaration of Pamela Searles; Declaration of Glenda Wilkerson; Declaration of Ashley Zarrella.

The depositions of the Bank's managers (including those who supervised Culpepper and Salmeri) further show that the Bank did not expect Inbound Specialists to open computer programs before their shifts or to perform that work or any other work off the clock. *See* Gladney Depo. [Pelliconi Decl., Exh. A], 29:9-15; 41:17-22; 44:21-45:18; Brown Depo. [Pelliconi Decl., Exh. B], 24:6-8; 59:11-20; Mosier Depo. [Pelliconi Decl., Exh. H], 75:22-76:4; 83:20-25; 89:10-15; Campos Depo. [Pelliconi Decl, Exh. G], 46:17-25.

In *Seward v. IBM, supra*, the court granted a motion to decertify an FLSA collective action on facts similar to those present here. 2012 U.S. Dist. LEXIS 49688, at *70-95. The plaintiffs in *Seward* were call center employees whose primary job duties involved fielding incoming telephone calls. Like Plaintiffs here, the plaintiffs in *Seward* alleged that they were required to boot up their computers prior to their shifts in order to be "call ready" at the start of their shifts and that they were paid only for their scheduled hours. *Id.* at * 3. Also, as here, the plaintiffs in *Seward* alleged that they were not permitted to log into their phone system until their scheduled shift start time, and they could put their phones in "aux" to block incoming calls until

they finished booting up their computers.  *Id.* at * 30 and n. 16.  In *Seward*, as here, the employer's formal employment policies required that employees be compensated for all of their work, including the time spent logging into computers before the start of their shifts.  *Id.,* at * 9.  Furthermore, as here, the employees were grouped into teams which were supervised by different managers – some of whom expected the plaintiffs to boot up their computers before their shifts to make themselves "call ready."  *Id.* at *18-38.

Although there were 39 opt-in plaintiffs in *Seward*, many of whom claimed they were directed by management to log into their computers before their scheduled shifts so that they would be "call ready" when they logged into their phones, the Court found that the plaintiffs' evidence was anecdotal and not sufficient to show a common plan or scheme resulting in the alleged FLSA violations.  To that end, the Court found that because the employer's formal policies required that employees be paid for all their time worked and were lawful, it was incumbent upon the plaintiffs to show that the employer's practices in violation of the policy were "sufficiently uniform and pervasive as to warrant class treatment."  *Id.* at * 75.  The Court concluded that the plaintiffs had not made this showing, noting as follows:

> "Seward has not shown that he shares common factual and employment settings with all of the opt-in plaintiffs due to the existence of a 'sufficiently uniform and pervasive' policy requiring off-the-clock work, given the many differences in specific job duties, team functions and structures, managerial expectations, and individual experiences and understandings among the plaintiffs." *Id.* at 80.

Here, as in *Seward*, Plaintiffs cannot establish any uniform policy requiring off-the-clock work that can be determined on a class-wide basis.  The individuals who contend they worked off the clock in violation of the Bank's lawful policies offer myriad reasons why and how they

did so.   At best, these reasons reflect improper inferences and misunderstandings of policies, personal preferences and/or instructions they may have received from rogue managers or trainers – not because of a uniform practice that resulted in off the clock work on a classwide basis.

Plaintiffs claim that the "vast majority" of district courts have granted conditional certification in call center "boot up" cases.   But, they conspicuously ignore the *Seward* holding, and the cases on which they rely were based on the lenient stage one conditional certification analysis which does not apply here because discovery has closed.

Plaintiffs are trying to fit a square peg into a round hole by asserting that they, like the plaintiffs in the call center cases upon which they rely, were "victimized by the contradictory interplay" between the expectation that they be ready to start fielding calls at the start of their shifts and when their paid time starts.    That "contradictory interplay" does not exist here, and could not have resulted in class-wide FLSA violations because the Inbound Specialists had so many options for handling customer calls that they may have received before they opened their computer programs, such as: (1) they were permitted to use "aux" to block customer calls at their scheduled start time while they opened computer programs; (2) they were permitted to put the customer on hold while they opened the computer program(s) they needed to assist the customer; and (3) they were permitted to engage in small talk rather than putting the customer on hold while the program(s) loaded if they so desired.  *See supra* at 8-10, 25.  Moreover, not all of the Inbound Specialists even received customer calls immediately when their shifts started. Further, the Inbound Specialist Is had vastly different functions as compared to the Inbound Specialist IIs and Inbound Specialist IIs which would impact whether they would have any reason to log into their computers prior to the start of their shifts.  *See supra* at 5-8.

There is simply no evidence of any common policy, plan or scheme at the Call Center that resulted in FLSA violations on a class-wide basis.  Instead, all the evidence points inexorably to the conclusion that no such common policy, plan or scheme has existed. Therefore, the Court should deny Plaintiffs' Motion.

E.     **THE COURT SHOULD DENY PLAINTIFFS' MOTION BECAUSE THERE ARE SIGNIFICANT VARIATIONS BETWEEN THE NAMED AND THE SOLE VALID OPT-IN PLAINTIFF**

In order to proceed as a collective action, the named Plaintiff and Opt-In Plaintiffs must be similarly situated with regard to whether an FLSA violation has occurred.  *See Myers v. Hertz Corp., supra*, 624 F.3d at 555; *Zivali, supra*, 784 F. Supp. 2d at 459.  Indeed, the purpose of conditional certification is to determine whether there is "an identifiable factual nexus which binds the named plaintiffs and potential class members together as victims of a particular practice." *Brown v. Barnes & Noble, supra*, 2018 U.S. Dist. LEXIS 106098, at * 64.  Where, as here, evidence shows that the named plaintiff and potential opt-ins are not similarly situated, conditional certification should be denied because "solicitation of additional opt-ins will raise more questions and prolong the resolution of [the] case – not lead to just and economic resolution." *Id.*, at 65.

Here, there is only one valid Opt-In Plaintiff, Salmeri.  A comparison of her and Plaintiff Culpepper's contentions demonstrate that conditional certification is not proper.

Culpepper contends that she worked off the clock for 20-30 minutes per day before her shift started by opening all of her available computer programs because one of her supervisors, Garfield Brown, *implied* that it was necessary, but she admits that no one ever told her not to record her time in doing so.  Culpepper Depo. [Pelliconi Decl, Exh. C], 26:6-27:18; 53:11-24;

143:10-144:4.  She also testified that there was "no rule" at the Call Center when she worked there regarding how early Inbound Specialists could sit at their desks prior to their shifts and that people ate breakfast at their desks prior to their shifts.  *Id.*, 48:11-18.  Further, Culpepper testified that she was permitted to and did block incoming calls at times when she was logging into her computer, and that she could place customers on hold "as often as necessary" as long as she returned to the line every two to three minutes to check in with the customer.  *Id.*, 44:8-47:3.  Culpepper does not recall anyone at the Bank telling her that she should not place customers on hold while she opened her computer programs during her shift.  *Id.*, 172:3-6.

In stark contrast, Salmeri contends that she worked off the clock for 10-15 minutes per day.  ECF No. 75-10, ¶ 13.  She further contends that her supervisors told her that she was not allowed to block incoming calls while logging into her computer systems, Salmeri Depo. [Pelliconi Decl., Exh. D], 85:5-21, and that she could not place customer calls on hold.  *Id.*, 123:22-124:5.  In further contrast to Culpepper's testimony, Salmeri testified that she was, in fact, told not to record the time it took her to log in; not by any supervisor, but, rather by "various associates that [she] was sitting with" during the "nesting" phase of her employment. *Id.*, 140:10-141:13.

Salmeri also testified that she received different instructions from different Bank representatives about whether she was allowed to sit down at her desk prior to her scheduled start time.  *Id.*, 158:20-159:5.  Further, while Salmeri claims in her declaration that she usually sat down at her desk at least 10 to 15 minutes before the 9:30 start of her shift in order to boot up her systems, ECF No. 75-10 at ¶¶ 7, 12, her computer login records show that she typically logged into her computer only a couple of minutes prior to her 9:30 a.m. start time. Gladney Decl., Exhs. C, D.

Thus, there are more differences than similarities in the material allegations which Culpepper and Salmeri have made regarding the reasons and circumstances under which they allegedly worked off the clock at the Bank. They are not similarly situated. Therefore, as in *Brown, supra*, conditional certification should be denied because solicitation of additional opt-ins will only prolong the resolution of this case and undermine rather than promote efficiency.

**F.     THE COURT SHOULD DENY PLAINTIFFS' MOTION BECAUSE INDIVIDUAL ISSUES PRECLUDE RESOLUTION ON the MERITS AS TO THE COLLECTIVE**

1.     Actual Or Constructive Notice By Call Center Managers

Under the FLSA, an employee is only entitled to compensation for those hours of work of which the employer had actual or constructive knowledge. *See Kuebel v. Black & Decker, Inc.*, 361 F.3d 352, 361 (2d Cir. 2011); *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998), *cert. denied*, 525 U.S. 1055 (1998); *Singh v. City of New York*, 418 F.Supp.2d 390, 397 (S.D.N.Y. 2005). Where, as here, the plaintiffs in an FLSA collective action cannot establish that there was any common policy or practice to require off-the-clock work, they must demonstrate that each individual manager had actual or constructive knowledge that they were working off the clock; this is a "highly fact specific" issue that makes conditional certification improper. *See Zivali, supra*, 784 F.Supp.2d at 467-68 (granting motion to decertify collective action); *see also Tracy v. NVR, Inc.*, 293 F.R.D. 395, 399 (W.D.N.Y. 2013) (granting motion to decertify FLSA collective action and finding that testimony from every manager would be required in order to determine the extent of their actual or constructive knowledge of plaintiffs' off the clock work).

Here, there is no evidence of a common policy or practice that required all Inbound Specialists at the Call Center to open computer programs off the clock prior to their shifts. Thus, in order to ascertain whether the Bank had actual or constructive knowledge of Plaintiffs' alleged

off-the-clock work, it would be necessary for every manager at the Call Center to testify. The Court cannot "infer" this knowledge as Plaintiffs contend, based on cases where evidence was presented that does not exist here.  In this case, the managers who have been deposed testified that they did not know that Inbound Specialists were working off the clock.  *See* Gladney Depo. [Pelliconi Decl., Exh. A], 29:9-15; 41:17-22; 44:21-45:18; Brown Depo. [Pelliconi Decl., Exh. B], 24:6-8; 59:11-20; Mosier Depo. [Pelliconi Decl., Exh. H], 75:22-76:4; 83:20-25; 89:10-15; Campos Depo. [Pelliconi Decl., Exh. G], 46:17-25.  Further, while Plaintiffs suggest that the managers would have known that they were working because they could see them at their desks, this fact does not equate to actual or constructive knowledge. The Inbound Specialists were permitted to sit at their desks prior to their shifts before they started working.  Gladney Decl., ¶ 12.  Thus, the mere fact that they were sitting at their desks does not mean they were working. In addition, the managers did not have computer programs that showed whether any Inbound Specialists were logged into their computers.  *Id.*, ¶ 10.

Thus, the issue of whether the Bank had actual or constructive knowledge of off-the-clock work by Inbound Specialists would have to be determined by separate inquiries of each manager as to the Inbound Specialists that he or she supervised.  This highly individualized issue makes certification improper.

### 2.    *De Minimis* Defense

The *de minimis* doctrine provides a defense for employers to claims under the FLSA for unpaid time worked if it involves only a few minutes of work beyond the scheduled working hours.  *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946); *Reich v. New York City Transit Auth.*, 45 F.3d 646 (2d Cir. 1995).  In the Second Circuit, work is considered *de minimis* and therefore not compensable where: (1) it would be administratively difficult to record the additional time; (2) in the aggregate, the time is not substantial; and (3) the work is not

performed on a regular basis. *See Reich*, 45 F.3d at 652 (quoting *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir.1984).

While there is no bright line test for determining how much time will be considered *de minimis* for FLSA purposes, time periods of under fifteen minutes have often been found to be *de minimis*. *See Anderson v. Pilgrim's Pride Corp.*, 147 F.Supp.2d 556, 564 (E.D.Tex.2001) (citing holdings by majority of courts on *de minimis* doctrine); *Lindow*, 738 F.2d at 1062 ("most courts have found daily periods of 10 minutes de minimis, even though otherwise compensable"); *Carter v. Panama Canal Co.*, 314 F.Supp. 386, 392 (D.D.C.1970) (held that two to fifteen minutes was de minimis for FLSA purposes), *aff'd*, 463 F.2d 1289, 150 U.S. App. D.C. 198 (D.C. Cir.), *cert. denied*, 409 U.S. 1012 (1972).

Here, Plaintiffs claim that they and the putative collective worked anywhere from ten to twenty minutes off the clock prior to their shifts.  If that is true, the time would include *de minimis* time that is not compensable.  Indeed, Salmeri typically logged into her computer less than ten minutes prior to her shift (as did some of the Plaintiffs' declarants) and, in fact, she frequently logged into her computer only a minute or two prior to her shift.  Moreover, to determine whether the time at issue is *de minimis* for each member of the collective would require individualized inquiries making conditional certification improper.  *See e.g., Zivali, supra*, at 468 (granting motion to decertify collective action for off the clock work and noting that "[t]he extent to which work was de minimis, however, will necessarily vary widely according to the particular situation of each individual plaintiff").

Thus, the Court should deny Plaintiffs' Motion because these individualized issues preclude resolution of the merits of the Plaintiffs' claims on a class-wide basis.

## VI.   CONCLUSION

For all of these reasons, the Bank respectfully requests that the Court deny Plaintiffs'

Motion for Conditional Certification.

DATED: July 13, 2018                    MCGUIREWOODS LLP


                                 By:    /s/ Bethany A. Pelliconi
                                        Michael D. Mandel (CA Bar. No. 216934)
                                        (admitted pro hac vice)
                                        Bethany A. Pelliconi (CT Bar. No. 407615)
                                        (admitted pro hac vice)
                                        1800 Century Park East
                                        Los Angeles, CA 90067
                                        Telephone: (310) 315-8200
                                        Facsimile: (310) 315-8210
                                        bpelliconi@mcguirewoods.com
                                        mmandel@mcguirewoods.com

                                        Phillip A. Goldstein (N.Y. Bar No. 4011961)
                                        (admitted *pro hac vice*)
                                        1251 Avenue of the Americas, 20th Floor
                                        New York, NY 10020
                                        Telephone: (212) 548-2167
                                        Facsimile: (212) 715-6245
                                        pagoldstein@mcguirewoods.com

## CERTIFICATION

I hereby certify that on July 13, 2018 a copy of the foregoing **Defendant's Memorandum of Law In Opposition to Plaintiffs' Motion for Conditional Certification** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


By: /s/ Bethany A. Pelliconi