UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AILEEN CULPEPPER, individually and on behalf of all other similarly situated individuals | : | |
| | : | |
| | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| v. | : | Civil Action No.: |
| | : | 3:17-cv-00264-VAB |
| | : | |
| BANK OF AMERICA, NATIONAL ASSOCIATION | : | Complaint Filed: February 16, 2017 |
| | : | |
| | : | |
| DEFENDANT. | : | |

**DEFENDANT BANK OF AMERICA, N.A.'S RESPONSE
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION PURSUANT
TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE (ECF NO. 91)**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

I.  INTRODUCTION .................................................................... 1

II.  PROCEDURAL OVERVIEW ...................................................... 1

III.  STATEMENT OF FACTS .......................................................... 4

    1.  The Bank's Timekeeping Policies ......................................... 4

    2.  Inbound Specialist Positions At The Contact Center ................. 5

        A.  Inbound Specialist I ................................................. 5

        B.  Inbound Specialist II ............................................... 6

        C.  Inbound Specialist III .............................................. 7

    3.  Organizational and Reporting Structure At The Contact Center .......... 8

    4.  Phone and Computer Log-In Procedures For Inbound Specialists ......... 8

    5.  Schedule Adherence And Productivity Requirements For Inbound Specialists ................................................................. 11

    6.  Plaintiff's Employment And the Putative Class Members' Very Different Contentions About Allegedly Working Off The Clock ...................... 12

        A.  Plaintiff Aileen Culpepper ......................................... 12

        B.  FLSA Opt-In Plaintiff Sarena Salmeri ............................. 14

IV.  ARGUMENT ......................................................................... 15

    A.  Applicable Legal Standard For Rule 23 Class Action Certification ...... 15

    B.  The Court Should Deny Plaintiff's Motion Because It Is Untimely. ...... 16

    C.  The Court Should Deny The Motion Because Plaintiff Cannot Establish Commonality Or Typicality. ............................................... 17

        1.  Plaintiff's Anecdotal Evidence Does Not Establish A Common *De Facto* Unlawful Policy. .......................................... 19

        2.  Plaintiff's Claims Are Not Typical of the Class. ................. 23

        3.  Plaintiff Cannot Establish Predominance of Common Issues. ....... 25

**TABLE OF CONTENTS**
(continued)

**Page**

D.     THE CASES PLAINTIFF CITES FOR THE PROPOSITION THAT
       THIS CASE IS AMENABLE TO CLASS CERTIFICATION ARE
       INAPPOSITE.................................................................................................... 27

V.     CONCLUSION.......................................................................................................... 29

CERTIFICATION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Coca-Cola Co. & Energy Brands, Inc.*,
    2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July 18, 2013) ....................................................15

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ..............................................................................................................15

*Burch v. Qwest Communs. Int'l, Inc.*,
    677 F. Supp. 2d 1101 (D. Minn. 2009) .............................................................................27, 28

*Caridad v. Metro-North Commuter R.R.*,
    191 F.3d 283 (2d Cir. 1999) ..................................................................................................17

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ....................................................................................................16

*Dunningan v. Metro Life Inc. Co.*,
    214 F.R.D. 125 (S.D.N.Y. 2003) .......................................................................................23, 27

*Eng-Hatcher v. Sprint Nextel Corp.*,
    2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) ..........................................15, 17, 18

*Fernandez v. Wells Fargo Bank, N.A.*,
    2013 U.S. Dist. LEXIS 124692 (S.D.N.Y. Aug. 28, 2013) ....................................................18

*Ginsburg v. Comcast Cable Communs. Mgmt LLC*,
    2013 U.S. Dist. LEXIS 55149 (W.D. Wash. April 17, 2013) .................................................18

*Gregory v. Stewart's Shops Corp.*,
    2016 U.S. Dist. LEXIS 89576 (N.D.N.Y. July 8, 2016) ..............................................15, 17, 18

*Haynes v. Planet Automall, Inc.*,
    276 F.R.D. 65 (E.D.N.Y. 2011) ..............................................................................................15

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................................................15, 16

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ..................................................................................................15

*Kernats v. Comcast Corp*,
    2010 U.S. Dist. LEXIS 112071 (N.D. Ill Oct. 20, 2010) ......................................................27, 28

*Levitt v. J.P. Morgan Sec., Inc.*,
  710 F.3d 454 (2d Cir. 2013)......................................................................16

*McBean v. City of New York*,
  260 F.R.D. 120 (S.D.N.Y. 2009) .............................................................16

*Mendez v. U.S. Nonwovens Corp.*,
  314 F.R.D. 30 (E.D.N.Y. 2016) .........................................................18, 20

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)....................................................................16

*Morangelli v. Chemed Corp.*,
  922 F. Supp. 2d 278 (E.D.N.Y. 2013) .....................................................17

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)......................................................................16

*Parker v. Time Warner Entm't Co.*,
  L.P., 331 F.3d 13 (2d Cir. 2003) ..............................................................15

*Pryor v. Aerotek Scientific*,
  LLC, 278 F.R.D. 516 (C.D. Cal. 2011) ....................................................18

*Ribot v. Farmers Ins. Group*,
  2013 U.S. Dist. LEXIS 100810 (C.D. Cal. July 17, 2013).......................28

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)................................................................15, 25

*Ruiz v. Citibank, N.A.*,
  93 F. Supp. 3d 279 (S.D.N.Y. 2015)....................................................17, 20

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013)......................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...................................................................................19

**Statutes**

29 U.S.C. §§ 201 *et seq*...........................................................1, 2, 4, 14, 17

Conn. Gen. Stat. §§ 31-58 *et seq.* .................................................................2

Conn. Gen. Stat. § 52-596.............................................................................21

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................1, 4, 15, 16, 17, 18, 19, 20, 23, 25

Fed. R. Civ. P. 23(a) ..........................................................................................15, 16, 19

Fed. R. Civ. P. 23(b) ...............................................................................................15

Fed. R. Civ. P. 23(c)(1) .........................................................................................15, 16

## I.      INTRODUCTION

The Court should deny Plaintiff's Motion for Class Certification.  As an initial matter, Plaintiff's motion is untimely.  Pursuant to the Court's initial pretrial order, the deadline for Plaintiff to file her Rule 23 motion expired 60 days after she filed her complaint on April 16, 2017.  Plaintiff never sought or obtained an extension, and did not file her Motion until August 17, 2018, more than a year after the deadline.

In addition, Plaintiff has not met and cannot meet her burden of establishing each element of Rule 23.  Plaintiff's Motion is based on the same anecdotal evidence that she submitted in response to Defendant Bank of America, N.A.'s ("the Bank") pending and fully-briefed Motion to Deny Rule 23 Class Certification.  Plaintiff's evidence consists entirely of a few declarations from putative class members ("PCMs") in which they contend that they understood from verbal statements by peers that they should arrive early and open computer programs before their shifts started, contrary to the Bank's legally-compliant policy.  This is not evidence of a uniform policy or procedure that warrants class certification under Rule 23.

Furthermore, Plaintiff's own admissions show that her claims are not typical of the class, and she has identified no generalized evidence that could be offered to prove the elements of her claims on a class-wide basis as she is required to do.  Plaintiff cannot establish that there any common issues of law or fact, or that any common issues will predominate this action such that the case will not devolve into numerous individual mini-trials for each PCM.  The Court should deny Plaintiff's Motion.

## II.     PROCEDURAL OVERVIEW

Plaintiff Culpepper commenced this action on February 16, 2017, asserting a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. and a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for alleged violations of the Connecticut

Minimum Wage Act, Conn. Gen. Stat. Section 31-58 *et seq.*, on behalf of all Connecticut Inbound Specialists.  *See* ECF No. 1.  Shortly after commencing this action, Culpepper's attorneys posted notice of the lawsuit on their firm website, with information on many issues such as how to join, how to obtain answers to questions, how much money they could expect to obtain, and the status of the case.  *See* ECF No. 81-3, at pp. 101-109.

On February 16, 2017, the Court issued an Order on Pretrial Deadlines, which provides that "All motions relating to . . . class certification . . . shall be filed within 60 days after the filing of the complaint, the filing of a petition for removal, or the transfer of an action from another District."  ECF No.2.

The Court's initial Scheduling Order, dated April 28, 2018, provided for an October 6, 2017 discovery cut-off.  *See* ECF No. 30.

On July 6, 2017, Plaintiffs took the depositions of former Home Equity Division Fulfillment Leader, Donna Gladney and former Team Leader Garfield Brown, who was Plaintiff Culpepper's supervisor.  *See* Pelliconi Decl., ¶¶ 2-3.  On July 7, 2017, the Bank took the deposition of Plaintiff Aileen Culpepper.  *Id.*, ¶ 4.

On October 2, 2017, the Court granted a Joint Motion for Modification of the Scheduling Order and set a discovery cut-off of December 7, 2017.  *See* ECF No. 37.  On October 27, 2018, the Bank took the deposition of FLSA Opt-In Plaintiff Salmeri.  *See* ECF No. 81-3, p. 2, ¶ 5.

On October 31, 2017, Plaintiff moved to modify the Scheduling Order, on grounds that Attorney Richard Hayber was taking over as lead counsel on the case and would need time to come up to speed and complete discovery.  *See* ECF No. 43.  Plaintiff also argued in the motion that she needed additional time to negotiate with the Bank over production of class log in records and to file a motion to compel same if necessary.  *Id.* at 2.

2

On November 1, 2017, the Court issued another Amended Scheduling Order, setting a March 9, 2018, discovery cut-off.  *See* ECF No. 45.

On January 18, 2018, Plaintiff filed a request for a discovery conference to address the Bank's refusal to produce class computer login data that Plaintiff had requested approximately one year earlier.  *See* ECF No. 48.  The Court held the discovery conference on February 27, 2018.  *See* ECF No. 56.

On February 27, 2018, Plaintiff took the depositions of Inbound Specialists Sarena Greene and Jason Krukas.  *See* ECF No. 81-3, p. 2, ¶¶ 6-7.  On February 28, 2018, Plaintiff took the depositions of Inbound Specialist Team Leaders Eyrella Campos (who was one of Culpepper's supervisors) and Jaime Mosier (who supervised opt-in plaintiff Salmeri).  *Id.*, ¶¶ 8-9.

On March 23, 2018, Plaintiff filed a Motion to Modify the Scheduling Order, and proposed that the discovery cut-off be extended to May 15, 2018.  *See* ECF No. 60.  On March 25, 2018, the Court again issued an Amended Scheduling Order, setting the discovery cut-off for May 15, 2018.  *See* ECF No. 62.

On March 31, 2018, the Bank produced to Plaintiff a class list containing each Inbound Specialist's name, address, phone number and email address.  *See* ECF No. 81-3, p. 3, ¶ 10. Plaintiff's counsel sent out letters to the putative class on April 18, 2018, wherein he notified them of the lawsuit, provided a copy of the lawsuit, explained the factual and legal basis of the lawsuit, and invited the putative class members to contact him about participating in the lawsuit. *See* ECF No. 81-2, p. 50-51; ECF No. 67, p. 2.

On May 31, 2018, the Court held another discovery teleconference at Plaintiff's request to discuss her anticipated motion to compel the Bank to produce class computer login data.  *See* ECF Nos. 67-69.  On June 1, 2018, the Court issued an Order stating that if Plaintiff wished to pursue a

motion to compel the class computer login data, Plaintiff had to file it by June 15, 2018, along with a motion to amend the scheduling order. *See* ECF No. 73. The Court also stated in its June 1, 2018, Order that the Court would address the motion to amend the scheduling order before the motion to compel, and may deny the motion to compel as "moot" if the Plaintiff did not establish good cause to amend the scheduling order. *Id.*

On June 15, 2018, Plaintiff filed a motion to compel the class login data, without filing any accompanying motion to amend the scheduling order as required by the Court's June 1, 2018, Order. *See* ECF No. 76. Thereafter, Plaintiff withdrew her motion to compel. *See* ECF No 86.

On June 15, 2018, Plaintiff filed a motion for conditional certification of her FLSA claim. *See* ECF No. 75. On July 13, 2018, the Bank filed a Motion to Deny Rule 23 Class Certification. ECF No. 81. Plaintiff's motion for conditional certification of her FLSA claim, and the Bank's Motion to Deny Rule 23 Class Certification are fully-briefed and under submission with the Court.

## III.   STATEMENT OF FACTS

Bank of America is a national banking association headquartered in Charlotte, North Carolina. It is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses, and large corporations with a full range of banking, investment, asset management and other financial products and services.

### 1.   The Bank's Timekeeping Policies

The Bank's hourly employees, including those working in contact centers,[1] are responsible for recording their own work time in the Bank's electronic timekeeping system. *See* ECF No. 81-2, p. 2, ¶ 3. It is not a traditional "clock in/clock out" timekeeping system. Rather, employees access the timekeeping system through their work computer and, sometime before the end of each

---

[1] The Bank refers to "call centers" as "contact" centers.

workweek, employees are expected to record their own starting time, ending time, and the start and end time of unpaid meal breaks for every day they worked in the week.[2]  *Id.*  Bank of America's policies require employees to record each of these times accurately, to-the-minute.  *Id.*  The Bank then relies upon this information to pay employees for all of their time worked.  *Id.*  The Bank requires its hourly employees and managers to take timekeeping compliance training on an annual basis.  *Id.*  The training materials specify, *inter alia*, that time spent preparing for work, including time booting up computers and opening computer programs, is compensable time worked which must be recorded in the timekeeping system:

> Employees should **enter all time to the minute** including **start** and **end** times, meal periods, and any time off.

> **Start Time**:  When an overtime-eligible employee is at his or her desk or work station and ready to begin work, including preparatory tasks (initial log-in procedures, team meetings, required reading materials, follow-up calls and equipment preparation.

*Id.*, p. 17 (emphasis in original).

### 2.    Inbound Specialist Positions At The Contact Center

The Bank employs three different levels of Inbound Specialists at the Contact Center, namely Inbound Specialist I, Inbound Specialist II, and Inbound Specialist III.  *See* ECF No. 81-2, pp. 2-4.   Each of these positions has different functions, priorities, skill levels, and responsibilities.  *See id.*

### A.    Inbound Specialist I

Inbound Specialist I is an entry-level position that exists primarily to handle incoming calls from Bank customers pertaining to home equity loans.  *Id.*, p. 3. Once hired, an Inbound

---

[2] In other words, to the extent Plaintiff argues that she could not record her time without first logging into her computer, that is true.  However, the Bank expected Plaintiff (and all others) to record the time they started booting up as their start time.  For example, if Plaintiff began working at 8:00 a.m. but her computer was not booted up until 8:02 a.m., the Bank would expect Plaintiff to put 8:00 a.m. in the timekeeping software.

Specialist I undergoes a classroom training period that lasts approximately six weeks.  *Id.* This classroom training covers the Bank's home equity loan products, credit, collateral, debt to income ratio, lien and non-lien payoffs, closing procedures, phone etiquette, and online and business partner resources available to Inbound Specialists for assisting customers with their home equity loans. *Id;* ECF No. 81-3, p. 64-67, 68-69.  This training does not cover the Bank's timekeeping policies or practices.  *Id.*, p. 60; ECF No. 81-2, p. 3.  Rather, the Inbound Specialist Is learn and certify their understanding of the Bank's timekeeping policies and practices through a web-based program at the time of hire and each year thereafter.  *See* ECF No. 81-2, p. 3.  After the classroom training, the Inbound Specialist Is complete a "nesting" period for approximately two weeks, which pairs them in the same cubicle with a senior team member so the new Inbound Specialist Is can observe, listen to, and ask questions of the senior team member while the senior team member handles customer calls.  *Id.*; ECF No. 81-3, p. 70-72.  After the nesting period, the Inbound Specialist Is are expected to begin handling incoming calls from customers on their own, but the Bank expects them to continue to seek guidance from more senior Inbound Specialists on a "pod line" when they are unsure how to respond to customers' inquiries.  ECF No.  81-2, p. 3.

### B.     Inbound Specialist II

The primary function of the Inbound Specialist II is to handle questions from those holding the Inbound Specialist I position.  *Id.*  This typically occurs when an Inbound Specialist I is on a call with a customer and is not sure how to answer a question or how to direct the customer for assistance.  *Id.*  In that event, the Inbound Specialist I places the customer on hold and contacts an Inbound Specialist II on a separate "pod line" for guidance.  *Id.* The Inbound Specialist I may then return to the customer call on hold to convey information learned from the Inbound Specialist II, or may transfer the customer call to the Inbound Specialist II.  *Id.*

The Inbound Specialist II does not receive inbound calls directly from customers except on occasions when call volume is extremely high. *Id.* During those times, a Team Leader must "skill" or program the Inbound Specialist II's phone to allow for incoming customer calls for a period of time on an as-needed basis, so long as a sufficient number of Inbound Specialist IIs are still available for pod line calls. *Id.* Because of the nature of their job duties and the Bank's call routing system, Inbound Specialist IIs rarely receive direct inbound customer calls at the beginning of their shifts. *Id.*

### C.   Inbound Specialist III

The Inbound Specialist III handles "escalation" calls that are transferred to them from Inbound Specialist Is and Inbound Specialist IIs. *Id.*, p. 4. By way of example, if an Inbound Specialist I or II is speaking with a customer who requests to speak with a supervisor or who complains about the manner in which the Inbound Specialist I or II is handling an issue, the Inbound Specialist I or II is required to ask the customer to hold while they transfer the call to a line dedicated to the Inbound Specialist IIIs for handling. *Id.* When this occurs, the Bank's automated system directs the call to the Inbound Specialist III who has been available (*i.e.*, not on the phone) for the longest period of time. *Id.*

The Inbound Specialist III does not handle incoming calls from customers directly, except during times when call volume is extremely high. *Id.* During those times, a Team Leader must "skill" or program the phone of an Inbound Specialist III to allow for incoming customer calls for a period of time on an as-needed basis, so long as a sufficient number of Inbound Specialist IIIs are still available for escalation calls. *Id.*

Because of the nature of their job duties and the Bank's call routing system, those holding the position of Inbound Specialist III rarely receive direct inbound customer calls, and do not typically receive escalated calls at the beginning of their shifts. *Id.*; ECF No. 81-3, p. 73

(confirming that, as an Inbound Specialist III, she has never received a customer call within the first 30 minutes of her shift).

**3.  Organizational and Reporting Structure At The Contact Center**

Inbound Specialists are grouped into teams that typically comprise approximately 9-13 individuals, and who are supervised by a Team Leader.  ECF No. 81-2, pp. 4-5.  Each team has at least one Inbound Specialist II and one Inbound Specialist III, and approximately 5-8 Inbound Specialist Is.  *Id.*  The Team Leaders of each team report to the Home Equity Division Fulfilment Leader.  *Id.*

During the relevant time period, there have been 10-16 different teams and Team Leaders at the Contact Center.  *Id.*  The Team Leaders supervise and manage the day-to-day functions of the Inbound Specialists on their teams, including enforcing the Bank's policies and procedures, reviewing and approving time records, and managing the performance and scheduling needs of the team members.  *Id.*  The Inbound Specialists work in cubicles, and their teams are typically seated in clusters with the Team Leaders in the same row or section, but certain team members may be assigned to desks that are not adjacent to the rest of the team.  *Id.*, p. 5.

The Team Leaders are able to determine from their desktop computers whether the members of their teams are logged into their phones, but they cannot tell whether the team members have logged into their computers or whether they have any particular programs open. *Id.*

**4.  Phone and Computer Log-In Procedures For Inbound Specialists**

Inbound Specialists work 8-hour shifts, which are staggered to begin every 30 minutes between 8:00 a.m. and 11:30 a.m.  *Id.*  Inbound Specialists who work the first two morning shifts, starting at 8:00 a.m. and 8:30 a.m., are more likely to receive customer calls at the beginning of their shifts as compared to those who start later.  *Id.*

Inbound Specialists are permitted to sit at their desks prior to their scheduled start times, but they are not permitted to begin working until their scheduled start times unless their Team Leader approves it in advance.   *Id.* The Inbound Specialists are required to log into their phones at the scheduled start time of their shifts by pushing a button and entering an ID number – a process which takes only a few seconds.   *Id.*  Upon logging into their phones, the phones are in "aux" mode, meaning that incoming calls are blocked.   *Id.* When the Inbound Specialists are ready to start receiving calls, they must push the "auto in" button so the system will start to route incoming calls to them.   *Id.*  The Inbound Specialists are permitted to leave their phones in "aux" mode to block incoming customer calls for up to 5 minutes after logging into their phones while they open computer programs or engage in other preparatory tasks.   But those who have the first two shifts (starting at 8:00 a.m. and 8:30 a.m.) may be required to "auto" in and take calls during that initial 5 minute period of time if call volume is high.   *Id.*  For that reason, the Bank staffs the shifts beginning at 8:00 a.m. and 8:30 a.m. with experienced Inbound Specialists.   *Id.*

After Inbound Specialists log into their phones, they then may open, but are not required to open, the computer programs that they may need in order to respond to customer inquiries, or for other purposes such as to review their schedules or their emails.[3]  *Id.*, pp. 5-6.  The Inbound Specialists may open as many or as few computer programs as they wish after their shifts begin, and may do so in any order they wish.   *Id.*  If Inbound Specialists receive a customer call before they have opened any particular computer program that they need in order to assist the customer, they are permitted to ask the customer to hold while they open the program or, at their option, may engage in small talk with the customer while they open the program.   *Id.* One computer program, "ACAPS," houses the customer home equity application data,  Inbound Specialists use

---

[3] As noted below, Inbound Specialists may open some computer programs as they need them during their shifts.

ACAPS for every customer call and, for that reason, Inbound Specialists typically open ACAPS right after logging into their phones.  *Id.*, p. 6.  It takes less than two minutes to open.  *Id.*

There are several other computer programs that Inbound Specialists use less frequently than ACAPS in responding to certain types of customer calls, depending on the nature of the call. *Id.*  Inbound Specialists are not required to open any particular program until and unless they need it.  *Id.*  Because the programs "time out" after 30 minutes of non-use, opening them at the beginning of the shift would not obviate the need to open them again when and if they are needed. *Id.* One such program is "Interact," which enables the processing of a customer request to have payments deducted automatically from their checking account.  It takes approximately 30 seconds to one minute to open Interact.  *Id.*

Another program that Inbound Specialists may use in responding to customer calls is "Control Center," which is used only for closings (accounting for about 10% of the Inbound Specialists' incoming calls).  *Id.*, pp. 6-7.  It takes approximately one minute to open the Control Center program.  *Id.*  Once that program opens, it displays links for tools Inbound Specialists may use for particular customer inquiries, such as the "Setting Expectations" tool, which allows Inbound Specialists to predict how much longer the loan process will take, the "Notary List" tool, which allows them to assist customers who ask for a notary, and the Policy and Procedure Guide which they can review to find protocols for home equity loan processes.  *Id.*  It takes a few seconds for these tool programs to open from the links provided in Control System. *Id.*

The Online Status Tool Host program is another system that Inbound Specialists may use, on occasions when customers are having problems with their online account data.  *Id.*, p. 7.  The Online Status Tool Host program allows Inbound Specialists to view customers' online account

screens in the same format as the customer sees.  *Id*.  This program opens in approximately one minute.  *Id.*

Inbound Specialists may also use the "XT" system in order to view documents that the customers have provided to the Bank, in case the customers ask about the contents of the documents or the dates on which the Bank received them.  *Id*., p. 7.  The XT System loads in 30 seconds to one minute.  *Id*.

Inbound Specialists use a program called "Commit" to input notes about customer complaints should that occur.  *Id*.  This program loads in approximately 30 seconds.  *Id.*

In addition to the foregoing, Inbound Specialists use other computer programs but not for customer calls.  *Id.*  For example, IEX tells them when their breaks are scheduled, and Outlook allows them to access their emails.  *Id.*

### 5.     <u>Schedule Adherence And Productivity Requirements For Inbound Specialists</u>

The Bank uses Inbound Specialists' phone login data for purposes of determining their schedule adherence, productivity, and performance metrics, but does not use or consider their *computer* login data for those purposes.  *Id*.  Inbound Specialists are considered to be on time for schedule adherence purposes if they are logged into their phones when their shifts begin.  *Id.* Inbound Specialists are permitted to block incoming calls by placing their phones in "aux" mode five minutes before the end of their shifts, if they are not on a call at that time.  Doing so does not count against them for schedule adherence purposes.  *Id.*

Inbound Specialists have scheduled meal periods of 30 minutes, and the Bank also provides them with two 15-minute paid rest periods during their 8-hour shifts, even though they are not required by federal or state law.  *Id.*, pp. 7-8.  Other than when they are on meal and rest breaks, or scheduled meeting or training time, the Bank expects Inbound Specialists to be on calls

or available to receive calls (*i.e.*, logged into their phones and not in a call blocking mode) for 70% of their time.  *Id.*  Put another way, the Bank permits Inbound Specialists to block their incoming calls for up to 30% of their working time per month, which equates to approximately 2.4 hours per day.  *Id.*  The Bank refers to this time as "wrap and idle" time because Inbound Specialists may block incoming calls when they are inputting call "wrap" notes into the computer and when they are "idle" and simply want to block incoming calls for any other reason, including personal reasons.  *Id.*

### 6.   Plaintiff's Employment And the Putative Class Members' Very Different Contentions About Allegedly Working Off The Clock

#### A.   Plaintiff Aileen Culpepper

Plaintiff Aileen Culpepper worked for the Bank as an Inbound Specialist I from March 23, 2015, to May 28, 2016, when the Bank terminated her employment for "call avoidance."  *Id.*, p. 8.  Culpepper's conduct in avoiding calls included transferring customer calls out to other Bank representatives or to automated systems without disconnecting on her end, which prevented additional incoming calls from being routed to her line.  *Id.*  As Culpepper admits, after transferring these calls, she remained connected to the calls while she shopped or looked at products on the Internet using the Bank's computer.  *Id*; ECF No. 81-3, pp. 29, 40.

Culpepper admits that she knew at all times during her employment that the Bank's policies required her to record all of her time worked so she would receive pay for it, including time spent logging onto computer programs; she concedes that working off the clock violated the Bank's policies.  *Id.*, p. 28, 30-31.  Notwithstanding, Culpepper contends that she worked off the clock for 20-30 minutes per day before her shift started by opening all of her available computer programs.  She does not contend that she did this because of a uniform policy or procedure at the Bank or that she was ever specifically told to do this.  Instead, Culpepper asserts that one of her

supervisors, Garfield Brown, *implied* that it was necessary when he told her to have unidentified "systems" "at the ready to be able to field the first call when you sign into your phone." *Id.*, pp. 20-21, 27. But, Culpepper admits that no one at the Bank ever told her not to record the time she spent doing this pre-shift work:

> ***Nobody ever said don't – nobody ever said do not record the time you're using to open those systems. Don't record it. Nobody ever said that.*** They said, be here early and have everything up and ready to go by your start time. So, it was implied you needed to be there early, because if you weren't early, you were late.

*Id.*, p. 32 and ECF No. 96 (emphasis added).

Culpepper also acknowledges that another supervisor, Eyrella Campos, never said anything to give her the impression she had to have her computer and all of her programs up and running by the time her shift began. *Id.*, p. 34-35. Furthermore, Culpepper testified that she does not recall ever working off the clock when she had an 8:30 a.m. start time. *Id.*, p. 36. When Culpepper was late for work she always logged into her phone at the start of her shift, and then used the "aux" function to block incoming calls while she opened her computer programs. *Id.*, pp. 37-38.

Culpepper also testified that there was "no rule" at the Contact Center when she worked there regarding how early Inbound Specialists could sit at their desks prior to their shifts. She acknowledged that some people ate breakfast at their desks prior to their shifts. *Id.*, p. 26. She also testified that she was permitted to place customers on hold "as often as necessary" as long as she returned to the line every two to three minutes to check in with the customer. *Id.*, pp. 22-25. Culpepper does not recall anyone at the Bank telling her that she should not place customers on hold while she opened her computer programs during her shift. *Id.*, p. 39.

### B.        FLSA Opt-In Plaintiff Sarena Salmeri

The Bank hired Salmeri on May 23, 2016 as an Inbound Specialist I.  ECF No. 81-2, p. 8, ¶ 22.  Salmeri had difficulty performing her basic job functions because she has a "central auditory processing disorder," which makes it difficult for her to process information that is conveyed to her verbally.  ECF No. 81-3, pp. 45-49.  As a result of her impairment, and after repeated attempts by the Bank to provide extra training, support, and other accommodations to enable Salmeri to perform her basic job functions, on June 12, 2017, Salmeri commenced a leave of absence from which she never returned.  *Id;* ECF No. 81-2, p. 8, ¶ 22.

In contrast to Culpepper's testimony, Salmeri testified that her supervisors told her she was *not* allowed to block incoming calls while logging into her computer systems, Salmeri Depo. ECF No. 81-3, p. 50, and that she could *not* place customer calls on hold.  *Id.*, pp. 51-52.  Salmeri also testified that she was told *not* to record the time it took her to log in – but, not by any of her trainers or supervisors, but, rather by "various associates that [she] was sitting with" during the "nesting" phase of her employment.  *Id.*, pp. 53-54.

Salmeri also testified that she received different instructions from different Bank representatives about whether she was allowed to sit down at her desk prior to her scheduled start time:

> I'm not sure how to answer this because there was some people saying yes to sit down at your desk before your scheduled start time and then others were saying no; so, it was a mix of, yes, sit down and, no, don't.

*Id.*, pp. 55-56.

While Salmeri claims that she usually sat down at her desk at least 10 to 15 minutes before the 9:30 start of her shift in order to boot up her systems, ECF No. 75-10 at ¶¶ 7, 12, her computer login records show that she typically logged into her computer only a couple of minutes prior to her 9:30 a.m. start time.  *See* ECF No. 81-2, pp. 53-77.

14

## IV.   ARGUMENT

### A.   APPLICABLE LEGAL STANDARD FOR RULE 23 CLASS ACTION CERTIFICATION

The Federal Rules of Civil Procedure provide that a district court must rule on the issue of class certification "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1).   "Rule 23 class actions are designed to promote efficiency and economy of litigation . . . without sacrificing procedural fairness." *Ackerman v. Coca-Cola Co. & Energy Brands, Inc.*, 2013 U.S. Dist. LEXIS 184232, *6 (E.D.N.Y. July 18, 2013).   District courts are afforded broad discretion in determining whether an action should be certified under Rule 23.   *Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 73 (E.D.N.Y. 2011) (citations omitted); *Parker v. Time Warner Entm't Co.*, L.P., 331 F.3d 13, 28 (2d Cir. 2003).

A court may certify a class only after it concludes, based on a "rigorous analysis" that each of the requirements of Rule 23 is met. *See Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 405 (2d Cir. 2015); *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).   Rule 23(a) permits a case to be litigated as a class action only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.   Fed. R. Civ. P. 23(a); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 U.S. Dist. LEXIS 127262, * 18 (S.D.N.Y. Nov. 13, 2009).

The court must also be satisfied that certification is appropriate under at least one of the three provisions in Rule 23(b). *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013); *Gregory v. Stewart's Shops Corp.*, 2016 U.S. Dist. LEXIS 89576, * 35 (N.D.N.Y. July 8, 2016).   The predominance requirement of Rule 23(b) tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."   *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 623 (1997).  Predominance is required to ensure that the class will be certified only when it would "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 104 (2d Cir. 2007). Common questions predominate only "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Additionally, the Second Circuit has added an "implied requirement of ascertainability" to the express requirements of Rule 23(a).  *In re IPO Sec. Litig.*, *supra*, 471 F.3d at 30. This requirement "obligates plaintiffs to demonstrate that the class they seek to certify is readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *McBean v. City of New York*, 260 F.R.D. 120 (S.D.N.Y. 2009).

The party seeking class certification "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met."  *Myers, supra,* 624 F.3d 537, 547 (2d Cir. 2010); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

### B.    THE COURT SHOULD DENY PLAINTIFF'S MOTION BECAUSE IT IS UNTIMELY.

In keeping with Rule 23's requirement that the court determine class certification "[a]t an early practicable time after a person sues or is sued as a class representative" Fed. R. Civ. P. 23(c)(1), the court's initial pretrial order says that "all motions relating to … class certification … shall be filed within 60 days after filing of the complaint."  ECF No. 2.

Although the Court issued subsequent orders extending the deadline for Plaintiff to file her motion for conditional certification under the FLSA, the Court never extended the deadline for filing a Rule 23 motion for class certification.  Therefore, pursuant to the Court's initial pretrial order, the deadline for Plaintiff to file her Rule 23 motion expired 60 days after she filed her complaint, on April 16, 2017.  Since Plaintiff did not file her Motion until August 17, 2018, more than a year after that deadline, the Court should deny it as untimely.

### C.   THE COURT SHOULD DENY THE MOTION BECAUSE PLAINTIFF CANNOT ESTABLISH COMMONALITY OR TYPICALITY.

"A review of the case law in this Circuit confirms that cases, like this one, involving allegations of 'off-the-clock' work, are less susceptible of class-wide resolution than other types of wage and hour cases." *Gregory v. Stewart Shops Corp. supra*, 2016 US Dist LEXIS 89576, at *36 (quoting *Ruiz v. Citibank, N.A.,* 93 F. Supp. 3d 279, 294 (S.D.N.Y. 2015).   *See also Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 306 (E.D.N.Y. 2013) (recognizing that "[o]ff-the-clock" cases can present challenges for class-wide determination that often preclude certification") (citation omitted).  In the Second Circuit's inquiry, particularly in cases involving off-the-clock claims, the typicality, commonality and predominance requirements merge into a single inquiry. *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999); *Eng-Hatcher v. Sprint, supra*, 2009 U.S. Dist. LEXIS 127262, * 20; *Gregory v. Stewart's Shops, supra*, 2016 U.S. Dist. LEXIS 89576, * 38.

In analogous class actions based on alleged off-the-clock violations, courts in the Second Circuit and elsewhere have denied class certification, finding that plaintiffs cannot establish the requisite elements of Rule 23 where, as here, the employer had a lawful policy and there was no evidence of a class-wide scheme to violate it.  *See Ruiz v. Citibank, supra*, 93 F. Supp. 3d at 294-295 (denying Rule 23 class certification because the employer's policy was lawful, and the

plaintiffs' evidence of individual violations did not establish a common plan or scheme to subvert them); *Gregory v. Stewart's Shops, supra*, 2016 U.S. Dist. LEXIS 89576, * 46 (holding that "[b]ecause the anecdotal evidence presented in this case does not document consistent and widespread deviations from [defendant's] formal policy of paying employees for all time worked, the court concludes that the plaintiffs have not proven, by a preponderance, that the de facto practices and policies of which they complain are sufficiently uniform and pervasive as to warrant class treatment") (internal quotations omitted); *Fernandez v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 124692 (S.D.N.Y. Aug. 28, 2013) (denying class certification where employer's policy required payment for all time worked, and the plaintiffs merely submitted "anecdotal evidence" concerning instances when employees were denied compensation for pre and post-shift work); *Eng-Hatcher v. Sprint, supra*, 2009 U.S. Dist. LEXIS 127262, *21 (denying Rule 23 certification because the plaintiff's anecdotal proof that she and other class members were forced to work after clocking out was insufficient to establish commonality, typicality or predominance in light of employer's lawful policy to pay for all time worked); *Mendez v. U.S. Nonwovens Corp.*, 314 F.R.D. 30, 46 (E.D.N.Y. 2016) (denying class certification in off the clock case because while the plaintiffs' anecdotal evidence showed that some employees did not receive compensation for all of the hours they worked, other class members did receive full compensation pursuant to employer's lawful policy); *Pryor v. Aerotek Scientific*, LLC, 278 F.R.D. 516, 532 (C.D. Cal. 2011) (in call center case where the plaintiffs alleged they were required to work off the clock prior to their shifts by logging into their computers, denying class certification because employer's policy was lawful, and individual circumstances of each employee determined whether or not he or she incurred any unpaid time); *Ginsburg v. Comcast Cable Communs. Mgmt LLC*, 2013 U.S. Dist. LEXIS 55149 (W.D. Wa. April 17, 2013) (denying class certification in call

center case where the plaintiffs alleged they were pressured to open computer programs before their shifts started, because of the employer's lawful policy, evidence that some employees followed procedures resulting in no off the clock work, and divergent practices with respect to phone and computer log on).

Here, as in the foregoing cases, Plaintiff's off-the-clock claims are not amenable to class certification because she cannot establish the requisite elements of commonality, typicality or predominance under Rule 23.

### 1.   Plaintiff's Anecdotal Evidence Does Not Establish A Common *De Facto* Unlawful Policy.

In *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ("Dukes") the Supreme Court clarified the commonality requirement under Rule 23(a) as follows:

> What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.   Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.*, 564 U.S. at 350.

In *Dukes*, the plaintiffs offered in support of their motion for class certification 120 affidavits from putative class members who claimed that they had experienced discrimination on the part of their supervisors, and statistical data suggesting a gender bias in favor of male employees.   *Id*. at 2553-2555.   The Court found that because the affidavits accounted for only about 1 out of every 12,500 class members, they did not demonstrate that the entire company operated under a general policy of discrimination and therefore class certification was not appropriate.   *Id.*

Pursuant to the holding in *Dukes*, in order to certify a class action, Plaintiff must show either: (1) an express policy that potentially resulted in a violation of the plaintiffs' legal rights; or

(2) a practice that had so pervaded the company that it had become a *de facto* policy.  As for the latter, plaintiffs can establish this through anecdotal evidence, but only if it that "reaches a certain critical mass" or a comprehensive statistical analysis. *Mendez v. U.S. Nonwovens Corp.*, 314 F.R.D. 30, 42 (E.D.N.Y. 2016); *Ruiz v. Citibank, supra*, 93 F. Supp. 3d at 289.

In *Ruiz v. Citibank, supra*, plaintiffs sought to certify a Rule 23 class of employees who alleged that their employer pressured them to work off the clock.  *See Ruiz, supra,* 93 F. Supp. 3d at 281-82.  In support of their motion for class certification, the *Ruiz* plaintiffs submitted proof that certain managers told them to perform work but not record it in the timekeeping system because of budgetary pressure to avoid paying overtime.  *Id.*  The plaintiffs could not point to formal policies by the employer to deny overtime and instead relied on anecdotal accounts to establish a *de facto* policy of pressuring them to work off the clock.  *Id.* at 291-292.   The court concluded that the plaintiffs could not establish commonality, typicality or predominance to warrant class certification, because, even if the number of anecdotal accounts were "sufficiently large to confidently be extrapolated to the class as a whole" the "contradictions" within the group – such as those who were told to record all their time and never worked off the clock – "suggest the lack of a common answer."  *Id.*, at 292.  As the court noted, the plaintiffs did not reach the "critical mass" standard for providing the existence of a *de facto* unlawful policy that would make class certification appropriate:

> A classwide determination of liability . . . depends upon demonstrating that appropriate policies have reliably translated themselves into inappropriate managerial behavior across the width and breadth of the class.  Such evidence is simply not to be had from this record.

*Id.* at 295.

Here, Plaintiff relies solely on anecdotal evidence that comes nowhere near a "critical mass" that would suggest there was a "de facto policy" at the Bank to require off-the-clock work.

Nor does Plaintiff's anecdotal evidence show any "inappropriate managerial behavior" at all, much less that affecting the breadth of the class. Instead, her evidence merely shows that she and four PCMs were allegedly advised by other *peer* Inbound Specialists[4] to: (1) arrive at work prior to the start of their scheduled shift to boot-up computer systems; *or* (2) be "ready to take calls" at the start of their shifts; *or* (3) to boot-up their computers before logging into their phones. *See* ECF No. 75-4-75-10. This limited sample of five Inbound Specialists (one of whom, Michelle Bertolino, is not even a PCM because she worked outside of the relevant time period)[5] out of a total of approximately 280 PCMs (i.e., less than 2%) does not establish or suggest that a policy or practice existed that applied to all PCMs, nor does it show any inappropriate managerial behavior. And, even assuming that the allegations these declarants make are all true, they do not establish or even suggest the existence of a common policy or practice. In fact, the instructions Plaintiff and her declarants allegedly received from peer trainers were not even uniform or consistent.

**Matthew Ericksen** states that trainers told him to arrive for work "at least 30 minutes" before his shift to load computer programs, whereas **Jeff Dunphy** and **Andrea Morgan** merely state that they were told to arrive "before" their scheduled start time. *See* ECF Nos. 75-5, ¶ 9; 75-8, ¶ 9; 75-4, ¶ 9. **Sarena Salmeri** does not claim that anyone told her to open computer programs before her shift; she states only that trainers told her to boot up her computer before logging into the phone. *See* ECF No. 75-10, at p. 3, ¶ 15. **Michelle Bertolino** (who, as noted above, is not a PCM) does not state that any trainers told her to open computer programs before her shift; rather,

---

[4] The training was conducted by other Inbound Specialists, such as Sarena Greene and Jason Krukas, who were not supervisors or managers of the Bank. *See* ECF No. 81-3, at pp. 64-70, 82. Thus, even assuming that these individuals made such statements to Plaintiff and others (which they testified they did not), there is still no evidence that this is the Bank's policy, or that the Bank otherwise knew or should have known people were not recording all of their time worked.

[5] Bertolino last worked as an Inbound Specialist in January 2015. *See* ECF No. 75-9, ¶ 4. Thus, under the two-year limitations period under state law, any state-law claims Bertolino might assert were time-barred prior to the time this action was commenced on February 16, 2017. *See* Conn. Gen. Stat. 52-596.

she states that the trainers merely told her to be "ready to take calls" when her shift began.  ECF No. 75-9 at p. 2, ¶ 8.  Furthermore, the trainers that Plaintiff deposed testified that there was no training or expectation for any Inbound Specialist to open computer programs before their shift or to otherwise work off the clock.  *See* ECF No. 81-3 at pp. 74-77, 85, 86.

Even accepting Plaintiff and her declarants' allegations as true, they would not establish liability even on an individual basis, much less a class-wide basis.  Notably, neither Plaintiff nor the other declarants claim that they were in any way prevented from recording any time.  Thus, any liability determination necessarily will turn on inherently individualized issues, including what instruction each individual received regarding their boot-up time; whether each individual, in fact, performed any work-related tasks for which they were not compensated; whether they reported any pre-shift time; and, if they did not report time worked to the Bank, whether the Bank knew or had reason to know that any individual had violated Bank policy and worked off the clock.

Plaintiff's claim that there is a common policy or practice is also directly refuted by the sworn statements of numerous Inbound Specialists that they were never advised to arrive early to open computer programs or perform any other work before their shifts, and that they followed the Bank's established procedures by: (1) waiting until their shift start time to begin working; (2) logging into their phones at the start of their shifts; (3) beginning to open computer programs of their own choosing *after* their shifts started, and after logging into their phones; (4) placing customer calls on hold or making small talk if they received a call before any given computer program was open; and (5) recording all of their time in the Bank's timekeeping system so they would be paid for it.  *See* ECF Nos. 81-4 to 81-15.

Thus, Plaintiff cannot establish that there any common issues of law or fact, or that any common issues will predominate this action such that the case will not devolve into numerous individual mini-trials for each PCM.   Class certification is not appropriate here.   *See e.g., Dunningan v. Metro Life Inc. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. 2003).

### 2.   Plaintiff's Claims Are Not Typical of the Class.

As Plaintiff acknowledges, the typicality requirement in Rule 23 requires that she establish the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  ECF No. 91-1, p. 20.  Here, Plaintiff was employed by the Bank as an Inbound Specialist I, and she seeks to represent all Inbound Specialists at the Connecticut Contact Center, including those holding the positions of Inbound Specialist II and Inbound Specialist III.  Plaintiff contends that all the PCMs had the same job duties and were affected equally by pressure to log into their computers before their shifts started.  This contention is belied by the evidence.

While all of the PCMs had duties involving inbound calls and they were similar in that respect, their duties differed in ways that are material to Plaintiff's claims.  The primary duty of the Inbound Specialist I position that Plaintiff held is to respond to incoming calls from customers.  *See* ECF No. 81-2, p. 3.  But, the primary duty of the Inbound Specialist II is to handle calls referred from Inbound Specialist Is through a "pod line."  *Id.*  The Inbound Specialist IIs do not even receive inbound calls directly from customers (except on limited occasions when their phones are "skilled" to receive such calls because of high call volume), and they rarely receive direct inbound customer calls at the beginning of their shifts.  *Id.*, pp. 3-4.  Likewise, the Inbound Specialist IIIs handle "escalation" calls that other Inbound Specialists transfer to them. *Id.*, p. 4.  They do not handle incoming calls from customers directly (again, except on limited occasions when their phones are "skilled" to receive such calls because of high call volume), and they typically do not receive escalated calls at the beginning of their shifts.  *Id.*

Thus, Plaintiff's contention that PCMs felt pressure to log into their computers before they started to receive customer calls at the start of their shifts simply is not true.  The Inbound Specialist IIs and IIIs could not have felt pressure to be logged into their computers by the time their shifts started because they did not need to start fielding customer calls immediately when their shifts began.  Indeed, Sarena Greene, who worked as an Inbound Specialist II and Inbound Specialist III, testified that she has "never" received a customer call within the first 30 minutes of starting her shift.  ECF No. 81-3, p. 73.

In addition, the PCMs were permitted to place customers on hold or make small talk while they opened their computer programs and many of them did so rather than logging into their computers before their shifts started as Plaintiff claims she did (other than when she was late for work).  *See* ECF No. 81-2, p. 5-6; ECF Nos. 81-4 to 81-15.  They were also permitted to block incoming calls while opening computer programs using the "aux" function at their discretion.  ECF No. 81-2, pp. 5-6.  These distinctions are essential, because those PCMs who elected to use "aux" or place customers on hold or make small talk while they opened their computer programs would not have worked off the clock.

In addition, while Plaintiff contends that the Bank's "strict metrics" resulted in pressure on the PCMs to log into their computers before their shifts started, she acknowledges that the PCMs had different practices as to whether they started work early, whether they logged into computers before their shifts, whether they placed calls on hold, how they used "aux" and how they were affected by the metrics.  For example, Plaintiff testified as follows:

> Q.    Are you aware of any inbound specialists that started their shift by logging into their phone and then opened their computer programs while they were taking calls?

24

A.     I honestly know one person who was able to do that, because his metrics were so crazy, because he was just a computer whiz. His name was Adam Miller.

* * *

Q.     But his order of starting work was to sign into his phone and then boot up his computer.  Right?

A.     No.  He would start, but he wouldn't be there 20 minutes before.  He would have his phone in aux.  But the rest of his numbers were so good that that 15, 20 minutes, however long he was in aux every day, didn't affect him negatively because he almost never put anybody on hold.

Exh. A, at 232:8-233:4.

This testimony by Plaintiff and the undisputed evidence of the differences in the PCMs job duties and their different practices with respect to logging into the computer, putting customer calls on hold and using "aux" shows without question that Plaintiff's claims are not typical of the class she seeks to represent.  Class certification is not appropriate.

### 3.     Plaintiff Cannot Establish Predominance of Common Issues.

In order to establish the predominance element of Rule 23, Plaintiff must show that the question of liability for the class can be determined through generalized proof and the case will not devolve into mini-trials for each PCM.  *See, e.g. Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).  Here, Plaintiff proposes to use the PCM "computer log-in information with their timesheets" as such generalized proof.  ECF No. 91-1.  There are several problems with this proposal.  First, Plaintiff does not have the computer log-in data or the timesheets for the class and she has no means to obtain them at this point.  She has withdrawn her motion to compel the computer log-in data, and discovery closed long ago.  Second, Plaintiff's proposal would require a comparison of each PCM's computer log-in data with their timesheets to see if they recorded all of their time worked, including that spent logging into their computers.  This would be a highly individualized task that is specific to each PCM.

Furthermore, even if Plaintiff had generalized proof that could establish liability for the class, individualized inquiries would predominate in this matter as to whether the PCMs' supervisors knew or should have known of the off-the-clock work.  Plaintiff contends that she "can prove that the [Bank] had actual or constructive notice of the off-the-clock work based upon [its] admissions" that the supervisors were responsible for ensuring the PCMs arrived for work on time.  ECF No. 91-1, p. 27.  But, this ignores that the Bank permitted the PCMs to sit at their desks before their shifts started, and, as Plaintiff admits, many of them engaged in personal activities at their desks before beginning work.  *See* ECF No. 81-3, at p. 26.  Thus, while the PCMs' supervisors could have noticed whether the PCMs were at their desks at their shift start times, they would not have known that by sitting at their desks prior to that time they were working off-the-clock.  Furthermore, as Plaintiff herself points out, the supervisors could not tell from their systems whether the Inbound Specialists were logged into their computers.  *See* ECF No. 89 at p. 15.  Thus, while Plaintiff contends that it can be "inferred" that the supervisors knew of the alleged off-the-clock work, there is no evidence in this case that would support such an inference, and certainly not on a class-wide basis.

In fact, supervisors and trainers have testified that they did *not* know any Inbound Specialists were opening computer programs or otherwise performing any work-related tasks before their shifts started.  *See* ECF No. 81-3 at pp. 74-77, 85, 86.  Thus, the only way to establish whether any PCM performed work off the clock and whether the Bank knew or should have known of any such work would be for each PCM to testify that they performed off-the-clock work and did not record it as hours worked, and then for each supervisor to testify whether they observed anything that put them on notice that any PCM was working off-the-clock.  The case

would necessarily deteriorate into a series of mini-trials for each putative class member, such that class certification is not appropriate. *See e.g., Dunningan, supra,* 214 F.R.D. at 142.

      **D.**      **THE CASES PLAINTIFF CITES FOR THE PROPOSITION THAT THIS CASE IS AMENABLE TO CLASS CERTIFICATION ARE INAPPOSITE.**

Plaintiff relies on inapposite authority in support of her Motion, and argues that the Court should certify a class here based on cases that involved wholly different types of evidence and claims.

In *Kernats v. Comcast Corp*, 2010 U.S. Dist. LEXIS 112071 (N.D. Ill Oct. 20, 2010), the court ruled that there was common evidence that could establish the defendant's liability on a class-wide basis. Specifically, the plaintiffs could not access their phone systems without first performing an initial computer login, but the defendant's timekeeping system recorded start times based upon the ***phone*** logins, not the initial computer logins. *Id.*, 2010 U.S. Dist. LEXIS 112071, at * 3-4. Furthermore, the plaintiffs were required to be signed in to the system 96% of their time to avoid being placed into an "improvement required" category for their performance evaluations, and could not reach the "strong performance" category without being signed in for 98% of their time. *Id.* at *4-6. Yet, they had numerous off-phone duties that could not be accomplished during their sign-on time, resulting in them being forced to work before their shifts and during breaks to avoid discipline. *Id.* at *4-6.

In *Burch v. Qwest Communs. Int'l, Inc.*, 677 F. Supp. 2d 1101 (D. Minn. 2009), the court determined, *inter ali*a, that the employer's "uniform payroll system weighs in favor of certification" because it only included incidental overtime for time spent finishing a customer call after the shift ended and did not provide compensation for the other off-the-clock activities alleged by the plaintiffs. *Id.* at 1119. There also was "consistent evidence" bolstered by the

results of an audit showing that the plaintiffs were required to have their computer systems open before they logged into their phones at the start of their shifts.  *Id.* at 1115.

In *Ribot v. Farmers Ins. Group*, 2013 U.S. Dist. LEXIS 100810 (C.D. Cal. July 17, 2013) the employer had an adherence policy that the court concluded was "part of a policy to encourage preshift work" because it required the plaintiffs to be available for calls for 90% of their work time, and there was common evidence that supervisors directed the plaintiffs to arrive early for work to perform preliminary tasks before their shifts started.  *Id.*, at * 16-17, 21-22.

By contrast to the foregoing cases, the PCMs here reported their own work time, and they could (and were expected to) record *all* time worked – including any pre-shift time – in the Bank's timekeeping system.   There is no evidence that any supervisors or managers ever instructed people to work off the clock or not record all of their time worked, as Plaintiff herself admits.  *See* ECF No. 81-3, p. 32; ECF No. 96.  The Bank does have a schedule adherence policy, but it is very different than the ones in *Kernats* and *Ribot,* which required employees to be logged in and available to take calls over 90% of their working time.  The Bank's policy does not require PCMs to be logged in and available to take calls 90% of their working time.  Instead, it merely requires that they start work on time, take breaks and lunch on time, and go home at their scheduled time, at least 92% of the time.  *See* ECF No. 89, p. 10.  In fact, unlike the cases Plaintiff cites, the Bank allows PCMs to block calls altogether for up to *30%* of their day – i.e., 2.4 hours – and the Bank advises them that they may place customers on hold or make small talk with them if they need to open computer programs.  *See* ECF No. 81-2, pp. 5-8; ECF Nos 81-4- 81-15.  Plaintiff herself admits that these are policies of the Bank.  *See* ECF No. 89, p. 10; ECF No. 81-3, at p. 22.   Thus, there is simply no reason that PCMs would need to boot up their

computers off the clock, and there is no evidence that can establish that the Bank had a common policy or practice to require or even encouraged any off-the-clock work.

## V.     CONCLUSION

For all of these reasons, the Bank respectfully requests that the Court deny Plaintiff's Motion for Class Certification.

DATED: September 6, 2018                     MᴄGᴜɪʀᴇWᴏᴏᴅs LLP

By:     /s/ Bethany A. Pelliconi
        Michael D. Mandel (CA Bar. No. 216934)
        (admitted pro hac vice)
        Bethany A. Pelliconi (CT Bar. No. 407615)
        (admitted pro hac vice)
        1800 Century Park East
        Los Angeles, CA 90067
        Telephone: (310) 315-8200
        Facsimile: (310) 315-8210
        bpelliconi@mcguirewoods.com
        mmandel@mcguirewoods.com

        Phillip A. Goldstein (N.Y. Bar No. 4011961)
        (admitted *pro hac vice*)
        1251 Avenue of the Americas, 20th Floor
        New York, NY 10020
        Telephone: (212) 548-2167
        Facsimile: (212) 715-6245
        pagoldstein@mcguirewoods.com

## <u>CERTIFICATION</u>

I hereby certify that on September 6, 2018 a copy of the foregoing **DEFENDANT BANK OF AMERICA, N.A.'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE (ECF NO. 91)** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

By: /s/ Bethany A. Pelliconi

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


AILEEN CULPEPPER, individually      :    CIVIL CASE NO.
and on behalf of all other          :    3:17-CV-00264 VAB
similarly-situated individuals      :
                                    :
vs.                                 :
                                    :
BANK OF AMERICA, NATIONAL ASSOCIATION :




DEPOSITION OF:  AILEEN CULPEPPER



APPEARANCES:


        THE HAYBER LAW FIRM, LLC
                Attorneys for the Plaintiffs
                221 Main Street - Suite 502
                Hartford, CT 06106
                (860) 522-8888
        BY:   ANTHONY J. PANTUSO, III, ESQ.
                apantuso@hayberlawfirm.com


        McGUIRE WOODS, LLP
                Attorneys for the Defendants
                1800 Century Park East
                Los Angles, CA 90067
                (310) 315-8200
        BY:   BETHANY A. PELLICONI, ESQ.
                bpelliconi@mcguirewoods.com




                Christine E. Borrelli
              Connecticut License No. 117
               Registered Merit Reporter

1   each day to start work?

2      A.   Brenda, Shari, Ann.  Those are the ones that I sat

3   there and could physically see.  I saw Peter, but I don't

4   know if he logged his time or not.  I don't know if Ann

5   logged her time either, because we didn't talk time cards.

6   I was too new.  But Brenda and Shari, I know.  We talked

7   about it.

8      Q.   Are you aware of any inbound specialists that

9   started their shift by logging into their phone and then

10  opened their computer programs while they were taking calls?

11     A.   I honestly know one person who was able to do

12  that, because his metrics were so crazy, because he was just

13  a computer whiz.  His name was Adam Miller.  He's the only

14  one that I know of that -- I mean, he wouldn't log in at his

15  start time.  It would be a few minutes before, but he

16  could -- he put the customers on hold.  I don't know how he

17  got away with it, but his wrap and idle time was so good the

18  rest of the day, that even if he put it in aux while he was

19  booting up his systems, he could take notes like this while

20  he was talking.  I've just never seen anybody like him.  He

21  was the human computer.  He's the only one I knew of who

22  could do it.

23     Q.   But his order of starting work was to sign into

24  his phone and then boot up his computer.  Right?

25     A.   No.  He would start, but he wouldn't be there 20

1   minutes before.  He would have his phone in aux.  But the

2   rest of his numbers were so good that that 15, 20 minutes,

3   however long he was in aux every day, didn't affect him

4   negatively because he almost never put anybody on hold.

5        Q.   Are you aware of any inbound specialists that

6   started their shifts each day by signing into their phone

7   and then opening their computer programs?

8        A.   No.  I don't know anyone who did that.

9        Q.   At the end of the day when you were an inbound

10   specialist, did you power off your computer or

11   control-alt-delete, lock it?

12        A.   The end of the day, you would power off.  If

13   you're going to a meeting, you would lock it.

14        Q.   And did you, in fact, power off every day instead

15   of control-alt-deleting at the end of the day to power off?

16        A.   You would power off.

17        Q.   That's what you did?

18        A.   Yes.

19        Q.   Are you sure you did that?

20        A.   Yes.

21        Q.   And did other inbound specialists, all of them

22   power off at the end of the day rather than

23   control-alt-deleting to lock their computers?

24        A.   I don't know.  You're supposed to power it off.

25        Q.   Who told you you're supposed to power it off?