# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AILEEN CULPEPPER,<br>*Plaintiff*,<br><br>v.<br><br>BANK OF AMERICA, NATIONAL ASS'N,<br>*Defendant.* | No. 3:17-CV-00264 (VAB) |

## RULING AND ORDER ON PENDING MOTIONS

On February 16, 2017, Aileen Culpepper ("Plaintiff" or "Ms. Culpepper") filed a class

action Complaint against Bank of America, National Association ("Bank of America" or

"Defendant") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. and Rule 23

of the Federal Rules of Civil Procedure, asserting violations of the Connecticut Minimum Wage

Act, Conn Gen. Stat. § 31-58 *et seq*. Compl., ECF No. 1. Ms. Culpepper, an Inbound Specialist,

or customer service agent, was responsible for answering customer calls at Bank of America's

Farmington, Connecticut call center. *Id*. ¶¶ 1, 17, 25. She and other Inbound Specialists allege

that the Farmington, Connecticut Bank of America call center had a policy or practice of failing

to pay Inbound Specialists who reported to work early to perform necessary pre-shift work, such

as reviewing policy updates and launching their computer systems. *Id*. ¶ 3.

Several motions are now pending: (1) Plaintiff's motion for conditional certification of a

collective action and for notice to be issued under Section 216(b) of the Fair Labor Standards

Act, ECF No. 75; (2) Defendant's motion to strike the consent to join the FLSA collective action

by Michael Weed, ECF No. 80; (3) Defendant's motion to deny Rule 23 class certification, ECF

No. 81; (4) Plaintiffs' motion for class certification under Rule 23, ECF No. 91; (5) Defendant's

motion to seal the Timekeeping Compliance Learning Guide, ECF No. 82; and (6) Plaintiff's motion to amend or correct the scheduling order, ECF No. 85.

For the reasons set forth below, the Court **GRANTS** Plaintiff's motion for conditional certification under section 216(b) of FLSA, ECF No. 75; **DENIES without prejudice to renewal** Defendant's motion to strike Michael Weed's consent to join the FLSA collective action, ECF No. 80; **DENIES without prejudice to renewal** Defendant's motion to deny Rule 23 class certification and Plaintiff's motion for Rule 23 class certification, ECF Nos. 81 and 91; **GRANTS** Defendant's motion to seal the Timekeeping Compliance Learning Guide, ECF No. 82; and **DENIES** as moot Plaintiff's motion to amend or correct the scheduling order, ECF No. 85.

Consistent with its inherent authority to manage this case, *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (". . . district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."), the Court also establishes a schedule for the second phase of discovery and sets a deadline for a renewed motion for Rule 23 class certification and dispositive motions.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Factual Allegations

This class action suit revolves around the policies and practices of a group of trainers and supervisors in a single room at a single call center in a small town in central Connecticut. In support of her motions for conditional certification under the FLSA and class certification under Rule 23, Ms. Culpepper focuses on four types of information: (1) the common bonds between and among Inbound Specialists; (2) the typical work schedules for Inbound Specialists; (3) the

policies and practices that allegedly result in Inbound Specialists working off-the-clock; and (4) the corporate timekeeping policy, as opposed to the local timekeeping practice.

### 1.    The Common Bonds Between and Among Inbound Specialists

All of the Inbound Specialists at the Farmington call center allegedly work in the same room on the first floor of the building. Deposition of Jayme Mosier ("Pl. Excerpted Supervisor Mosier Dep.") (Feb. 28, 2018), ECF No. 75-6, at 9[1] ("Q. Are [Inbound Specialists] all in the same room? A. Yes."); Declaration of Andrea Morgan ("Morgan Decl.) (June 7, 2018), ECF No. 75-4 ¶ 26. They assist customers applying for home equity loans, explain Bank of America mortgage policies and procedures, and schedule home sale closings. Deposition of Donna Gladney ("Pl. Excerpted Gladney Dep.") (July 6, 2017), ECF No. 75-2, at 8–10; *see also* Deposition of Garfield Brown ("Pl. Excerpted Supervisor Brown Dep.") (July 6, 2017), ECF No. 75-3 at 7. According to Donna Gladney, the head supervisor, or Division Fulfillment Leader, who has been at the bank for more than thirty years, Inbound Specialists are "responsible for answering phone calls from clients who are in the process of a home equity application . . . . they're phone specialists who are on the phone. Other than for training, meetings, events, they are on the phone." Pl. Excerpted Gladney Dep. at 8–9.

There are three levels of Inbound Specialists: Level I, Level II, and Level III. Level I specialists handle incoming calls generally, Level II specialists serve as subject matter experts, and Level III specialists act as senior specialists responsible for addressing calls with dissatisfied customers (i.e., if a customer wishes "to speak with a supervisor", he or she is allegedly transferred to a Level III specialist). Pl. Excerpted Gladney Dep. at 10–12. All three levels of specialists receive customer calls directly, though Level III specialists allegedly do not routinely

---

[1] ECF pagination unless otherwise stated.

receive direct customer calls. *Id*. at 12; Pl. Excerpted Supervisor Brown Dep. at 8 ("A III . . . . would wait for a phone call to come in from a I to offer assistance.").

Despite the different titles, Ms. Culpepper alleges that all three positions have similar job duties. *See, e.g*., Declaration of Davon Allen ("Allen Decl.) (Aug. 8, 2017) ¶ 3 ("I was an Inbound Specialist I from March 2016 through March 2017 and, since March 2017, have been an Inbound Specialist II. In these positions . . . my primary duties have involved answering customer phone calls and reviewing customer applications for home equity lines of credit."); Declaration of Pamela Searles ("Searles Decl."), ECF No. 79-12 ¶ 3 (". . . I served as an Inbound Specialist I until April 2015 and as an Inbound Specialist II at all times thereafter. In these positions . . . my primary duties have involved answering customer phone calls and reviewing customer applications for home equity lines of credit."); *see also* Deposition of Serena Greene ("Pl. Excerpted Supervisor Greene Dep.) (Feb. 27, 2018), ECF No. 75-11, at 3–5 (on similarities during her time as an Inbound Specialist II and III).

Inbound Specialists are allegedly assembled into ten to fourteen-member teams, comprised of several Level I, II, and III specialists and led by a team leader. Pl. Excerpted Gladney Dep. at 12. During the time relevant to this lawsuit, team leaders were overseen by Donna Gladney. *Id*. at 3, 12. Ms. Gladney managed eight to ten team leaders. *Id*. at 4–5. Those team leaders oversaw the work of the hourly, non-exempt Inbound Specialists.[2]

## 2.    Typical Work Schedules

Inbound Specialists, allegedly full-time employees, typically work eight-and-a-half hour shifts to allow for eight hours of work and an unpaid half-hour lunch. Gladney Dep. at 19 ("Q. How many hours a day do Inbound Specialists work? A. They physically work -- they're there

---

[2] "The position of Inbound Specialist is a non-exempt position under the Fair Labor Standards Act and the Connecticut Minimum Wage Act." Joint Report of the Rule 26(f) Planning Meeting, ECF No. 23, at 4.

for an 8 and ½ hour day, with a 30 minute lunch. So they work eight hours a day."). They

typically work five days a week plus a half-day one Saturday or Sunday each month. Morgan

Decl. ¶ 5 ("My schedule was usually 11:30 a.m. until 8:00 p.m., Monday through Friday. I also

worked four hours on every third Saturday."); Ericksen Decl. ¶ 6 ("Throughout my employment,

my scheduled shift varied. At the beginning of my employment I worked from 10:00 a.m. until

6:30 p.m. Next, my scheduled shift was from 9:30 a.m. until 6:30 p.m. [Last . . .] I worked from

8:30 a.m. until 5:00 p.m. Bank of America also scheduled me to work Saturday shifts every few

weeks during my employment.").

### 3. Policies and Practices that Allegedly Result in Inbound Specialists Working Off-the-clock

Ms. Culpepper alleges four policies and practices that individually or together result in

Inbound Specialists working off-the-clock.

First, Inbound Specialists allegedly are expected to assist customers accurately, which

requires knowledge of the bank's most recent mortgage equity policies. Updated policies

allegedly are not available to Inbound Specialists at home. Morgan Decl. ¶ 19. Rather, Inbound

Specialists allegedly have to read policy updates and bank e-mails at work, as former Inbound

Specialist Andrea Morgan describes:

> During the 10–15 minutes I spent booting up my systems, I also read and responded
> to emails from bank customers, mortgage handlers, and the bank itself. It was also
> common for Bank of America to update its policies regarding home equity loans.
> If that happened, I needed to review the updates so that I [could] accurately assist
> customers. I needed to read and answer emails and review updated policies before
> my shift started because as soon as I logged into the phone, I started receiving phone
> calls. I typically received my first phone call of the day within seconds, if not
> immediately after logging into my phone.

Morgan Decl. ¶ 16–18. *See,* Ericksen Decl. ¶ 19 ("While I was waiting for my systems to fully

open, I routinely read and answered emails I received from the prior evening or early morning.");

*See also*, Pl. Excerpted Supervisor Brown Dep. at 7 (on how Inbound Specialists receive "[v]ery robust training" followed by additional professional development.).

Second, Inbound Specialists allegedly are expected to assist callers personally, which requires access to each customer's loan application, information about the bank's various home equity lines of credit, contact information for other departments, and more. Pl. Excerpted Supervisor Greene Dep. at 6–7. This information allegedly is stored in more than a dozen computer programs and systems that Inbound Specialists must open up at the start of each shift. Pl. Excerpted Supervisor Greene Dep. at 9 ("Available computer software programs between February 16, 2014 and [June 26, 2017] include: Main Frame (ACAPS), Interact, Control Center, Online Status Tool (Host), Branch Look-Up, NBK Look-Up Tool, HELoan, Payment Calculator, Setting Expectations, Smart Lobby (BBA Tool), Sharepoint, Product & Policy Guide (PPG), IEX, Notary List, FileNet Workplace XT/Document Management Portal, Commit, and LS Property Information Exchange (PIE) . . . ." (internal quotations omitted)); Declaration of Sarena Salmeri ("Salmeri Decl.") (July 10, 2017), ECF No. 75-10, at ¶ 11 ("Before I can log into the telephone system each morning, I need to log into my computer and boot up several computer systems, including but not limited to two ACAPS systems, Interact, Document Management Portal, Commit, AVS, IEX, PPG and Sharepoint.").

At times, the bank's computer systems allegedly run slowly, which allegedly increases the time needed to boot-up computer programs. Morgan Decl. ¶ 14–15 ("I needed to start booting up my computer 10–15 minutes early because the computer system was slow. It could even take 15–20 minutes to fully boot-up at times. At times, I was still in the process of fully opening my computer programs during my first call of the day, even though I logged in and started booting up 10–15 minutes earlier."); Declaration of Jeff Dunphy ("Dunphy Decl.") (May

25, 2018) ¶ 11 ("Throughout my employment I usually came into work 15–25 minutes before my scheduled start time. I usually came to work 15 to 25 minutes early because it took that long to boot-up all of the applications on my computer before my shift started. I recall there being approximately a dozen or more applications.").

Third, Inbound Specialists allegedly are expected to comply with finance regulations and provide high-quality customer service, both of which are reviewed by random quality control calls. Pl. Excerpted Gladney Dep. at 17 ("[Inbound Specialists] receive two or three quality reviews that are done by a separate team to review their call treatment, accuracy of information, and they receive an overall quality score for that . . . . In addition, they also receive a compliance review. So it could be an additional one to three calls that strictly review the compliance or regulatory components of a call."). Inbound Specialists allegedly know that they can receive a quality control call at any time, including at the start of their shifts. Morgan Decl. ¶ 21–22 ("Bank of America can, and does, monitor our phone calls. Bank of America monitors these calls to amongst other things, grade our customer service quality. Bank of America monitors these calls randomly. This means that I could have my calls monitored at any time, including my first call of the day.").

Fourth, Bank of America allegedly disciplines Inbound Specialists for starting late (i.e., failing to "adhere"), keeping customers on hold for too long, or falling below the bank's performance metrics. Inbound Specialists allegedly must be ready to accept calls at their appointed start times, or they are subject to discipline. Pl. Excerpted Supervisor Brown Dep. at 11 ("Q. Now, what happens if an Inbound Specialist is not logged onto the phone system at their scheduled start time? A. If they're not? Q. If they're not logged into their schedule start time? A. They can be subject up to disciplinary actions. You know, they're expected to start work at the

beginning of your scheduled time, so disciplinary actions potentially be taken."); Sarena Salmeri

("Def. Excerpted Salmeri Dep.") (Oct. 27, 2017) at 52 ("Q. Once all these programs are up and

running, what is the next thing that you do? A. The next thing that I do is I log in to my phone at

the specific time that my IEX says that I need to be logged in to the phone so I'm not late and

affecting my adherence."); Morgan Decl. ¶ 10 ("The instructors stressed to us that we needed to

be on the phone and ready to answer calls at our start times."); Ericksen Decl. ¶ 12 ("Our trainers

emphasized to us that we needed to be prepared to respond to phone calls and accurately answer

customer questions as soon as our shifts started.").

Inbound Specialists allegedly are allowed to place callers on hold, if they are not ready to

take a call, but that practice is allegedly discouraged and allegedly negatively affects the call

center's performance scores. Def. Excerpted Salmeri Dep. at 51 (Q. "Are you able to put a

customer on hold while you open AVS and the program loads? A. No. Q. Why is that? A.

Because it affects our customer delight. Q. Can you elaborate on that? A. Yes. For every time we

put a client on hold, the clients have reported they get upset in terms of waiting to get their

questions answered; so, therefore, it affects the client delight which lowers the scores for the

whole call center."); Def. Excerpted Culpepper Dep. at 23 ("Q. So, as long as you told the

customer I am going to have you on hold for ten minutes, you were allowed to do that. A. Not

for ten minutes. You were allowed to say two to three minutes . . . . Donna Gladney would say

that in knowledge shares about . . . customer delight, which is what they called it, customer

happiness. Q. And so were you told at the bank that leaving a customer on hold for longer than

two to three minutes would just be too long? A. Yes.").

Bank of America's telephone system allegedly records the amount of time that Inbound

Specialists spend taking customer calls, and Inbound Specialists are allegedly disciplined if they

fail to speak with customers 70% of their scheduled time. Pl. Excerpted Gladney Dep. at 21.

("Time away from the phone, or 'wrap and idle' time, must remain at 30% or less, or Inbound

Specialists face consequences, including termination."); *id.* at 7 ("Q. What is the wrap/idle

metric? A. It is an allocated time that associates are given within their scheduled work hours to

perform history text documentation after a call . . . . And that would be the wrap portion. Idle

refers to personal time that they can take to perhaps use a rest room . . . ."); Supplemental

Declaration of Matthew Ericksen ("Supp. Ericksen Decl."), ECF No. 75-14 ¶¶ 7–8 ("We were

required to have 'wrap and idle' metrics of 30% or less, meaning that we could not spend

anymore than 30% of our time performing 'wrap and idle tasks.' My employment with Bank of

America ended on August 7, 2017 when they terminated me for having poor 'wrap and idle'

metrics."); Salmeri Decl. ¶ 18 (if Inbound Specialists "logged into the telephone system before

booting up their computer systems, they would need to place their telephone systems on 'Aux,'

which would negatively affect their 'Wrap and Idle' time."); Declaration of Michelle Bertolino

("Bertolino Decl.) (June 1, 2018) ¶ 19 ("I have been disciplined for having my 'Wrap and Idle'

time exceed 30%.").

### 4.    Corporate Timekeeping Policy versus Local Timekeeping Practice

At Bank of America, overtime-eligible employees are supposed to be paid for all time

worked. Bank of America, 2015 Timekeeping Compliance: Act Responsibly (Jan. 30, 2014),

ECF No. 75-16 at 11 ("Bank of America is committed to ensuring its employees are paid

accurately for all time worked."). Bank of America, 2014 Timekeeping Compliance: Act

Responsibly (Jan. 30, 2014), ECF No. 75-17 at 15–16 ("Managers are responsible for ensuring

that employees are paid for all time worked."). Ms. Culpepper alleges that the managers at the

Farmington facility did not adhere to this corporate policy. Compl. ¶ 3.

Ms. Culpepper alleges that Bank of America trainers, such as Serena Green and Jason Krukas, told new Inbound Specialists to arrive early to boot-up so that they would be ready to take calls at the start of their shifts. Morgan Decl. ¶¶ 9–11 ("the training instructors told me and all members of the training class to come into work before our scheduled start times . . . . so that we could boot-up our computer systems and ensure that we were ready to take calls as soon as our scheduled shift began."); Dunphy Decl. ¶ 8 ("During my training, my instructors told me, and all members of the training class, to come into work before our scheduled start dates."); Bertolino Decl. ¶ 8 ("They told me, and the rest of the training class, to ensure that we were ready to take calls as soon as our scheduled shift began."); Salmeri Decl. ¶ 13, 15 (". . . I usually sit down at my desk at least 10 to 15 minutes before the start of my shift in order to boot up my systems . . . . I was instructed during training by Serena Green, one of my trainers, and Jason Krukas, another trainer to boot up my computer systems before logging into the telephone system."); Pl. Excerpted Supervisor Greene Dep. at 7 ("Q. And you're standing at the front of the room as the teacher? A. I am standing at the front of the room or the back of the room. There's also another – there is a co-facilitator in there as well . . . . Jason Krukas.")

Accordingly, Inbound Specialists allegedly arrive early to boot-up their systems. Dunphy Decl. ¶ 12–13 ("I came into work prior to my scheduled start time to boot-up my computer and open the computer programs. I did this because I was required to be ready to take customer calls as soon as I was logged into the phone system."); Salmeri Decl. ¶¶ 13–14 (". . . I usually sit down at my desk at least 10 to 15 minutes before the start of my shift in order to boot up my systems. This is true for all Inbound Specialists at the Farmington Call Center of whom I am aware."); Bertolino Decl. ¶ ("I came into work before my scheduled start time on most, if not all, of the days I was scheduled to work.").

Ms. Culpepper alleges that team leaders knew that the Inbound Specialists were performing pre-shift work and not recording that time, and that team leaders did not correct the specialists' timesheets accordingly. Dunphy Decl. ¶¶ 16–17 ("Our supervisors were aware that Inbound Specialists were arriving early and performing work, but never told us to include that time on our time sheets. Our supervisors never corrected our time sheets to include the work performed before our shifts began . . . ."); Bertolino Decl. ¶¶ 14–15 ("Our supervisors were aware that Inbound Specialists were arriving early and performing work, but never told us to include that time on our time sheets. Our supervisors never corrected our time sheets to include the work we performed before our shifts began . . . ."). Ms. Culpepper claims that she tried to record her pre-shift work once and that her supervisor told her that that was not allowed. Def. Excerpted Culpepper Dep. at 28 ("Q. You knew . . . that the bank's policy was to pay for all hours worked, including any time you spent booting up computers. Right? A. Right. Q. Did you ever try to record that time? A. I think there was an instance where I reported the time very early on when I was new, and I think it was Ellen Ranco who said your time -- your time card has to exactly match what your schedule is.").

Ms. Culpepper also alleges that supervisors were focused on Inbound Specialists' over-reporting—not under-reporting—of time worked. Pl. Excerpted Supervisor Brown Dep. at 9–10 ("If the associate is sick or left early, there is another part to the Timekeeping Tool which would allow them to . . . choose whatever that particular situation is. So if it's unpaid time, if it's bereavement, vacation time, sick time, that will automatically pre-fill the eight hours. So once an associate has completed the time card they would then submit it to their supervisor for review and approval . . . . I'll review the time to make sure that it's correct. I may also look on the [telephone] login system on CMS to make sure, you know, that the two correspond with one

another."); Pl. Excerpted Gladney Dep. at 16 ("Q. What if a time is not approved by the Team

Leader? A. There would be discussion with the associates if there was thought to be a

discrepancy on the time that was entered and submitted. Q. What sort of discrepancy would

result in time not being approved? A. If an associate had a scheduled vacation day and entered

that time as hours worked versus vacation. Q. What else? A. Sick time. If the associate came in

late to work and advised their Team Leader that they were late, but yet did not accurately enter

that time, there would be discussion. Q. Anything else? A. Not that comes to mind for me, no.").

### B.    Procedural Background

On February 16, 2017, Ms. Culpepper filed her Complaint and sought to represent a class

of: "All current and former employees of Defendant who were employed as Inbound Specialists

in Connecticut at any time after February 16, 2014 through the date of final judgment in this

action." Compl. ¶ 12.

On April 20, 2017, the parties submitted a joint case management plan. Joint Report of

the Rule 26(f) Planning Meeting, ECF No. 23; FED. R. CIV. P. 26(f). In that report, Bank of

America "request[ed] that the Court schedule the case in two phases, beginning first with

discovery on Plaintiff's individual claims and whether class or collective treatment is

appropriate." *Id*. at 4.

Bank of America suggested that the first phase of discovery should conclude near the end

of September 2017. *Id*. On April 28, 2017, the Court issued a scheduling order that reflected

Bank of America's request and set the deadline for the first phase of discovery as October 6,

2017. Scheduling Order, ECF No. 30.

The Court did not set a deadline for a Rule 23 class certification motion, *id*., and noted

"that the filing of motions for class certification or collective action may require modifications to

this schedule and to the scope of discovery," *id*. After several motions to modify the scheduling

order, ECF Nos. 36, 43, 60, a motion to compel log-in data, ECF No. 76, and a motion to

withdraw the motion to compel, ECF No. 86,[3] the first phase of discovery closed.

On June 15, 2018. Plaintiff filed a motion for conditional certification of an FLSA

collective action. ECF No. 75. On July 13, 2018, Defendant filed its opposition to conditional

certification, ECF No. 79, and a motion to strike Michael Weed's consent to join the FLSA

collective action, ECF No. 80. On July 27, 2018, Plaintiff replied to Defendant's opposition to

class certification. ECF No. 87. On August 3, 2018, Plaintiff opposed Defendant's motion to

strike Michael Weed's consent. ECF No. 80.

On July 13, 2018, Defendant filed a motion to deny certification under Federal Rule of

Civil Procedure 23. ECF No. 81. On August 3, 2018, Plaintiff opposed that motion. ECF No. 89.

On August 17, 2018, Plaintiff moved for Rule 23 class certification. ECF No. 91. That same day,

Defendant replied to Plaintiff's response to its motion to deny Rule 23 class certification. ECF

No. 93. On September 6, 2018, Defendant responded to Plaintiff's motion for Rule 23 class

certification. ECF No. 97. On September 20, 2018, Plaintiff replied to Defendant's response.

ECF No. 98.

## II.      STANDARD OF REVIEW

### A.      Conditional Certification under the Fair Labor Standards Act

In 1938, Congress enacted the Fair Labor Standards Act ("FLSA") to "eliminate" "labor

conditions detrimental to the maintenance of the minimum standard of living necessary for

health, efficiency, and general well-being of workers." 29 U.S.C. § 202 (a–b). "In furtherance of

---

[3] Pl. Withdrawal of Mot. to Compel, ECF No. 86, at 1 ("Plaintiff reserves all rights to seek log-in data specifically, [and] full discovery compliance, for all Inbounds who join this case, either by opting into the FLSA collective action or as Rule 23 class members.")

this goal, the FLSA imposes numerous 'wage and hour' requirements, including an overtime provision mandating employers to pay non-exempt employees time-and-a-half for each hour worked in excess of 40 hours per week." *Lassen v. Hoyt Livery Inc.*, No. 3:13-CV-01529 JAM, 2014 WL 4638860, at *3 (D. Conn. Sept. 17, 2014). Section 216(b) of the Act creates a private cause of action for FLSA violations for individual employees or collectives of "similarly situated" employees. 29 U.S.C. § 216(b); *Lassen*, 2014 WL 4638860, at *3.

The Second Circuit has adopted a two-step approach to FLSA conditional certification. *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010) ("Although they are not required to do so by FLSA, district courts have discretion, in appropriate cases, to implement [§ 216(b)] by facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to opt-in as represented plaintiffs. In determining whether to exercise this discretion in an 'appropriate case[ ],' the district courts of this Circuit appear to have coalesced around a two-step method, a method which, while again not required by the terms of FLSA or the Supreme Court's cases, we think is sensible." (internal citations omitted)).

"The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id*. at 555.[4] "The court may send this notice after plaintiffs make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.*, *quoting Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) ("Plaintiffs have amply satisfied this burden. They

---

[4] The *Myers* court did not certify the FLSA collective action because, in large part, Plaintiffs had failed to show that the station managers were correctly classified as non-exempt. *Myers v. Hertz Corp.*, No. 02-cv-4325 (BMC) (MLO), 2007 WL 2126264, at *1 (E.D.N.Y. July 24, 2007), *aff'd*, 624 F.3d 537 (2d Cir. 2010). As noted above, the parties have stipulated that "Inbound Specialist is a non-exempt position . . . ." Joint Report of the Rule 26(f) Planning Meeting, ECF No. 23, at 4.

have made substantial allegations, both in their Complaint and supporting affidavits, that Sbarro's restaurant managers were subject to reductions in their compensation as result of a uniform company–wide policy requiring them to reimburse defendant for cash shortages and other losses.").

Some courts adopt a modest-plus, or heightened, review standard once some discovery has been completed. *See*, *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 480–81 (S.D.N.Y. 2016) ("Where, as here, a conditional certification motion is made after some, but not all, discovery has occurred, it remains an open question whether some kind of 'intermediate scrutiny' should apply . . . . there is less consensus within the Circuit than might appear at first blush."). The Second Circuit, however, has yet to adopt a modest-plus or intermediate scrutiny standard. *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) ("We certified for immediate review the question of whether a higher standard, urged by defendants, applies to motions to conditionally certify an FLSA collective made after discovery. We do not need to decide that question, however, because . . . we cannot, on the record before us, conclude that the plaintiffs in Antalik's proposed collective are similarly situated, even under the minimal pre-discovery standard.").

Thus, while a court will review the evidence produced through pre-certification discovery carefully, the "modest factual showing" standard still governs that review. "The modest factual showing cannot be satisfied simply by unsupported assertions, but it should remain a low standard of proof because the purpose of this first stage is merely to determine whether similarly situated plaintiffs do in fact exist." *Myers*, 624 F.3d at 555. Then, "[a]t the second stage, the district court will, on a fuller record, determine whether a so-called collective action may go forward by determining whether the plaintiffs who have opted in are in fact similarly situated to

the named plaintiffs. The action may be de-certified if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Id.* (internal quotations and citations omitted)).

### B.   Class Certification under Rule 23 of the Federal Rules of Civil Procedure

Under Rule 23 of the Federal Rules of Civil Procedure, a class action may proceed under Rule 23(a) only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

If a court finds that a class action may proceed under Rule 23(a), the class action may be maintained only if one of the three provisions of Rule 23(b) is met:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b).

While courts enjoy "considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements," *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *decision clarified on denial of reh'g sub nom.*, *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007), they may certify a Rule 23 class only after determining that each of the Rule's requirements have been met. *Id.*[5]

So long as a court has ruled on whether each Rule 23 requirement has been met, its rulings will be reviewed for abuse of discretion. *Myers*, 624 F.3d at 547 ("We apply an abuse of discretion standard both to the lower court's ultimate determination on certification of a class as well as to its rulings that the individual Rule 23 requirements have been met. (alterations in original)); *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 40 ("The Rule 23 requirements are threshold issues, similar in some respects to preliminary issues such as personal or subject matter jurisdiction. We normally do not say that a district court makes a 'finding' of subject matter jurisdiction; rather, the district court makes a 'ruling' or a 'determination' as to whether such jurisdiction exists . . . . Of course, in making such a ruling, the judge often resolves underlying factual disputes, and, as to these disputes, the judge must be persuaded that the fact at issue has been established. The same approach is appropriate for Rule 23 requirements.")

The court must determine "whether to certify the action as a class action" at an "early practicable time after a person sues or is sued as a class representative." FED. R. CIV. P.

---

[5] In *In re Initial Pub. Offerings Sec. Litig.*, the Second Circuit "reach[ed] the following conclusions: (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits." 471 F.3d at 41.

23(c)(1)(A). If the court certifies a class under Rule 23, it must issue an order that "define[s] the

class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)."

FED. R. CIV. P. 23(c)(1)(B).

## III.   DISCUSSION

### A.   Conditional Certification under the Fair Labor Standards Act

#### 1.   Applicable Standard

As a threshold matter, the Court must determine which standard governs review of

Plaintiff's conditional certification motion. Defendant argues that the Court should employ a

heightened scrutiny standard because discovery has closed. Def. Mem. in Opp. to Pl. Mot. for

Conditional Cert. at 18. Plaintiff alleges that discovery is not complete and that the court should

apply the "modest factual showing" standard. The Court agrees.

Following *Myers*, the typical requirement for conditional certification under the FLSA is

a "modest factual showing" that potential opt-in plaintiffs may be "similarly situated" to named

plaintiffs with respect to a "common policy or plan that violated the law." *Myers*, 624 F.3d at 555;

*Jing Fang Luo*, 2016 WL 11263668, at *3–4 ("Courts within the Second Circuit apply a two-step

process to determine whether an action should be certified as an FLSA collective action . . . . The

first step requires only a modest factual showing that plaintiffs and potential opt-in plaintiffs

together were victims of a common policy or plan that violated the law.") (internal quotations and

citations omitted).

Ms. Culpepper's burden at the initial certification stage thus "should remain . . . low . . .

because the purpose of this first stage is merely to determine whether similarly situated plaintiffs

do in fact exist." *Myers*, 624 F.3d at 555. At the second stage, and on a fuller record, a court may

de-certify the action. *Id*.; *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460, 69 (S.D.N.Y.

2011) ("At the conditional certification stage, the Court found these allegations sufficient to satisfy the 'modest factual showing' required . . . . In considering Mobility's post-discovery motion for decertification, however, the Court, now afforded a much fuller record, must apply a more 'stringent standard' of proof in determining whether plaintiffs are similarly situated for the purposes of the FLSA." (internal quotations and citations omitted)).

Bank of America then needs to support a departure from the "modest factual showing" standard, such as protracted pre-certification discovery. Defendant has failed to make such a showing.

Bank of America "request[ed] that the Court schedule the case in two phases, beginning first with discovery on Plaintiff's individual claims and whether class or collective treatment is appropriate." Joint Report of the Rule 26(f) Planning Meeting at 4. The Court noted in its initial Scheduling Order "that the filing of motions for class certification or collective action may require modifications to this schedule and to the scope of discovery." Scheduling Order, ECF No. 30.

The parties then took roughly a half-dozen depositions of current and former Bank of America employees, gathered declarations from additional Bank of America workers, and provided the Court with Bank of America policies and a handful of timekeeping records. *See*, *e.g.*, ECF No. 79-1–79-14. Bank of America now argues that "discovery has closed." Def. Mem. in Opp. to Pl. Mot. for Conditional Cert. at 18. The Court disagrees.

While the first phase of discovery has closed, culminating in Plaintiffs' conditional motion for class certification under FLSA, Pl. Mot. for Conditional Cert. of a Collective Action, ECF No. 75, the second phase of discovery has not begun. *See, e.g.*, Pl. Withdrawal of Mot. to Compel, ECF No. 86, at 1 ("Plaintiff reserves all rights to seek log-in data specifically, [and] full

discovery compliance, for all Inbounds who join this case, either by opting into the FLSA

collective action or as Rule 23 class members."). At the conclusion of the second phase of

discovery, the Court will entertain a motion for decertification of the class on the fuller record

before it. *See Myers*, 624 F.3d at 555.

　　　　As a result, the Court declines to adopt a heightened review standard and requires

Plaintiff to make a "modest factual showing" that certification of the collective is appropriate at

this time. *See Myers*, 624 F.3d at 555.

## 　　　2.　　　FLSA Certification in Call Center Cases

　　　　A number of single or dual-site location call center cases have resulted in conditional

certification. *See*, *Byard v. Verizon W. Virginia, Inc.*, 287 F.R.D. 365, 367 (N.D.W. Va. 2012);

*Clarke v. Convergys Customer Mgmt. Grp., Inc.*, 370 F. Supp. 2d 601, 603 (S.D. Tex. 2005);

*Conklin v. 1-800 Flowers.com, Inc.*, No. 2:16-CV-675, 2017 WL 3437564, at *1 (S.D. Ohio

Aug. 10, 2017); *Garrett v. Sitel Operating Corp.*, No. 10-CV-2900-STA-CGC, 2011 WL

5827240, at *1 (W.D. Tenn. Nov. 18, 2011); *McCray v. Cellco P'ship*, No. 1:10-CV-2821-SCJ,

2011 WL 2893061, at *1 (N.D. Ga. Apr. 8, 2011); *O'Donnell v. Sw. Bell Yellow Pages, Inc.*, No.

4:11-CV-1107 CEJ, 2012 WL 1802336, at *1 (E.D. Mo. May 17, 2012); *Robinson v. Ryla*

*Teleservices, Inc.*, No. CA 11-131-KD-C, 2011 WL 6667338, at *1 (S.D. Ala. Dec. 21, 2011);

*Ware v. T-Mobile USA*, 828 F. Supp. 2d 948, 949 (M.D. Tenn. 2011).

　　　　Furthermore, multi-site, multi-state, and nationwide call center workers have been

conditionally certified. *See*, *Bishop v. AT & T Corp.*, 256 F.R.D. 503, 504 (W.D. Pa. 2009);

*Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1107 (D. Minn. 2009); *Fisher v.*

*Michigan Bell Tel. Co.*, 665 F. Supp. 2d 819, 821 (E.D. Mich. 2009); *Ribot v. Farmers Ins. Grp.*,

No. CV 11-02404 DDP FMOX, 2013 WL 3778784, at *1 (C.D. Cal. July 17, 2013), *modified on*

*clarification*, No. CV 11-02404 DDP FMOX, 2013 WL 5351085 (C.D. Cal. Sept. 24, 2013);

*Sherrill v. Sutherland Glob. Servs., Inc.*, 487 F. Supp. 2d 344, 346 (W.D.N.Y. 2007).

On the whole, these cases share a similar set of facts, including: (1) policies or practices requiring workers to be "caller-ready" at their scheduled start times, *see e.g.*, *Bishop*, 256 F.R.D. at 508; *Fisher*, 665 F. Supp. 2d at 827 ("Defendant expected them to be ready to take a call at the beginning of their scheduled tours, thus requiring them log in to Defendant's computer systems before they began their tours."); (2) negative consequences for workers that fail to adhere to their scheduled start times or minimum on-call metrics, *see, e.g.*, *Fisher*, 665 F. Supp. 2d at 823; *Ribot*, 2013 WL 3778784, at *8 ("Defendants are correct that being out of adherence for 10 to 15 minutes would not in itself result in an employee being unable to meet the 85–90% adherence target. However, other activities such as bathroom breaks also entered into the calculation of adherence . . . . Particularly when taken in conjunction with instructions from supervisors, the schedule adherence policy thus can be considered to be part of a policy to encourage pre-shift work."); (3) unpaid pre-shift work involving boot-up of computer programs, reading of email, and other work-related tasks, *see e.g.*, *Sherrill*, 487 F. Supp. 2d at 347, 350 ("According to plaintiffs, Sutherland required or encouraged its call center agents to arrive early to work in order to review and complete paperwork, sign on to the computer and the Kronos system, and review e-mail communications . . . . On this record, I find that a sufficient factual basis exists to conclude that telemarketing agents at all Sutherland call centers were subjected to common policies that allegedly violated the FLSA. Thus, I conclude that sending notices to current and former agents at each facility is appropriate."); *Garrett*, 2011 WL 5827240, at *1 ("The preliminary tasks included booting up the computer and logging in to computer programs prior to clocking in, which took approximately seven to ten minutes"); and (4) failure to correct

employees' under-reporting of time, *see e.g.*, *O'Donnell*, 2012 WL 1802336, at *3 ("Plaintiffs'

time slips, which have been submitted by defendant as exhibits to plaintiffs' deposition

testimony, indicate that plaintiffs were compensated for eight-hour shifts. This would tend to

support their claim that they were paid for their scheduled shift hours, not the actual time they

spent working.").

Many of these call center decisions were issued after the Supreme Court's decision in

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Several of the opinions directly

address *Dukes*, finding the Supreme Court's decision either wholly inapposite to FLSA

collective action cases, or inapplicable at the conditional certification stage of FLSA cases. *See*

*Ware*, 828 F. Supp. 2d at 955–56 ("*Dukes* does not affect its analysis of whether the plaintiffs are

similarly situated to employees in the putative class under the FLSA. . . . This case, however,

involves a collective action brought under the FLSA where, unlike a Rule 23 class action

lawsuit, employees seeking to join the class are statutorily required to affirmatively opt-in. The

Sixth Circuit has distinguished Rule 23's more stringent criteria for class certification from the

FLSA's requirement that opt-in plaintiffs only be similarly situated and declined to apply those

criteria to FLSA claims . . . . The Supreme Court's decision in *Dukes* does not change that

result." (internal citations and quotations omitted)); *Robinson*, 2011 WL 6667338, at *3 (". . . if

applicable at all, *Dukes* is not applicable at the first step of the two-step collective action

certification process), *citing Alli v. Boston Market Co*., Civil No. 3:10–cv–4 (JCH), 2011 WL

4006691, at *7 n. 3 (D.Conn. Sep. 8, 2011) ("Boston Market disregards the fact that the issue

raised by the pending Motion for Conditional Certification 'is quite distinct from the question

whether the plaintiffs have satisfied the much higher threshold of demonstrating that common

questions of law and fact will 'predominate' for Rule 23 purposes . . . .' *Myers*, 624 F.3d at 556.

Assuming for the sake of argument that these Rule 23 cases might provide some guidance in FLSA collective action cases, they do not alter the standard applicable at the initial, conditional certification stage." (alterations in original)).

Bank of America urges the Court to adopt the reasoning of *Steger*, a FLSA conditional certification denial, *Steger v. Life Time Fitness, Inc*., No. 14-CV-6056, 2016 WL 245899, at *1 (N.D. Ill. Jan. 21, 2016), or several FLSA decertification cases. *Ruiz v. Citibank*, N.A., 93 F. Supp. 3d 279, 281 (S.D.N.Y. 2015); *Seward v. Int'l Bus. Machines Corp*., No. 08-CV-3976 VB-PED, 2012 WL 13059788, at *1 (S.D.N.Y. Jan. 20, 2012), *report and recommendation adopted sub nom. Seward v. Int'l Bus. Mach. Corp*., No. 08-CV-3976 VB, 2012 WL 860363 (S.D.N.Y. Mar. 9, 2012); *Zivali v. AT & T Mobility*, LLC, 784 F. Supp. 2d 456, 459 (S.D.N.Y. 2011). The Court declines to do so.

In *Steger*, the court denied plaintiffs' conditional certification motion. *Steger*, 2016 WL 245899, at *1. The Steger plaintiffs were "personal trainers, Pilates instructors, Pilates coordinators, metabolic specialists, nutritionists, and dietary specialists" employed in "over one hundred fitness centers throughout the United States." The court there found that plaintiffs failed to show that metabolic specialists, physical trainers, Pilates instructors, and other workers employed at myriad locations throughout the nation were similarly situated with respect to their duties, compensation, departmental policies, or timekeeping practices. *Id*. at 3. In contrast to *Steger*, Ms. Culpepper proposes conditional certification under the FLSA of workers in a single room, sharing similar job responsibilities, and allegedly subject to the same performance pressures and local timekeeping practices. The Court thus finds *Steger* dissimilar from this case.

The decertification cases cited by Defendant, of course, raise issues appropriate down the road, but are premature to consider at this stage. Indeed, in *Ruiz*, the court de-certified the

conditional certification years into discovery because Plaintiff failed to show that the personal bankers were similarly situated across their many departments and states. *Ruiz*, N.A., 93 F. Supp. 3d at 281. *Id*. at 299–300. Likewise, in *Seward*, decertification followed more than three years of contentious discovery, *see Seward*, 08-CV-03976 VB-PED, Scheduling Order (Sept. 19, 2008), Dkt. 28; Minute Entry (June 14, 2011), Dkt. ("By June 20, 2011, counsel shall . . . submit a letter brief to the Court regarding the discovery issues discussed during the conference call . . . ."), yielding more than 25 depositions, an expert report, and other evidence. In other words, in *Seward*, there was a much fuller record than is before the Court. *See Seward*, 2012 WL 13059788, at *1. Finally, in *Zivali*, following years of discovery, the Court determined that the 4,100 opt-in plaintiffs were subject to an "extremely wide range of company practices in the context of varied factual and employment settings." *Zivali, 784 F. Supp. 2d 456.Id*. at 464.

Accordingly, the Court will undertake the two-step FLSA conditional certification inquiry prescribed by *Myers*, 624 F.3d at 554–55, beginning with the "similarly situated" prong.

### 3.        Similarly Situated

Section 216(b) of FLSA creates a private cause of action for "similarly situated" employees. 29 U.S.C. § 216(b); *Lassen*, 2014 WL 4638860, at *3. "Although the Second Circuit has yet to prescribe a particular method for determining whether members of a putative class are similarly situated, courts in this circuit look to the '(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against notification to the class.'" *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 351 (E.D.N.Y. 2008) (*quoting Guzman v. VLM, Inc*., No. 07 CV 1126, 2007 WL 2994278 at *3 (E.D.N.Y. Oct. 11, 2007)). As a threshold matter, Ms. Culpepper must demonstrate that putative class members

were non-exempt workers. *Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 264 (S.D.N.Y. 2017) ("In sum, neither the job description itself, nor Plaintiffs' conclusory and potentially incomplete descriptions of their duties, support Plaintiffs' theory that all CMs nationwide primarily performed non-exempt work.").

Ms. Culpepper has met her modest burden, at the certification stage, to prove that the employees are similarly situated. First, the parties have stipulated that "[t]he position of Inbound Specialist is a non-exempt position under the Fair Labor Standards Act and the Connecticut Minimum Wage Act." Joint Report of the Rule 26(f) Planning Meeting, ECF No. 23, at 4. Second, Ms. Culpepper has sufficiently demonstrated similarity among the Inbound Specialists. Bank of America alleges that each level of Inbound Specialists—I, II, and III—has "different functions, priorities, skill levels, and responsibilities" than the others. Def. Mem. in Opp. to Pl. Mot. for Conditional Cert. at 6–8. Ms. Culpepper alleges that the Inbound Specialists are sufficiently similar at this stage. The Court agrees.

The Inbound Specialists at the Farmington call center all allegedly work in a single room. Morgan Decl. ¶ 26. They all receive incoming calls from customers who are in the process of securing home equity lines of credit from Bank of America. Pl. Excerpted Gladney Dep. at 8–10. *See also*, Pl. Excerpted Brown Dep. at 7; Allen Decl. ¶ 3 ("I was an Inbound Specialist I from March 2016 through March 2017 and, since March 2017, have been an Inbound Specialist II. In these positions . . . my primary duties have involved answering customer phone calls and reviewing customer applications for home equity lines of credit."); Searles Decl., ECF No. 79-12 ¶ 3 (". . . I served as an Inbound Specialist I until April 2015 and as an Inbound Specialist II at all times thereafter. In these positions . . . my primary duties have involved answering customer phone calls and reviewing customer applications for home equity lines of credit.")

Inbound Specialists all work similar eight-and-a-half hour shifts. Ericksen Decl. ¶ 6 ("At the beginning of my employment I worked from 10:00 a.m. until 6:30 p.m. Next, my scheduled shift was from 9:30 a.m. until 6:30 p.m. [Last . . .] I worked from 8:30 a.m. until 5:00 p.m.").

Despite increasing skill among the levels, Inbound Specialists II and III do not supervise their peers. Rather, team leaders supervise groups comprised of Is, IIs, and IIIs. *Id*. at 12; Def. Excerpted Gladney Dep. At 9; Allen Decl. ¶ 3 ("I was an Inbound Specialist I from March 2016 through March 2017 and, since March 2017, have been an Inbound Specialist II. In these positions my supervisor has been Danielle Fradette . . . ."). Ms. Gladney referred to all of the non-supervisory Inbound Specialists collectively, describing how "they" begin their day, introduce themselves to customers, and log their time, as well as how Bank of America evaluates their performance. Def. Excerpted Gladney Dep. at 8–11.

Given the record before it, Ms. Culpepper has made a modest factual showing that the Inbound Specialists at the Farmington, Connecticut call center are similarly situated to each other with respect to location, work hours, job duties, and authority.

### 4.       Common Policy or Practice

To obtain conditional certification under the FLSA, Ms. Culpepper must show that she "and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555 (internal quotation and citation omitted). Her evidence must support a "reasonable inference" that a common, unlawful policy or plan existed. *Capsolas v. Pasta Res., Inc.*, No. 10 CIV. 5595 RJH, 2011 WL 1770827, at *3 (S.D.N.Y. May 9, 2011) ("It is undisputed that five of the restaurants withheld roughly the same percentage . . . of exactly the same thing (wine sales) . . . . All of these facts support a reasonable inference that there was a

uniform policy across the eight restaurants, all of which share common ownership, are supervised by the same individuals, and are administered by the same company.").

The policy or plan need not be official or in writing, and may actually contradict official corporate policy. *See Laroque*, 557 F. Supp. 2d at 353 ("For the purposes of conditional certification, the court finds that plaintiffs have met their burden of demonstrating they are similarly situated to a putative class of delivery drivers and customer service representatives who worked at the Coney Island Store within the past three years. A class, so constituted, would involve individuals with similar responsibilities, who worked in the same location, during the same general period, under essentially the same management, and pursuant to the same general policies regarding the hours they worked and how those hours were recorded and compensated."); *Fisher*, 665 F. Supp. 2d at 823, 827 ("Despite Defendant's arguments to the contrary, Plaintiffs need not show that the challenged policy is in writing. Likewise, that Defendant has a procedure for obtaining overtime compensation that Plaintiffs could use and has a written Code of Business Conduct that prohibits 'off-the-clock' work, does not preclude conditional certification.").

Ms. Culpepper has made a modest factual showing that she and the other Inbound Specialists have been affected by a common policy or plan that violates the law. The plan or policy begins with Bank of America's expectation that Inbound Specialists provide accurate, personal, effective, and compliant customer service. This expectation necessitates booting-up, checking e-mail, and reading new bank policies before the start of a shift. Bank of America allegedly monitors and disciplines Inbound Specialists for logging into their telephones late, failing to sufficiently "delight" customers, failing to provide accurate and compliant information, and failing to meet on-call performance metrics. While Bank of America requires that Inbound

Specialists be paid for their pre-shift work, Ms. Culpepper alleges that they are not paid for this work, and that their team leaders know they are working off-the-clock and allow—or even counsel—Inbound Specialists to underreport their time.

First, the Inbound Specialists allege that they have to perform accurate, personal, and effective work. Morgan Decl. ¶¶ 16–18 ("It was also common for Bank of America to update its policies regarding home equity loans. If that happened, I needed to review the updates so that I [could] accurately assist customers. I needed to read and answer emails and review updated policies before my shift started because as soon as I logged into the phone, I started receiving phone calls."); Ericksen Decl. ¶¶ 19 ("While I was waiting for my systems to fully open, I routinely read and answered emails I received from the prior evening or early morning."); Morgan Decl. at ¶ 20 (". . . without having certain systems open and available, I could not verify the status of a customer's mortgage application.").

Second, Inbound Specialists allegedly boot-up, check e-mail, and read new policies before the start of shifts in order to perform their jobs at their scheduled start times. Salmeri Decl. at ¶ 11 ("Before I can log into the telephone system each morning, I need to log into my computer and boot up several computer systems, including but not limited to two ACAPS systems, Interact, Document Management Portal, Commit, AVS, IEX, PPG and Sharepoint."); Morgan Decl. ¶¶ 14–15 ("I needed to start booting up my computer 10–15 minutes early because the computer system was slow."); *id.* at ¶ 20 ("I needed to boot up my system before my shift because I could not adequately assist customers if the systems were not open."); Dunphy Decl. ¶ 11 ("I usually came to work 15 to 25 minutes early because it took that long to boot-up all of the applications on my computer before my shift started.").

Third, Inbound Specialists allegedly are disciplined for logging into their telephones late, failing to sufficiently "delight" customers, failing to provide accurate and compliant information, and failing to meet on-call performance metrics. Pl. Excerpted Supervisor Brown Dep. at 11 ("You know, they're expected to start work at the beginning of your scheduled time, so disciplinary actions potentially be taken."); Bertolino Decl. ¶ 8 ("They told me, and the rest of the training class, to ensure that we were ready to take calls as soon as our scheduled shift began."); Def. Excerpted Salmeri Dep. at 51–52 ("For every time we put a client on hold, the clients have reported they get upset in terms of waiting to get their questions answered; so, therefore, it affects the client delight which lowers the scores for the whole call center . . . . I log in to my phone at the specific time that my IEX says that I need to be logged in to the phone so I'm not late and affecting my adherence."); Def. Excerpted Culpepper Dep. at 23 (". . . Donna Gladney would say that in knowledge shares about . . . customer delight . . . . Q. And so were you told at the bank that leaving a customer on hold for longer than two to three minutes would just be too long? A. Yes."); Morgan Decl. ¶ 21–22 ("Bank of America can, and does, monitor our phone calls . . . . [to] grade our customer service quality. Bank of America monitors these calls randomly. This means that I could have my calls monitored at any time, including my first call of the day."); Pl. Excerpted Gladney Dep. at 17 (". . . quality reviews . . . are done by a separate team to review their call treatment, accuracy of information, and they receive an overall quality score for that . . . . In addition, they also receive a compliance review. So it could be an additional one to three calls that strictly review the compliance or regulatory components of a call."); *id*. at 21 ("'[W]rap and idle' time, must remain at 30% or less, or Inbound Specialists face consequences, including termination."); Supp. Ericksen Decl. ¶¶ 7–8 ("My employment with Bank of America ended on August 7, 2017 when they terminated me for having poor 'wrap

and idle' metrics."); Salmeri Decl. ¶ 18 (if Inbound Specialists "logged into the telephone system

before booting up their computer systems, they would need to place their telephone systems on

'Aux,' which would negatively affect their 'Wrap and Idle' time."); Bertolino Decl. ¶ 19 ("I have

been disciplined for having my 'Wrap and Idle' time exceed 30%.").

Fourth, Inbound Specialists are supposed to be paid for all the time they work. Bank of

America, 2015 Timekeeping Compliance: Act Responsibly; Bank of America, 2014

Timekeeping Compliance: Act Responsibly.

Ms. Culpepper therefore claims that the managers at the Farmington facility do not

adhere to the corporate policy, do not correct Inbound Specialists' timesheets to reflect their pre-

shift work, and focus more on over-reporting, rather than unlawful under-reporting, of the

specialists' work time. Dunphy Decl. ¶¶ 12–13 ("I came into work prior to my scheduled start

time to boot-up my computer and open the computer programs. I did this because I was required

to be ready to take customer calls as soon as I was logged into the phone system."); *id*. ¶¶ 16–17

("Our supervisors were aware that Inbound Specialists were arriving early and performing work,

but never told us to include that time on our time sheets. Our supervisors never corrected our

time sheets to include the work performed before our shifts began . . . ."); Bertolino Decl. ¶¶ 14–

15 ("Our supervisors were aware that Inbound Specialists were arriving early and performing

work, but never told us to include that time on our time sheets. Our supervisors never corrected

our time sheets to include the work we performed before our shifts began . . . ."); Def. Excerpted

Culpepper Dep. at 28 ("Q. Did you ever try to record that time? A. I think there was an instance

where I reported the time very early on when I was new, and I think it was Ellen Ranco who said

your time -- your time card has to exactly match what your schedule is."); Pl. Excerpted Gladney

Dep. at 16 ("Q. What sort of discrepancy would result in time not being approved? A. If an

associate had a scheduled vacation day and entered that time as hours worked versus vacation. Q. What else? A. Sick time. If the associate came in late to work and advised their Team Leader that they were late, but yet did not accurately enter that time, there would be discussion. Q. Anything else? A. Not that comes to mind for me, no.").

At this stage of the case, these allegations support a "reasonable inference", *Capsolas*, 2011 WL 1770827, at *3, that the Inbound Specialists at the Farmington, Connecticut call center performed unpaid work as a result of a common, unlawful policy or plan among the team leaders at the facility.

### 5.     Bank of America's Defenses to Conditional Certification

In opposition to conditional certification, Def. Mem. in Opp. to Pl. Mot. for Conditional Cert., Bank of America raises two issues: (1) actual or constructive notice by call center managers and (2) *de minimis* unpaid time, *id*. at 38–41. Bank of America argues that the only way to determine if managers knew that Inbound Specialists were working off-the-clock would be to inquire into the actual or constructive knowledge of each manager, and that such a highly individualized inquiry makes certification improper. The Court disagrees.

This case presents the relatively closed universe of a single space and a small cadre of supervisors, several of which have already been deposed. *See, e.g*., Pl. Excerpted Brown Dep.; Pl. Excerpted Supervisor Mosier Dep. Indeed, the events at issue allegedly took place in a single room. Morgan Decl. ¶ 26. At this stage of the case, the role of the Court is not to weigh the evidence, but instead determine whether there is a plausibly alleged common, unlawful policy or plan resulting in unpaid work, and there is. *Davis v. Abercrombie & Fitch Co*., No. 08-CV- 1859 PKC, 2008 WL 4702840, at *9 (S.D.N.Y. Oct. 23, 2008) (At the conditional certification stage, "the court does not resolve factual disputes, decide ultimate issues on the merits, or make

credibility determinations."); *Grant v. Warner Music Grp. Corp.*, 13-cv-4449 PGG, 2014 WL

1918602, at *3 (S.D.N.Y. May 13, 2014) (collecting cases).

Bank of America next contends that the 10 to 20 minutes of non-compensated boot-up

time would be considered *de minimis* and therefore not a violation of FLSA, citing to the Second

Circuit's decision in *Reich v. New York City Transit Auth.*, 45 F.3d 646, 647 (2d Cir. 1995), and

cases from the D.C. Circuit and the Eastern District of Texas. The Second Circuit, however,

distinguished *Reich* in *Kosakow v. New Rochelle Radiology Assocs.*, P.C., 274 F.3d 706, 719 (2d

Cir. 2001):[6]

> *Reich* held that time spent by transit police charged with the care of police dogs was
> *de minimis* where that time was limited to restraining (and occasionally walking)
> the dogs during the officer's commute to or from work. *Id*. In so holding, *Reich*
> adopted the three-part test . . . : '(1) the practical administrative difficulty of
> recording the additional time; (2) the size of the claim in the aggregate; and (3)
> whether 'the claimants performed the work on a regular basis.'

> Applying these factors to the present case, Kosakow's fifteen minutes of
> preparatory work each morning are not properly excluded as *de minimis*. Initially,
> the time in question in *Reich* is distinguishable from the time worked by *Kosakow*.
> The transit police in *Reich* spent only a couple of minutes when it was necessary to
> discipline or walk their dogs, and, more importantly, this was an extremely
> infrequent occurrence on the whole. In contrast, Kosakow claims that her early
> arrival was necessary for the office to be ready to receive patients by 8:00 a.m.
> every day, and, consequently, she would arrive at 7:45 a.m. each day she worked.
> As already stated, a question of fact exists as to whether Kosakow in fact arrived at
> 7:45 a.m. each morning, but, if she did, this regular arrival for fifteen minutes of
> preparatory work would not constitute *de minimis* activity. It would not be difficult
> to calculate, in the aggregate it constituted a significant amount of time, and it
> occurred regularly. Accordingly, the district court erred in holding that this time
> was excludable as *de minimis* (internal citations omitted.).

Here, Ms. Culpepper has alleged the sort of recurrent and necessary unpaid work that is

not considered *de minimis* in the Second Circuit. *Id*. Despite this finding, a "question of fact

exists", *id*., as to whether the Inbound Specialists actually arrived more than a few minutes early,

---

[6] While the Second Circuit's decision in *Kosakow* involved the Family and Medical Leave Act of 1993, not FLSA,
its application of the test in *Reich* for determining *de minimis* activity makes the decision relevant here.

routinely. Accordingly, Defendant may raise again the *de minimis* defense at the close of discovery in a motion to decertify this conditional collective.

The Court considers the final *Laroque* factor, "fairness and procedural considerations counseling for or against notification to the class" in the context of Bank of America's argument that notification is unnecessary or improper. *Laroque*, 557 F.Supp.2d at 351.

### 6.     Necessity of Notification

District courts have discretion to authorize the sending of notice to potential class members in a FLSA collective action. *Hoffmann*, 982 F. Supp. at 261; *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165 (1989); *Braunstein v. Eastern Photographic Laboratories, Inc.,* 600 F.2d 335, 336 (1978) (such notice "comports with the broad remedial purpose of the [FLSA] . . . as well as with the interest of the courts in avoiding multiplicity of suits"). "[B]ecause the three-year statute of limitations for an FLSA claim begins to run as soon as a non-named plaintiff opts-in to the litigation, courts routinely approve court-authorized notice in order to ensure that the rights of potential claimants do not expire during the discovery process." *Grant*, 2014 WL 1918602, at *2.

"[I]nformal efforts by plaintiffs and their counsel to provide notice to potential opt-ins through advertisement letters or other means are not factors to be considered by courts when determining whether to approve court-authorized notice." *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 369 (S.D.N.Y. 2007), *citing Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988). Bank of America argues that Ms. Culpepper has already sent notice to potential collective members and that only Ms. Salmeri has opted in. Def. Mem. in Opp. to Pl. Mot. for Conditional Cert. at 26. Plaintiff argues that it has only sought pre-certification information from potential opt-ins. The Court agrees.

As support for its argument, Bank of America points to the language of the parties' joint

motion for a discovery teleconference, ECF No. 67, at page 2. In pertinent part, page 2 states:

> On March 30, 2018, Defendant produced the class list. Around April 18, 2018,
> Plaintiffs' counsel started mailing letters to the entire class (two-hundred and eighty
> (280) individuals) asking for an opportunity to ask them questions pertaining to the
> case. Plaintiffs received responses from five (5) former and one (1) current Inbound
> Specialist who confirmed the allegations in the complaint. Plaintiffs believe the
> response rate is low because many of the class members are still employed by
> Defendant, which Plaintiffs believe typically has a chilling effect on the response
> rate of putative class members.

Joint Mot. for Discovery Teleconference at 2. The Court interprets the plain meaning of the

phrase "opportunity to ask them questions" as information-seeking.

Bank of America also relies on Plaintiff's letter to potential class members, Letter from

Hayber Law Firm to Susan Schmidt (Apr. 18, 2018), ECF No. 79-1, as evidence that Plaintiff

has solicited the participation of a class. The letter states, in pertinent part:

> I am writing to you about a pending class action against Bank of America . . . . My
> firm represents the Plaintiff in this case. We have obtained your contact information
> from Bank of America after a conference with the judge. We wanted your contact
> information because we are attempting to win a ruling from the Court certifying the
> case as a class action. We are trying to win permission to represent all Inbound
> Specialists in Farmington from February 2014 to the present and to obtain back
> wages for them. We are contacting you at this time to find out if you will speak
> with us about this case and provide whatever information you may have. We would
> like to speak with as many Inbound Specialists as possible in order to gather
> evidence about this case in anticipation of a motion for class certification that we
> intend to file in the future.

*Id.* at 1. Again, the Court interprets the language of the letter as information-seeking. The letter

clearly communicates that Plaintiffs have not yet certified a class (e.g., "We are trying to win

permission to represent . . . ."; "in anticipation of a motion for class certification that we intend to

file in the future.").

By contrast, the Hayber Law Firm, representing Plaintiff, posted a web page containing a

recruitment section, entitled "How do I join?", on or before June 5, 2018. Bank of America Call

Center Wage Lawsuit (June 5, 2018), ECF no. 79-2. The site listed the status of the case as "Complaint stage", which some potential opt-in plaintiffs might understand as an early stage in the litigation. Even if the website informed some potential plaintiffs about the opportunity to opt-in, Bank of America has not shown how additional notice would confuse those plaintiffs or plaintiffs who have not viewed the website. More importantly, Bank of America has not demonstrated that court-ordered notice would prejudice it.

The Court therefore adopts the following definition of the collective action:

Inbound Specialists who worked at Bank of America, National Association's Farmington, Connecticut call center between July 3, 2014 and the present.[7]

*See* Consent to Join Lawsuit, ECF No. 75-12.

Plaintiff must send written notice of the certified collective to all individuals who have worked for Bank of America as Inbounds Specialists during the period from July 3, 2014 to September 27, 2019, by **February 22, 2019**. Written notice may be accompanied by a one-page explanation of the lawsuit and a pre-paid self-addressed envelope. Notice may also be sent by e-mail. *Pippins v. KPMG LLP*, No. 11-cv-0377 (CM) (JLC), 2012 WL 19379, at *14 (S.D.N.Y. Jan. 3, 2012) ("Although plaintiffs did not ask for Audit Associates' email addresses until they filed their Reply . . . I nonetheless conclude, given the reality of communications today, that the provision of email addresses and email notice in addition to notice by first class mail is entirely appropriate."). Bank of America is also ordered to post notice of the lawsuit in a prominent place in the Farmington call center. *Jacob v. Duane Reade, Inc.*, No. 11-CV-0160 JPO, 2012 WL 260230, at *10 (S.D.N.Y. Jan. 27, 2012) ("In addition, Plaintiffs request that Defendants post the approved notice at all locations where ASMs work. Defendants have stated no opposition to this request. Courts in this circuit also routinely grant such requests.")

---

[7] The Court defines "the present" as the date that the letter is mailed to the putative class member.

The Court will set the notice period at **sixty (60) days from February 22, 2019**. *See Strauch v. Computer Scis. Corp*., No. 3:14CV956 JBA, 2015 WL 3727804, at *7 (D. Conn. June 9, 2015) ("Potential opt-in plaintiffs will have 60 days from the date of the notice to submit their consent forms, electronically or in writing."). The Court will allow Plaintiffs to mail a reminder postcard to all class members who have not yet opted-in to this matter within thirty (30) days of the first notice mailing. *See* Andrew C. Brunsden, Hybrid Class Actions, Dual Certification, and Wage Law Enforcement in the Federal Courts, 29 BERKELEY J. EMP. & LAB. L. 269, 295 (2008) (on how people often disregard collective action notices.).

The Court will not require Bank of America to provide Plaintiff with potential opt-ins' Social Security numbers, as Plaintiff has provided scant justification for the social security numbers and the Court finds this data especially sensitive.

**B.      Rule 23 Class Certification**

**1.      Deadline for Certification**

Under Federal Rule of Civil Procedure 23, a court must determine "whether to certify the action as a class action" at "early practicable time after a person sues or is sued as a class representative." FED. R. CIV. P. 23(c)(1)(A).

As a threshold matter, the Court must determine whether Plaintiff's opportunity to move for Rule 23 certification has expired. Bank of America argues that Plaintiff's motion for certification should be denied because the Court's Standing Order on Pretrial Deadlines stated that "All motions relating to joinder of parties, claims or remedies, class certification, and amendment of the pleadings shall be filed within 60 days after filing of the complaint, the filing of a petition for removal, or the transfer of an action from another District." Order on Pretrial Deadlines, ECF No. 2.

The Standing Order on Pretrial Deadlines, however, "shall control the course of the action until a further Scheduling Order is issued pursuant to Fed. R. Civ. P. 16(b) and D. Conn. L. Civ. R.16." District of Connecticut, *Civil Standing Orders: Standing Order on Scheduling in Civil Cases*, D. CONN. L. CIV. R. at 105. Following the Standing Order, this Court issued a scheduling order on April 28, 2017 stating "that the filing of motions for class certification or collective action may require modifications to this schedule and to the scope of discovery." Scheduling Order, ECF No. 30. As a result, the time for filing a motion for class certification has not lapsed.

## 2.       Rule 23 Certification in Call Center Cases following *Dukes*

After the Supreme Court's decision in *Dukes*, there have been differences in the outcomes of the Rule 23 call center class certification cases. *See, e.g*., *Enea v. Bloomberg, L.P.*, No. 12 CIV. 4656 GBD FM, 2014 WL 1044027, at *1 (S.D.N.Y. Mar. 17, 2014) (granting Rule 23 class certification for New York call center workers who were required to work mandatory weekend shifts for 'comp time' and to perform other work related tasks off-the-clock); *Hill v. Xerox Corp.*, No. C12-0717-JCC, 2014 WL 3396098, at *8 (W.D. Wash. July 10, 2014), *on reconsideration in part*, No. 2:12-CV-0717-JCC, 2014 WL 4674349 (W.D. Wash. Sept. 18, 2014) (granting in part and denying in part Rule 23 class certification for workers from five Washington call centers; "Turning to the predominance and superiority questions of Rule 23(b)(3), the Court concludes that Plaintiff has failed to establish that the common questions predominate over the individual ones. . . . Concluding that the common claims did not predominate, the court recognized that the evidence 'reveal[ed] a variety of means by which supervisors imposed [a common efficiency] pressure ... and a variety of ways in which [agents] responded to that pressure.'" (internal citations and quotations omitted)); *Pryor v. Aerotek Sci*.,

37

LLC, 278 F.R.D. 516, 537 (C.D. Cal. 2011) (denying without prejudice to renewal Plaintiff's

Rule 23 class certification largely on Rule 23(b) predominance and superiority grounds; "Pryor

offers no suggestions as to how the individual issues that predominate in this case could be

adjudicated so as to achieve the efficiency and economy that is the goal of certifying a class.").

The difference in these decisions, however, is not doctrinal, but factual, as the Supreme

Court itself has noted. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455,

465–66 (2013) ("Although we have cautioned that a court's class-certification analysis must be

'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,'

*Wal–Mart Stores, Inc. v. Dukes* . . . Rule 23 grants courts no license to engage in free-ranging

merits inquiries at the [Rule 23] certification stage."); *see also Ginsburg v. Comcast Cable*

*Commc'ns Mgmt. LLC*, No. C11-1959RAJ, 2013 WL 1661483, at *1, 4 (W.D. Wash. Apr. 17,

2013) (denying Rule 23 certification for a potential class of "thousands" of workers employed at

three Washington call centers but finding the case a closer call than *Dukes*.).[8]

In any event, in all of these cases, courts have had a much fuller record from which to

determine the appropriateness of class certification. Given the limited record now before the

Court, the Court will permit Plaintiff to file a renewed motion for Rule 23 certification following

a second phase of discovery, as initially requested by Bank of America and agreed to by the

Court. Joint Report of the Rule 26(f) Planning Meeting at 4; Scheduling Order, ECF No. 30.

---

[8] In *Ginsburg,* the court concluded that, in contrast to the situation in *Dukes*, "Plaintiffs claims start with the glue that was missing in *Wal–Mart.* The classwide practice at issue is Comcast's alleged pressure to maximize time spent on the telephone and minimize other types of work. Plaintiffs have provided some evidence of that pressure, and some evidence that upper management applied that pressure in such a way that it reached CAEs. The result, Plaintiffs hope to prove, is a work environment in which it is difficult or impossible to complete preliminary work without working off the clock." 2013 WL 1661483, at *4.

In order to focus the parties' discovery efforts and second round of Rule 23 briefing, consistent with the Court's inherent authority to manage the cases on its docket, *Dietz*, 136 S. Ct. at 1892, the Court notes common Rule 23 issues suggested by the call center cases.

### 3.    Common Rule 23 Issues in Call Center Class Certifications

#### a.  Numerosity

A class action may proceed under Rule 23(a) only if the "class is so numerous that joinder of all members is impracticable"[.] FED. R. CIV. P. 23(a)(1). In the Second Circuit, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Guzman v. VLM, Inc*., No. 07-CV-1126 JG RER, 2008 WL 597186, at *5 (E.D.N.Y. Mar. 2, 2008) ("It is undisputed, and I find, that the class as the plaintiffs define it—individuals the defendants employed in specified positions within the specified time period-consists of at least 133 individuals, and there no serious dispute that this class would easily satisfy the requirement of numerosity."); *but see Tommey v. Computer Scis. Corp*., No. 11-CV-2214-EFM-GLR, 2013 WL 1304186, at *3 (D. Kan. Mar. 27, 2013) (call center plaintiffs failed to meet the 10th Circuit's standard for numerosity, which is more than 84).

The parties have jointly stipulated that "Culpepper was employed by Defendant as one of approximately 100 Inbound Specialists in Connecticut[.]" Joint Report of the Rule 26(f) Planning Meeting, ECF No. 23, at 4. As a result, the numerosity requirement likely will be satisfied in this case.

#### b.  Commonality

A class action may proceed under Rule 23(a) only if "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "What matters to class certification . . . is the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the

litigation." *Dukes*, 564 U.S. at 350, *quoting* Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. REV. 97, 132 (2009). To establish commonality, plaintiffs must demonstrate "common questions that are susceptible to common answers." *Lewis v. Alert Ambulette Serv. Corp.*, No. 11-CV-442, 2012 WL 170049, at *10–11 (E.D.N.Y. Jan. 19, 2012) ("There is sufficient proof for certification purposes of a uniform policy of underpayment and unlawful deductions, presenting a common question that is subject to classwide proof. While damages owed to each driver will require individual determinations, this computation issue is not enough to destroy commonality.)"

Call center plaintiffs have been denied Rule 23 certification for failing to satisfy the commonality requirement, particularly in cases involving the unofficial and unsanctioned practices of diverse supervisors. *See, e.g.*, *Russell v. Citigroup, Inc.*, No. 12-CV-16 DLB-JGW, 2015 WL 9424144, at *6 (E.D. Ky. Dec. 22, 2015) ("Russell's basic allegation depends upon an unofficial, unwritten policy of unknown origin. Although he alleges that this policy applied to all of the putative class members, it stands to reason that such a nebulous policy would be subject to varying levels of enforcement, depending upon the managers in charge of each group at each location.").

Ms. Culpepper asserts an unwritten and unsanctioned policy of prompting, pressuring, and permitting Inbound Specialists to complete pre-shift work, *see, e.g.*, Salmeri Decl. ¶ 15 ("I was instructed by Serena Greene, one of my trainers, and Jason Krucas, another trainer, to boot up my computer systems before logging into the telephone systems."); Pl. Reply to Def. Resp. to Pl. Mot. for Class Cert. under Rule 23 at 10 ("Defendant's schedule adherence policy requires Inbounds to adhere to their pre-set schedule 92% of the time and disciplines them if they do

not."), but she still must demonstrate that such "common questions are susceptible to common answers." *Lewis*, 2012 WL 170049, at *10–11; *see also*, *Dukes*, 564 U.S. at 350.

### c. Typicality

A class action may proceed under Rule 23(a) only if the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites." *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012), *aff'd sub nom. Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015), *citing Wal-Mart Stores, Inc.*, 564 U.S. at 350, n. 5 ("Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. . . . In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a)." (internal citation omitted)).

Bank of America argues that Ms. Culpepper's claims are not typical of the class's claims because she was only an Inbound Specialist I, and the IIs and IIIs did not typically receive inbound calls. Def. Resp. to Pl. Mot. for Class Cert. Pursuant to Rule 23; Gladney Decl., ECF No. 79-1 ¶¶ 7–8, also submitted as ECF Nos. 80-2 and 81-2 ("The Inbound Specialist II does not receive inbound calls directly from customers except during times when call volume is extremely high."). Ms. Culpepper argues that she is a typical member of the class because the Inbound Specialists had similar responsibilities and faced similar time pressures. Pl. Reply to Def. Resp. to Pl. Mot. for Class Cert. under Rule 23 at 10; *see, e.g*., Allen Decl. ¶ 3 ("I was an Inbound

Specialist I from March 2016 through March 2017 and, since March 2017, have been an Inbound Specialist II. In these positions . . . my primary duties have involved answering customer phone calls and reviewing customer applications for home equity lines of credit."); Searles Decl., ECF No. 79-12 ¶ 3 (". . . I served as an Inbound Specialist I until April 2015 and as an Inbound Specialist II at all times thereafter. In these positions . . . my primary duties have involved answering customer phone calls and reviewing customer applications for home equity lines of credit.").

For typicality, under Rule 23, Ms. Culpepper must demonstrate that her claims "and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

### d. Predominance and Superiority

Though Rule 23(b) provides several avenues to certification, call center cases tend to involve Rule 23(b)(3). *See, e.g.*, *Hill*, 2014 WL 3396098, at *8 ("Turning to the predominance and superiority questions of Rule 23(b)(3), the Court concludes that Plaintiff has failed to establish that the common questions predominate over the individual ones."). "Rule 23(b)(3) contains two prerequisites for certification not imposed on the other two types of Rule 23(b) classes: first, that questions of law or fact common to the members of the class must 'predominate' over any questions affecting only individual members, and second, that a class action is 'superior' to other available methods for the fair and efficient adjudication of the controversy, to test whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 89 (D. Conn. 2009), *citing Amchem Prod. Inc. v. Windsor,* 521 U.S. 591, 623 (1997).

Ms. Culpepper thus must show that "common questions predominate over the individual ones" and that a class action is a superior method to an individual action. *See*, *e.g.*, *Hendricks*, 263 F.R.D. at 90 ("While the court need not reach the question of superiority, it is highly doubtful, that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.' Indeed, the fact that the differences among the potential class members in this case outweigh the similarities, as stated *supra,* indicates that concentrating this litigation in this forum will be undesirable, and managing the class action will be quite difficult." (internal quotation and citation omitted)).

### C.     Remaining Motions

Three motions remain before the Court.

First, Bank of America has moved to strike Michael Weed's consent to join the FLSA collective action. ECF No. 80. Bank of America argues that Mr. Weed's FLSA claim is time-barred because the bank "did not employ Weed as an Inbound Specialist in the 3-year period of time preceding the filing of his Consent to Join." *Id*. at 3. In support of this claim, Defendant submits an affidavit by Ms. Gladney alleging that Mr. Weed was promoted to the position of Home Services Specialist on December 6, 2014. Gladney Decl. ECF No. 79-1 ¶ 23, also submitted as ECF Nos. 80-2 and 81-2.

Ms. Culpepper argues that "Defendant failed to provide sufficient evidence supporting its motion [to strike] and whether Mr. Weed is an appropriate collective member is more appropriately addressed at the second stage of the FLSA certification process." Pl. Opp. to Def. Mot. to Strike the Consent Form of Michael Weed, ECF No. 88, at 1.

The Court agrees.

Accordingly, Defendant's motion to strike is denied without prejudice to renewal following additional discovery.

Second, Bank of America has moved to seal its Timekeeping Compliance Learning Guide because the guide contains allegedly proprietary information. Def. Mot. to Seal. The motion is unopposed and the Court finds that sealing is supported by good cause and clear and compelling reasons, and the sealing of this filing is narrowly tailored to serve those reasons. The Court orders Defendant's Timekeeping Compliance Learning Guide sealed.

Accordingly, the Court grants Defendant's motion. Def. Mot. to Seal, ECF No. 82.

Third, Ms. Culpepper has moved to amend or correct the scheduling order. Mot. to Amend/Correct, ECF No. 85. The Court sets the following schedule for the second phase of discovery and thus denies as moot Plaintiff's motion to amend or correct.

Scheduling order:

- The second phase of discovery will commence immediately;

- Disclosure of Plaintiff's Rule 23 experts is due by **June 14, 2019**;

- Damages analysis is due by **June 14, 2019**;

- Deposition of Plaintiff's Rule 23 experts is due by **July 19, 2019;**

- Disclosure of Defendant's Rule 23 experts is due by **September 6, 2019**;

- Deposition of Defendant's Rule 23 experts is due by **October 11, 2019;**

- Discovery is to be completed by **October 11, 2019**;

- The Court will convene a post-discovery telephonic status conference on **October 17, 2019 at 10 a.m.**;

- Plaintiff's motion for Rule 23 certification is due by **November 15, 2019**;

- Defendant's motions for FLSA decertification and in opposition to Rule 23 certification as well as any dispositive motions by either party are due by **December 20, 2019**;

- Plaintiff's replies to Defendant's motions for FLSA decertification and in opposition to Rule 23 certification are due by **January 10, 2020**;

- Any response to any dispositive motions are due by **January 31, 2020;**

- Any replies to any responses to dispositive motions are due by **February 14, 2020;**

- Oral argument on motions for Rule 23 class certification, FLSA collective de-certifcation, and any dispositive motions will be held on **March 19, 2020.**

Given the age of this case and the significant discovery already conducted, extensions of the deadlines set forth above are not likely to be granted. *See Dietz*, 136 S. Ct. at 1892 (regarding the court's "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."). This schedule is designed to permit sufficient time for any other potential class members to opt-in and for Bank of America to provide additional discovery only as it relates to those additional opt-in plaintiffs, as well as for any necessary analysis of this discovery by either party. As a result, this schedule should not be the cause of any delay on the part of either party.

## IV.     CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff's motion for conditional certification under section 216(b) of FLSA, ECF No. 75; **DENIES without prejudice to renewal** Defendant's motion to strike Michael Weed's consent to join the FLSA collective action, ECF No. 80; **DENIES without prejudice to renewal** Defendant's motion to deny Rule

23 class certification and Plaintiff's motion for Rule 23 class certification, ECF Nos. 81 and 91;

**GRANTS** Defendant's motion to seal the Timekeeping Compliance Learning Guide, ECF No.

82; and **DENIES** as moot Plaintiff's motion to amend or correct the scheduling order, ECF No.

85.

     **SO ORDERED** at Bridgeport, Connecticut, this 28th day of January, 2019.

                          /s/ Victor A. Bolden
                          VICTOR A. BOLDEN
                          UNITED STATES DISTRICT JUDGE