## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **AILEEN CULPEPPER, individually and on behalf of all other similarly situated individuals,** | : : : : | **CIVIL ACTION NO.:** |
| **Plaintiff** | : : | |
| **V.** | : : | **3:17-cv-00264-VAB** |
| **BANK OF AMERICA, NATIONAL ASSOCIATION** | : : : : | |
| **Defendant** | : : | **OCTOBER 11, 2019** |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR APPROVAL OF COLLECTIVE ACTION SETTLEMENT

### I.      INTRODUCTION

This case was brought against Bank of America, N.A. ("BANA") on behalf of current and former employees in the position of "Inbound Specialist" at BANA's Farmington, Connecticut call center.  Plaintiff alleges that BANA violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA") and Connecticut wage and hour laws by requiring the Inbound Specialists to start their shifts early to open computer programs, resulting in them working "an extra 20 to 30 minutes per day" for which they were not paid, because they did not record the time in their timekeeping system. BANA contests that these employees were or are entitled to overtime, or that this case could be maintained as a collective action.

On January 28, 2019, the Court granted Plaintiff's Motion for Conditional Certification of a collective under the FLSA.  During and following completion of the opt-in period, BANA produced to Plaintiff's counsel timekeeping, earnings, and personnel file information regarding those who filed consents to join the case.  The parties then negotiated and agreed to a settlement of the FLSA and state wage and hour law claims of the Plaintiff, Aileen Culpepper, and the Opt-

in Plaintiffs (hereinafter "Opt-ins").   A copy of the settlement agreement (hereinafter "Agreement") is attached here as **Exhibit 1**.  Plaintiff now requests that the Court grant approval of this proposed settlement. The settlement only binds those individuals who opted into the case. The parties are not seeking approval of a settlement under Fed. R. Civ. P. 23, which would bind any absent class members. Thus, every individual who will be bound by the settlement has voluntarily joined the case by opting-in, has agreed to be bound by the result reached by the named Plaintiff, and has signed the settlement agreement.  Plaintiff now requests that the Court approve the settlement and permit the payments under the settlement to be distributed to the Opt-ins pursuant to the parties' settlement agreement. The settlement proceeds will be paid promptly after the Court's approval of the settlement.

Plaintiff submits that the proposed settlement is a good one for these collective members, and it is fair and adequate and should be approved by the Court. The settlement involved a wide-ranging exchange of information and arm's-length bargaining between the parties. The resolution will provide substantial benefits to the collective, without the uncertainty and delay of further litigation.

Accordingly, for all the reasons set forth herein, Plaintiff on behalf of herself and the Opt-ins requests that the Court grant final approval of the settlement.

## II.    THE PROPOSED DISTRIBUTION OF THE SETTLEMENT FUNDS

Settlement funds have been calculated and will be distributed to the Opt-ins based on a formula taking into account the number of weeks they worked within the maximum three-year statute of limitation period under the FLSA.[1]  Plaintiff calculated each Opt-in's damages by

---

[1] Plaintiff and the Opt-ins would only be entitled to damages for a third year if they proved BANA willfully violated the FLSA.  29 U.S.C. Sec. 255(a).

determining their overtime rate (multiplying their hourly rate by 1.5) and then multiplying their overtime rate by 1.25 hours (assuming 15 minutes of uncompensated work per day for the 5 day work week (5 x .25 = 1.25)), and multiplying that number by the number of weeks they worked in the period of their claims.[2]  Plaintiff calculated every week of each Opt-in's claim using this formula.

The terms of the settlement are fully set forth in the Agreement (**Exhibit 1**) and are summarized as follows:

1) **Venue for approval**: United States District Court for the District of Connecticut;

2) **Total Settlement Amount**: $190,000;

3) **Manner of Distribution**: Plaintiff and the 19 Opt-ins will receive $75,644.39.[3]  Each Opt-in will recover ***100%*** of the back pay and liquidated damages they could have received at trial in this case if Plaintiff and the Opt-ins proved all their FLSA claims. One-half (1/2) of these payments will be treated as wages, from which all necessary federal and state taxes shall be withheld.  BANA shall be responsible for the employer's share of any such taxes.  The remainder shall be treated as non-wage income, for which IRS Form 1099s shall be issued.

---

[2] Fifteen minutes of uncompensated boot-up time per day is within the range of estimated boot-up times reported by the Inbound Specialists who submitted declarations in support of conditional certification.  *See cf.,* Culpepper v. Bank of Am., N.A., 2019 U.S. Dist. LEXIS 12971, *17 (D. Conn. 2019) (citing opt-in Sarena Salmeri's declaration stating that she "usually s[a]t down at [her] desk at least 10 to 15 minutes before the start of [her] shift in order to boot up [her] systems.").

[3] For the Court's convenience, Plaintiffs have prepared a summary chart showing how the shares will be distributed, and what amounts Plaintiff and each Opt-in will receive. *See* **Exhibit 1**, Schedule A.

4) **Service payment to the named Plaintiff**: A $7,500 service payment shall be made to Aileen Culpepper, to be paid from the Total Settlement Amount if approved by the Court.

5) **Attorneys' Fees and Costs**: Hayber, McKenna & Dinsmore, LLC ("HMD") will receive the sum of $106,855.61, which represents a reduction from HMD's full lodestar figure of $165,551.00 in fees and $5,827.56 in costs. *Affidavit of Thomas J. Durkin* para. 4.[4]

## III.    THE PROPOSED SETTLEMENT IS FAIR AND REASONABLE

It is well-established that courts favor settlements of lawsuits over continued litigation. *See, e.g.*, *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 202 (2d Cir. 2006) (noting the Court's "longstanding adherence to the principle that 'courts are bound to encourage' the settlement of litigation") (internal citation omitted), abrogated on other grounds by *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("[I]t is axiomatic that the law encourages settlement of disputes.") (collecting cases). The FLSA provides that "[a]ny employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee . . . affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be . . . ." 29 U.S.C. § 216(b).

The FLSA's provisions are mandatory and, generally, are not subject to bargaining, waiver, or modification by contract or private settlement. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945). The two limited circumstances in which FLSA claims may be compromised are

---

[4] Plaintiff's counsel is willing to make their records available for *in camera* inspection if the Court requests.

(1) when the Secretary of Labor supervises the settlement pursuant to 29 U.S.C. § 216(c) or (2) when a court reviews and approves a settlement in a private action for back wages under 29 U.S.C. § 216(b). *See Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015).

In determining "whether to approve an FLSA settlement, courts consider whether the agreement 'reflects a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Li Ming Yan v. China Gourmet Food Inc.*, 2018 WL 3443637, at *2 (E.D.N.Y. July 17, 2018) (quoting *Le v. Sita Info. Networking Computing USA, Inc.*, 2008 U.S. Dist. LEXIS 46174, at *1-2 (E.D.N.Y June 12, 2008); and citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982) (holding that where an FLSA settlement is a reasonable compromise, the settlement should be approved to "promote the policy of encouraging settlement of litigation")). In the Second Circuit, courts examine the following factors:

> (1) the plaintiff's range of possible recovery; (2) the extent to which "the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses"; (3) the seriousness of the litigation risks faced by the parties; (4) whether "the settlement agreement is the product of arm's-length bargaining between experienced counsel"; and (5) the possibility of fraud or collusion.

*Russell v. Broder & Orland, LLC*, 2018 U.S. Dist. LEXIS 104654, *12-13 (D. Conn. June 22, 2018) (Bolden, J) (quoting *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012)).  An examination of these factors demonstrates that this settlement should be approved.

    a.   Plaintiff's and Opt-In's Range of Possible Recovery

Plaintiff claims that she and the Opt-ins consistently arrived at work pre-shift and performed work booting up their computers before their scheduled clock-in times.  Plaintiff

sought for herself, and the opt-in collective, compensation for unpaid overtime, liquidated damages, attorneys' fees and costs. (Compl. para. 35). BANA has agreed to pay $190,000 for Plaintiff and Opt-ins to settle their claims, which HMD calculates represents 100% of the unliquidated and liquidated damages that would be owed if Plaintiff and the Opt-ins prevailed on all of their FLSA claims at trial and through appeal. *Durkin Aff.* ¶ 5.

The determination of whether a settlement amount is reasonable "does not involve the use of a 'mathematical equation yielding a particularized sum.'" *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (quoting *In re Austrian & German Bank*, 80 F. Supp.2d 164, 178 (S.D.N.Y. 2000). "Instead, 'there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id*. (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). Here, the gross settlement amount provides Plaintiff and the Opt-ins with the recovery of unpaid overtime compensation, and it was carefully negotiated based on HMD's analysis of documents and information produced by BANA, including payroll data, timekeeping records, and personnel records. *Durkin Aff.* ¶ 8.

Using this information, HMD determined an estimated average of overtime hours that the collective members allegedly worked each week and calculated damages per shift of 15 minutes of uncompensated boot-up work, which exceed the damages supported by BANA's records.

HMD calculated the maximum recovery to the Opt-ins during a three year limitations period to be approximately $75,644.39. *Durkin Aff.* ¶ 6; *see also* 29 U.S.C. § 255(a) (providing for a two-year statute limitations under the FLSA, except where plaintiff proves the employer's violations are "willful," and a three-year statute of limitations applies)

As explained in Section II, *supra*, the payments are allocated among the collective members based on a formula that takes into account how many weeks they worked, their pay rate, and calculates their damages at 15 minutes per day, well within the range of time Inbound Specialists estimated they performed uncompensated work. *Id*. at ¶ 7.

Additionally, the settlement also takes into account the fact that several *bona fide* disputes exist. BANA argues that it did not violate the FLSA or Connecticut state wage laws and disputes that any alleged violations of the FLSA were willful. BANA also argues that the documentary evidence, including employee pay and time records, contradict Plaintiff's and the Opt-ins' claims. BANA contends that Plaintiff's and the Opt-ins paystubs and time records show that they received overtime for all hours worked in excess of forty hours. BANA also argues that the number of hours that Plaintiff and the Opt-ins allegedly worked per week is exaggerated. BANA also disputes whether it is appropriate to maintain this case as a collective (or possibly class) action. Accordingly, taking into account the attendant risks of continued litigation and BANA's asserted defenses to liability and certification, the parties agreed upon a gross settlement of $190,000. *Durkin Aff.* para. 8; Settlement Agreement, **Ex. 1**.

In light of the uncertainties associated with establishing liability and obtaining and maintaining class and collective action certification, as well as Plaintiff's desire to avoid future legal proceedings, the settlement reached here through arm's-length negotiations between experienced counsel is reasonable. Indeed, courts in this Circuit have approved settlements where the plaintiffs received a much smaller percentage of their potential damages than the Plaintiff and Opt-ins are recovering in this case. *See, e.g.*, *Hernandez v. Loco 111 Inc.*, 2017 WL 6205809, *2 (S.D.N.Y. Dec. 5, 2017) (approving settlement that "represents 37 percent of

Plaintiff's anticipated maximum recovery"); *Beckert v. Ronirubinov*, 2015 WL 8773460, *2

(S.D.N.Y. Dec. 14, 2015) (holding a settlement of approximately 25% of the amount initially

sought was a "substantial proportion of the maximum possible recovery" and fair, especially in

light of the risks associated with litigation).  Accordingly, this factor supports approving the

Agreement as fair and reasonable.

      b.  <u>Avoiding Anticipated Burdens in Establishing the Respective Claims and</u>
<u>Defenses and the Seriousness of the Litigation Risks Faced by the Parties</u>

Plaintiff believes that the settlement is an excellent result for the collective. BANA was

prepared to vigorously defend this action by asserting a number of defenses to liability as

described in Section III.a *supra*.  "Courts have recognized that FLSA cases are complex." *Febus*

*v. Guardian First Funding Grp., LLC*, 870 F. Supp.2d 337, 340 (S.D.N.Y. 2012). Absent

settlement, Plaintiff's counsel believes that this case may have required a trial to determine

whether the Inbound Specialists were properly compensated, and if so, to what extent they are

entitled to damages.  The proposed settlement provides relief to Plaintiff and the Opt-ins, takes

into account BANA's defenses, and provides compensation to the named plaintiff and Opt-ins

without the delay incumbent in continued litigation. Plaintiff also bore the risk of maintaining the

collective action through the trial. While the Court conditionally certified the collective here, the

risk remained that the collective (or possible class) could have been decertified at a later stage,

when it was appropriate for the Court to consider more substantive evidence. *See Collins v. Olin*

*Corp.*, 2010 U.S. Dist. LEXIS 39862, *20 (D. Conn. Apr. 21, 2010) (Droney, J) (citing

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)) (recognizing that "the ever-

present risk of class decertification counsels in favor of approving the proposed settlement").

    c.    <u>Arm's-Length Bargaining Between Experienced Counsel and the Possibility of Fraud or Collusion</u>

The settlement is the result of contested litigation, factual discovery, and arm's-length negotiations. It was reached only after the parties conducted extensive discovery, and engaged in lengthy motion practice to conditionally certify the collective.[5]   Plaintiffs' counsel have not hesitated to take collective and class action cases to trial in other instances, and have agreed to a settlement only when they believed doing so was in the best interests of the collective and/or class. Indeed, Plaintiff's counsel in this case, Attorney Richard E. Hayber is considered a leading attorney in wage and hour class action litigation, having successfully litigated many such cases. *See, e.g.*, *Aros v. United Rentals, Inc.*, 2012 U.S. Dist. LEXIS 104429, *19 (D. Conn. July 26, 2012) (Hall, J) (stating that the Hayber Law Firm consists of "experienced employment lawyers with good reputations among the employment law bar. They have prosecuted and favorably settled many employment law class actions, including wage and hour class actions").

Plaintiff's counsel drew on this substantial experience in order to provide Plaintiff and Opt-ins with a high degree of expertise in this field. Thus, for all the reasons discussed above, this settlement is fair, adequate, and reasonable according to the weight of the *Wolinsky* factors and should be approved by this Court.

## IV.    THE REQUESTED ATTORNEYS' FEE AND INCENTIVE AWARD ARE FAIR AND REASONABLE

    a.    <u>The Court Should Approve the Requested $106,855.61 as a Reasonable Attorneys' Fee Award.</u>

The FLSA allows plaintiffs to recover attorneys' fees and expenses under the statute's fee-shifting provisions. *See* 29 U.S.C. § 216(b) ("The court in such action shall, in addition to

---

[5] Plaintiff also moved for class certification, but the Court did not take up the issue at the time, giving the parties the opportunity to conduct additional discovery to support re-filed motions.

any judgment awarded to plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by

the defendant, and costs of the action."); *see also Kahlil v. Original Old Homestead Rest., Inc*.,

657 F.Supp.2d 470, 473 (S.D.N.Y.2009) ("In an action pursuant to the FLSA, a 'prevailing

party' must be awarded reasonable attorneys' fees and costs...'"). The proposed distribution of

the settlement proceeds provides for $106,855.61 as an award for attorneys' fees.

     This award of attorneys' fees is reasonable.  Other courts in this District have approved

similar attorneys' fees awards in other FLSA cases.  *See Lassen v. Hoyt Livery, Inc.*, 3:13-cv-

01529, ECF No. 201, *4 (D. Conn. June 5, 2017) (Bolden, J) (approving an attorneys' award of

up to $400,000 out of a $670,000 settlement fund).  Plaintiff's counsel is seeking an attorneys'

fee award here that is a smaller percentage of the settlement funds than the attorneys' fee award

approved in *Lassen.*  Here, Plaintiff's counsel is seeking 56.2% of the settlement fund as an

attorneys' fee award (106,855.61/190,000 = .5623).  In *Lassen*, the Court approved an award of

attorneys' fees up to 59.7% (400,000/670,000 = .5970) of the settlement fund.  *Id.*

     Awards of attorneys' fees in fee-shifting cases need not be proportional to the amount

recovered.  "Congress enacted fee shifting . . . precisely because the expected monetary recovery

in many cases was too small to attract effective legal representation." *Quaratino v. Tiffany &*

*Co*., 166 F.3d 422, 426 (2d Cir. 1999) (Title VII case).  "Especially for claims where the

financial recovery is likely to be small, calculating attorneys' fees as a proportion of damages

runs directly contrary to the purpose of fee shifting statutes: assuring that civil rights claims of

modest cash value can attract competent counsel.  The whole purpose of fee-shifting statutes is to

generate attorneys' fees that are *disproportionate* to the plaintiff's recovery." *Millea v. Metro-*

*North R.R.*, 658 F.3d 154, 169 (2d Cir. 2011) (emphasis in original) (FMLA case).

10

Plaintiff counsel's experience with federal and state overtime laws and this type of litigation provided the collective a high degree of expertise in this area.  Plaintiff's counsel put extensive time and effort into to this matter, which has been pending since February 16, 2017. Plaintiff's counsel took six depositions, defended two depositions, engaged in extensive discovery and motion practice resolving discovery issues, briefed conditional and class certification, opposed BANA's motion to deny class certification, attended court hearings, and investigated claims through interviews with numerous Inbound Specialists.  In addition, as with all cases of this nature handled by Plaintiff counsel's firm, Plaintiff's counsel accepted this case on a fully contingent arrangement, with no payment up front, and has borne all the expenses, costs, and risks associated with litigating this case.

Unlike traditional firms that receive hourly fees on a monthly basis, plaintiff's attorneys who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, document production, and so forth), without ever receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds or even thousands of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate").

11

By permitting clients to obtain attorneys without having to pay hourly fees, this system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case. It is well-recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) (addressing anti-trust laws).

This reasoning applies with equal force to wage and hour cases.  Courts have recognized that fee awards in [wage and hour] cases like this serve the dual purposes of encouraging 'private attorneys general' to seek redress for violations and discouraging future misconduct of a similar nature. Class actions are also an invaluable safeguard of public rights. . . If courts denied sufficient attorneys' fees 'no attorneys ... would likely be willing to take on ... small-scale class actions[.]' *Johnson v. Brennan*, 2011 U.S. Dist. LEXIS 105775, *57 (S.D.N.Y. Sept. 16, 2011) (internal citations omitted); *see also Skirchak v. Dynamics Research Corp., Inc.*, 432 F. Supp. 2d 175, 179 (D. Mass. 2006) ("Allowing private attorneys to prosecute [wage] actions in the aggregate effectively ensures enforcement of the wage laws by motivating employers to comply or face potentially large-scale litigation, and by providing counsel with an incentive to pursue such claims"), *aff'd* 508 F.3d 49 (1st Cir. 2007).

Here, Plaintiff's counsel has litigated this case and has achieved a significant result for Plaintiff and Opt-ins. By comparison, however, Plaintiff's counsel has spent great amounts of time litigating other cases on behalf of workers without compensation—and, indeed, at considerable expense. In the practice of their contingency work, Plaintiff's counsel has advanced

significant out-of-pocket resources, which have not been repaid, to pursue litigation on behalf of workers in various types of employment cases, including wage, tips, misclassification, and discrimination cases. In sum, a plaintiff-side contingency practice on behalf of low wage workers who could not afford to pay out-of-pocket for counsel, such as Plaintiff counsel's firms, is made possible by the nature of contingency fee work. Thus, in considering the fairness and reasonableness of the proposed attorneys' fees in this case, the Court should consider the nature of Plaintiff's counsel's practice, which is only made possible by this contingency fee structure.

For these reasons and given the precedent approving attorneys' fees award above the recovery to the collective, the Court should award the requested $106,855.61 in this case as well.

b. The Requested Incentive Fees for Named Plaintiff Aileen Culpepper is Reasonable

Finally, the proposed settlement calls for an incentive payment of $7,500 to Aileen Culpepper, who pressed these claims on behalf of the collective. This incentive payment is fair and reasonable and should be approved, given that it was Culpepper who initiated and pursued this lawsuit on behalf of her fellow Inbound Specialists. Culpepper assisted Plaintiff's counsel by providing substantive information about the duties, hours, and compensation of Inbound Specialists and submitting to a deposition in support of the claims of the Inbounds. It was through Culpepper's initiative that this substantial recovery on behalf of the collective, vindicating statutory rights under the wage and hour laws, was obtained. Thus, this incentive payment should be approved as fair and reasonable.

Incentive payments have been routinely approved by the courts in class and collective action settlements as a way of compensating representatives who have lent their names, reputations, and efforts to the prosecution of litigation on behalf of others. Courts have also

13

recognized that such payments serve an important function in promoting class and collective action settlements, and compensating class representatives for acting as "private attorneys general" in the enforcement of state and federal law.  *See Sheppard v. Consolidated Edison Company of New York, Inc*., 2002 WL 2003206, *5-6 (E.D.N.Y. 2002) (collecting cases approving incentive payments); *see also In re Relafen Antitrust Litig*., 231 F.R.D. 52, 82 (D. Mass. 2005) ("Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where, as here, the named Plaintiff participated actively in the litigation") (internal quotation omitted); SAVETT, ET AL., "Consumer Class Actions: Class Certification Issues, Including Ethical Considerations and Counsel Fees and Incentive Payments to Named Plaintiff," 936 PLI / Corp. 321, 340 ("It has become commonplace for the named representatives to request a special payment for having borne the flag and headed a class action. Most courts are receptive to this because they feel that private attorneys general should be encouraged, and such incentives further the goals of federal and state laws").

It is not uncommon for courts to approve incentive payments in the range of that requested in this case, and in even higher amounts. *See, e.g.*, *Matamoros v. Starbucks* Corp., Civ. A. No. 08-10772, Doc. 169 (D. Mass. Aug. 16, 2013) (approving $25,000 incentive payments for lead plaintiff in wage action); *In Re Publ'n Paper Antitrust Litig.*, 2009 WL 2351724, *1 (D. Conn. July 30, 2009) (approving incentive award of $20,000 for named plaintiff); *Sheppard*, 2002 WL 2003206, *5-6 (approving incentive awards of up to $29,000 for named plaintiffs); *Ingram v. The Coca-Cola Co*., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 to each of four representative plaintiffs); *Yap v. Sumintomo Corp. of America*, 1991 WL 29112, *9 (S.D.N.Y. 1991) (awarding $30,000 additional compensation to representative plaintiff); *In re*

*Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990)

(citing cases in support of incentive payments and awarding payments ranging from $35,000 to

$50,000 for named plaintiffs).

## V.   CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant

approval of this proposed settlement.

<div style="margin-left: 40%;">

Plaintiff, Aileen Culpepper, individually and
on behalf of all similarly situated individuals


By:     /s/ *Thomas J. Durkin*
        Thomas J. Durkin, Esq.
        The Hayber Law Firm, LLC
        750 Main St., Suite 904
        Hartford, CT 06103
        Fed No.: ct30371
        (860) 522-8888 (telephone)
        (860) 218-9555 (facsimile)
        tdurkin@hayberlawfirm.com
        Attorney for the Plaintiff

</div>

**CERTIFICATION OF SERVICE**

I certify that on **October 11, 2019,** the foregoing **Plaintiff's Memorandum in Support of Unopposed Motion for Approval of Collective Action Settlement** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing.  Parties may access this filing through the Court's CM/ECF system.

*/s/ Thomas J. Durkin*
Thomas J. Durkin

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **AILEEN CULPEPPER, individually and on behalf of all other similarly situated individuals,** | : : : : | **CIVIL ACTION NO.:** |
| **Plaintiff** | : : : | |
| **V.** | : : | **3:17-cv-00264-VAB** |
| **BANK OF AMERICA, NATIONAL ASSOCIATION** | : : : : | |
| **Defendant** | : : | **October 11, 2019** |

<u>**AFFIDAVIT OF THOMAS J. DURKIN, ESQ.**</u>

I, Thomas J. Durkin, Esq., affirm the following under penalty of perjury:

1) I am over the age of eighteen (18) and understand the obligations of an oath.

2) I make the following statements from my personal knowledge.

3) I am an associate attorney at Hayber, McKenna & Dinsmore, LLC ("HMD"), f/k/a the Hayber Law Firm ("HLF"). I am co-counsel for Plaintiff in this case against Bank of America, N.A. ("BANA").

4) I have reviewed and examined HMD's billing records for this case. HMD's full lodestar as of September 4, 2019 is $165,551.00. This amount does not include work performed after September 4, 2019. As of September 4, 2019, HMD's costs are $5,827.56.

5) BANA has agreed to pay $190,000 for Plaintiff and the opt-in collective to settle their claims. I calculate that this amount will pay Plaintiff and the opt-in collective 100% of the unliquidated and liquidated damages they could have recovered if they prevailed on all their claims at trial and through an appeal.

6) According to HMD's calculations, which I reviewed and examined, the maximum total recovery for the collective members, inclusive of unliquidated and liquidated damages would be approximately $75,644.39.

7) Plaintiff calculated each Opt-in's damages by determining their overtime rate (multiplying their hourly rate by 1.5) and then multiplying their overtime rate by 1.25 hours (assuming fifteen minutes of unpaid work per day for five days a week (5 x .25 hrs. = 1.25)) and then multiplying that figure by the weeks in the period of their claim.

8) I negotiated this settlement after careful review of the documents and information produced by BANA, including personnel records, timekeeping records, and payroll data. After taking into account that information, and the risks attendant with continued litigation and BANA's asserted defenses to liability and certification, including but not limited to the following, whether BANA violated the FLSA and state wage laws, whether any alleged violations of the FLSA were willful, whether the Plaintiff and Opt-ins are entitled to the damages they claim, whether it is appropriate to maintain this case as a collective (or possibly class) action, the parties agreed to a gross settlement of $190,000.00.

Thomas J. Durkin, Esq.

SWORN AND SUBSCRIBED BEFORE ME ON THIS 11th DAY OF OCTOBER 2019

Notary Public

My Commission Expires:

Donna M. Mahner
Notary Public-Connecticut
My Commission Expires
August 31, 2024

2